UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANDREW BLAIR HOWARD,

    Defendant.

_____/

No. 1:23-mj-00230

Hon. Ray Kent
United States Magistrate Judge

## GOVERNMENT'S TRIAL BRIEF

On August 15, 2022, the defendant used a shovel to dig part of a trench/channel in the Platte River in Sleeping Bear Dunes National Lakeshore and stacked large rocks on a dam to divert the river's natural water flow toward the channel. The result was an unauthorized diversion of the river as it emptied into Lake Michigan. The diversion resulted in destruction to wetlands and wildlife, and losses—some immeasurable—to the public and the National Park Service. The evidence will show that in taking these actions, the defendant tampered with and vandalized property of the National Park Service.

In advance of the final pretrial conference, the United States respectfully submits this trial brief to provide a summary of the facts the government intends to prove at trial and to highlight legal issues that may arise.

1

I.  **Factual Background**

A. **Background Regarding Dredging of the Platte River and Salmon Fishing Access**

Sleeping Bear Dunes National Lakeshore is a U.S. national lakeshore in the northwestern Lower Peninsula of Michigan; the park extends along an approximately 35-mile stretch of Lake Michigan's eastern coastline. The Platte River flows through the Sleeping Bear Dunes National Lakeshore for about four miles before it empties into Lake Michigan. In the summer, the river is heavily used by paddlers, tube floaters, and beachgoers (at the mouth of the river where it empties into Lake Michigan). A boat launch ramp is owned and managed by the Benzie County Road Commission next to federal land on the east side of the Platte River. The boat ramp does not launch directly into Lake Michigan; a boater would need to navigate through the Platte River after launching to access the Platte Bay, which is a portion of Lake Michigan. Several other recreational boat accesses to Lake Michigan exist within 20 miles, with boat ramps in Empire and Glen Arbor, and more extensive marina facilities in Frankfort. However, it is generally understood by National Park Service (NPS) that this Platte River area is preferred by salmon anglers for its proximity to the fall salmon fishing in Platte Bay and the Platte River, as launching at these other launches further away is not as efficient.

Dredging from the boat ramp through the river mouth was performed regularly by the NPS or the State of Michigan beginning in 1960s. Beginning around 2016, the NPS prepared the Platte River Mouth Restoration and Access Plan and associated environmental assessment (EA). Through their assessment and the public comment

process, NPS selected the preferred alternative in the EA to stop dredging the river, and that the area would be restored to its more natural, pre-dredging conditions. This decision to stop the dredging was and continues to be controversial in Northern Michigan.

Without dredging, sediment and sand builds up at the mouth of the Platte River that reduces boaters' ability to navigate through the Platte River into Platte Bay (in Lake Michigan). The Platte River and the Platte Bay are known for their presence of coho salmon. The salmon are in Lake Michigan throughout the summer, and then move with the "salmon run" in August and September where they "run" up the Platte River. Many fisherman fish the river for salmon, but fisherman also like to fish in Platte Bay before the "run." In summary, when the Platte River is not dredged, fishing boats have difficulty accessing Platte Bay to fish because of the shallow conditions and sediment build-up. When the area is dredged, fishing boats can more easily access the Platte Bay from the nearby boat launch located on the banks of the Platte River.

The following aerial photograph, taken in May of 2022, shows the natural flow of the un-dredged Platte River meandering approximately parallel to Lake Michigan/the Platte Bay (on the right) before it empties into Lake Michigan further down the river. The government anticipates trial testimony confirming that this was the flow of the river in August 2022 before the events of this case on or about August 15, 2022.



It is against this background regarding the controversial history of dredging the Platte River that the events of this case occurred.

**B. August 15, 2022 – Andrew Howard**

On August 15, 2022, NPS investigated a diversion of the Platte River involving a change in its natural course of flow. When the NPS Ranger approached the area, he saw a man later identified as Andrew Howard, a local fisherman, digging in a trench or channel with a shovel so that the river would empty out into Lake Michigan. He also observed Howard adding rocks to a dam in the river to divert the river's water toward the new trench/channel, as shown in the body camera footage below:

4



The government anticipates it will admit the NPS Ranger's body camera footage showing the defendant at the river that day and his statements regarding his actions. When an NPS officer confronted the defendant, he said he was "trying to get a better access" because that morning he had issues with navigating his boat on the river. Moving the rocks in this manner channeled more water at a faster rate of flow through the dredged channel/trench and cut a deeper section for water to flow, which would allow fishing boats to more easily get through shallow or slow sections of the Platte River to access the Platte Bay in Lake Michigan, where coho salmon congregated. The defendant stated he caught his first coho salmon of the season that day. The newly created channel allowed fishing boats to have greater access to the waters of the Platte Bay in Lake Michigan, like they did before when the area was previously dredged by NPS or the State of Michigan. The diversion that occurred on or about August 15, 2022 was in the same approximate location where NPS and the State of Michigan historically dredged.

In his conversation with the Ranger, the defendant claimed he did not dig the trench that led out to Lake Michigan, even though the Ranger told him he had just watched him do it with the shovel the defendant had nearby. When further questioned, the defendant claimed that he "came down today with the intention of shoveling that very trench, but I didn't do it." In the same conversation, the defendant later admitted that he did not think his boat could physically navigate the river that day, "that's why [he] got pretty determined … so [he] took [his] shovel and [he] just kept, all [he] was doing was trying to keep enhancing it and throwing these rocks to try to make it go that way . . . ."

Within days, the natural power of the water and the constructed dam caused the river to divert and created a new channel to Lake Michigan that grew to approximately 200 feet wide. It stayed approximately that wide for the summer and fall season. There was then an influx in the number of fishermen that came to Platte River boat launch to take advantage of the favorable conditions of access created by the new channel.

Below are side-by-side aerial images from before the diversion taken in May 2022 and after the diversion taken on August 19, 2022. On the top left corner of the left image is a gray parking lot area where the boat launch is located. The created trench or channel allowed the fishing boats using the boat launch to access Platte Bay in Lake Michigan, which is seen on the right in both photographs.



*May 2022*                                                          *August 19, 2022*

On May 23, 2023, the government filed a Class B Misdemeanor Information against Howard for charges of tampering and vandalism under Title 36 C.F.R. § 2.31. Howard has been on bond pending resolution of his case. On February 7, 2024, Howard will stand trial before this Court.

## II.    APPLICABLE LAW AND ELEMENTS OF THE OFFENSE

36 C.F.R. Chapter I generally contains regulations regarding the National Park Service and Department of the Interior. 36 C.F.R. § 2.31(a) has separate sub-sections to prohibit five different acts within park areas: trespassing, tampering, vandalism, harassment, and obstruction. Howard is charged by Class B Misdemeanor Information with one count of tampering (Count 1) and one count of vandalism (Count 2), under Title 36 C.F.R. § 2.31(a)(2) and (3) respectively. Those charged provisions provide the following acts are prohibited:

7

**(2)    Tampering.**  Tampering or attempting to tamper with property or real property, or moving, manipulating or setting in motion any of the parts thereof, except when such property is under one's lawful control or possession.

**(3)    Vandalism**.    Destroying, injuring, defacing, or damaging property or real property.

Title 36 C.F.R. § 2.31(b) further provides, "The regulations contained in this section apply, regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the United States."  36 C.F.R. further states that it applies to all persons within the boundaries of federally owned lands and waters administered by the National Park Service and all persons within navigable waters located within the boundaries of the National Park System, without regard to ownership of submerged lands.  36 C.F.R. 1.2(a)(1) and (3).

There are no Sixth Circuit pattern jury instructions outlining the elements of the offense.  One court has explained, "to obtain a conviction under this section, the Government must prove beyond a reasonable doubt that [defendant] tampered with property that was not under his lawful control or possession and did so on National Park land."  *United States v. Long*, No. 1:09-CR-14 AWI, 2009 WL 4052713, at *4 (E.D. Cal. Nov. 19, 2009).  Therefore, the elements of the offense can be summarized with reference to the text of the C.F.R. provisions as follows:

| Count | Element 1 | Element 2 |
|---|---|---|
| **Count 1**<br>**36 C.F.R. § 2.31**<br>**(a)(2), Tampering** | • Defendant tampered or attempted to tamper with property or real property; or<br>• moved, manipulated, or set in motion any of the parts thereof . . .<br><br>except when such property is under one's lawful control or possession. | The offense occurred on lands or waters within a park area that is under the legislative jurisdiction of the United States. |
| **Count 2**<br>**36 C.F.R. § 2.31**<br>**(a)(3), Vandalism** | Defendant destroyed, injured, defaced, or damaged property or real property. | |

Title 36 C.F.R. § 2.31 is a divisible regulation prohibiting five separate acts (trespassing, tampering, vandalism, harassment, and obstruction) because it "set[s] out one or more elements of the offense in the alternative," "thereby defin[ing] multiple crimes." *See United States v. Burris*, 912 F.3d 386, 393 (6th Cir. 2019). As such, it is the government's position that if the evidence demonstrates defendant committed both crimes of unauthorized tampering and vandalism, he can be convicted of each separate crime under the divisible statute.

Where, as here, a provision does not define a term, courts generally "give the term its ordinary meaning" and "dictionaries are a good place to start to identify the range of meanings that a reasonable person would understand" a word to have. *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021). The following are the ordinary meanings of various terms found in the C.F.R. provisions at issue:

- **Tamper:**

    - "[t]o meddle or interfere with (a thing) so as to misuse, alter, corrupt, or pervert it." TAMPER, Oxford English Dictionary, *available at* https://www.oed.com/.

    - "[t]he act of altering a thing . . ." TAMPERING, Black's Law Dictionary (11th ed. 2019).

- **Injure:**

    - "[t]o do hurt or harm to; to inflict damage or detriment upon; to hurt, harm, damage; to impair in any way." INJURE, Oxford English Dictionary, *available at* https://www.oed.com/.

- **Deface:**

    - "[t]o mar the face, features, or appearance of; to spoil or ruin the figure, form, or beauty of; to disfigure." DEFACE, Oxford English Dictionary, *available at* https://www.oed.com/.

    - "[t]o mar or destroy ... by obliteration, erasure, or superinscription; to spoil the surface or appearance of ... [t]o mar or injure (a building, monument, or other structure). DEFACE, Black's Law Dictionary (11th ed. 2019).

- **Damage:**

    - "[t]o do or cause damage to; to hurt, harm, injure; now commonly to injure (a thing) so as to lessen or destroy its value." DAMAGE, Oxford English Dictionary, *available at* https://www.oed.com/.

The government anticipates it will argue at trial that the defendant violated 36 C.F.R. § 2.31(a)(2) ("the tampering provision") because he both tampered with and moved, manipulated, or set in motion the property of the Platte River. The defendant also violated 36 C.F.R. § 2.31(a)(3) ("the vandalism provision") because he injured, defaced, and damaged the property. The defendant marred the appearance of and ruined the figure and form of the river and its banks.

The C.F.R. provisions do not require any heightened mental state, and therefore it can be presumed to be a general intent provision. *See United States v. Veach*, 455 F.3d 628, 632 (6th Cir. 2006) ("[w]here a statute does not specify a heightened mental element such as specific intent, general intent is *presumed* to be the required element.") (emphasis in original).

For purposes of trial elements and conviction under 36 C.F.R. § 2.31, the government need not prove any specific amount of injury, tampering, damage to its property. *Compare* 18 U.S.C. 1361 (establishing felony offense for injury to government property where the damage or attempted damage "exceeds the sum of $1,000 . . ."). Nor does the C.F.R. require the defendant to *act alone* or be the sole person who tampered or vandalized property. To the extent defendant argues, like he did when confronted by the NPS Ranger, that he was merely "enhancing" the newly created trench that someone else made by shoveling and damming the river with rocks, it is immaterial under the provisions whether other uncharged individuals also acted illegally to dredge the river. All that matters for purposes of the charges against Howard is that the defendant tampered with or vandalized National Park Service property. Moreover, it is irrelevant whether the damage is permanent or curable. *See United States v. Nieves*, No. 18-CR-835 (OTW), 2019 WL 1315940, at *3–4 (S.D.N.Y. Mar. 22, 2019) ("The Court does not read these definitions as implying an element of permanence . . . Curability is irrelevant."); *see also Mahoney v. Doe*, 642 F.3d 1112, 1119 (D.C. Cir. 2011) (affirming decision that different defacement statute applies to use of chalk and reasoning "[i]t is true, the

11

defacement at issue is temporary and can be cured . . . [t]he government can proscribe even temporary blight").

A person convicted of § 2.31 (a Class B Misdemeanor) is subject to a term of imprisonment of up to six months. *See* 36 C.F.R. § 1.3(a) (citing to penalties contained in 18 U.S.C. § 1865(a)). As a Class B Misdemeanor, a bench trial before the Court is appropriate, as there is no right to a jury trial. *See* F.R. Crim. Pro. 58(b)(2)(F).

### III. LEGAL AND EVIDENTIARY ISSUES

#### A. Witnesses

The government intends to offer the testimony of witnesses largely consisting of National Park Service Rangers and lay witness observers who were vacationing at the Platte River on August 15, 2022.

The government does not intend to call any expert or opinion witnesses. Because the government need not prove any specific amount of damage to the property, it anticipates it will not quantify any such damages at the trial stage, but rather present testimony or evidence of that nature (including potentially from a hydrologist who examined the site) at any sentencing or restitution proceedings.

#### B. Evidence and Proposed Stipulation

Absent a stipulation, the government intends to present witness testimony regarding the second element—that the offense occurred on lands or waters within a park area that is under the legislative jurisdiction of the United States. In an effort to streamline proceedings, the government has presented the following proposed stipulation regarding the jurisdictional elements to defense counsel:

12

Defendant's actions at issue in this matter—which occurred on or about August 15, 2022—occurred within the boundaries of the Sleeping Bear Dunes National Lakeshore, which is a park area controlled by the National Park Service and under the legislative jurisdiction of the United States.  The actions at issue occurred in Benzie County, in the Southern Division of the Western District of Michigan.

To streamline proceedings, the government has also presented a proposed stipulation regarding the admissibility of various aerial photographs of the Platte River area at issue in this case, including the photographs contained within this trial brief.  This stipulation would allow for the streamlining of the proceedings and witnesses as it relates to the foundation for admission of these exhibits.

        Respectfully submitted,

        MARK A. TOTTEN
        United States Attorney

Dated: January 16, 2024        */s/ Lauren F. Biksacky*
        LAUREN F. BIKSACKY
        Assistant United States Attorneys
        P.O. Box 208
        Grand Rapids, MI 49501-0208
        (616) 456-2404