<pre>
 1                   IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5                 Plaintiff,          No: 1:23mj230

 6       vs.

 7      ANDREW BLAIR HOWARD,

 8                 Defendant.

 9

10      Before:

11                        THE HONORABLE RAY KENT
                          U.S. Magistrate Judge
12                        Grand Rapids, Michigan
                       Wednesday, February 7, 2024
13                       Bench Trial Proceedings

14      APPEARANCES:

15                 MR. MARK A. TOTTEN, U.S. ATTORNEY
                   By:  MS. LAUREN BIKSACKY
16                 330 Ionia Avenue, NW
                   Suite 501
17                 Grand Rapids, MI 49503
                   (616) 456-2404
18
                           On behalf of the Plaintiff;
19
                   MR. ANTHONY J. VALENTINE
20                 227 Federal Square Building
                   29 Pearl Street, NW
21                 Grand Rapids, MI 49503
                   (616) 288-5410
22
                           On behalf of the Defendant.
23
                   Also Present:  Scott Dekkers, NPS Officer.
24                                 Kristen Kol & Stephanie Miller,
                                   US Attorney Paralegals.
25
        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
</pre>

1       02/07/2024

2       (Proceedings, 9:01 a.m.)

3            THE CLERK:  The United States District Court for the

4       Western District of Michigan is now in session.  The Honorable

5       Ray Kent, United States Magistrate Judge, presiding.  All

6       persons having business before this Court draw near, give

7       attention and you shall be heard.  God save these United States

8       and this Honorable Court.  Please be seated.

9            THE COURT:  This is 23mj230, United States versus

10      Andrew Howard.  Ms. Biksacky appears on behalf of the United

11      States.  Mr. Valentine on behalf of Mr. Howard.  We are here

12      for the first day of trial set in this matter.  Mr. Howard is

13      charged with two offenses.  Count 1 -- let me -- let me find

14      the information, which I thought I had organized so perfectly.

15      All right.  Count 1 the government charges him with tampering.

16      The government claims that on/or about August 15, 2022, in

17      Benzie County, in the Southern Division of the Western District

18      of Michigan, Andrew Blair Howard attempted or attempted to

19      tamper with property or real property or moved, manipulated or

20      set in motion any of the parts thereof in waters subject to the

21      jurisdiction of the United States located within the boundaries

22      of the National Park System, specifically within the boundaries

23      of Sleeping Bear Dunes National Lake Shore.

24           Count 2 charges vandalism on that same date and in the

25      same place.  The government claims that Mr. Howard destroyed,

injured, defaced and damaged property or real property in the park.

All right.  I understand there may be some preliminary matters the parties want to talk about.

MS. BIKSACKY:  Yes, Your Honor, a few matters.  The parties have been in contact with chambers regarding a witness who has COVID.  I wanted to give the Court an update.  That witness did test negative.  She is out of her quarantine period and did test negative and would defer to the Court on whether she should wear a mask still or whether she can unmask?

THE COURT:  I just had COVID again recently despite the fact I have had every shot known to mankind, so I am okay with her being unmasked.  If I change my mind I'll let you know.

MS. BIKSACKY:  One of our witnesses is a minor.  I have been in touch with the court reporter, and the proposed method of dealing with that is to change the transcript to reflect the initials of the minor, however, Mr. Brandell does need permission on the record from the Court to do so.

THE COURT:  Mr. Brandell, you have permission.

MS. BIKSACKY:  The parties have two separate sets of trial stipulations.  One, the first set, ECF No. 12, was filed last Wednesday.  That has a jurisdictional stipulation as well as stipulations regarding the government's trial exhibits.  The second set of stipulations, ECF No. 14, addresses admissibility

1      of the Defendant's exhibits.  The versions filed with the Court

2      did not have wet signatures from the Defendant.  We have both

3      of them now signed with wet signatures, and after the trial we

4      would be able to upload those to the docket just so that there

5      is no confusion that these were signed and agreed to by the

6      Defendant.

7              THE COURT:  All right.

8              MS. BIKSACKY:  And with respect to the stipulations,

9      the parties have spoken, and if the Court agrees, it would be

10     our intention to make reference at the beginning of proofs to

11     the stipulations and to admit all of the exhibits in the case.

12     These stipulations cover all of the government's exhibits and

13     all of the Defendant's exhibits.  We have reached agreement on

14     all of them.  So there should be no objections or arguments

15     about any of the exhibits, but we were not sure about the

16     Court's preference, if you would like us to read them in the

17     record at the beginning of proofs.  They are several pages each

18     and most refer to evidentiary issues, or if the Court would

19     simply like to reference the fact that the stipulations are

20     part of the Court record?

21             THE COURT:  That was what I intended to do.  The

22     parties have stipulated to admission of all the exhibits in the

23     case and so they are deemed admitted.

24             MS. BIKSACKY:  Thank you, Your Honor.

25             With that, the government has nothing further.

1          THE COURT:  All right.  There is another stipulation,

2    and that goes to one of the elements of the offense, the second

3    element of both offenses.  The parties have stipulated -- I am

4    just going to read it into the record that, quote, Defendant's

5    actions at issue in this matter, which occurred on/or about

6    August 15, 2022, occurred within waters subject to the

7    jurisdiction of the United States located within the boundaries

8    of the National Park System, Sleeping Bear Dunes National

9    Lakeshore, which includes navigable waters in areas within

10   their ordinary reach.  The actions at issue occurred in Benzie

11   County in the Southern Division of the Western District of

12   Michigan.  The government won't have to offer any proof with

13   respect to that element of either offense.

14          Anything else we should talk about while -- before we

15   get started, Mr. Valentine?

16          MR. VALENTINE:  No, Your Honor.  Thank you.

17          THE COURT:  Ms. Biksacky?

18          MS. BIKSACKY:  Nothing further.  Thank you.

19          THE COURT:  All right.  Ms. Biksacky, the burden of

20   proof is on you.  The floor is yours.

21          MS. BIKSACKY:  I would ask Your Honor would the Court

22   like openings statements?  I am ready to give one, but I know

23   that since this is a bench trial it's not always necessary.

24          THE COURT:  Do you have a -- if the parties want to do

25   a short opening I am happy to listen, but I am happy also to

1    just get right to the evidence.

2            MR. VALENTINE:  We have no opening.  We are prepared

3    to get moving on this, Your Honor.  Thank you.

4            THE COURT:  Okay.

5            MS. BIKSACKY:  I am also prepared.  Yes, Your Honor,

6    we will call National Park Service Law Enforcement Officer

7    Logan Bahm.

8            LOGAN BAHM, GOVERNMENT

9            having been first duly sworn, testified as follows:

10           (Witness sworn, 9:08 a.m.)

11                 DIRECT EXAMINATION

12   BY MS. BIKSACKY:

13   Q    Good morning.  Would you please introduce yourself to the

14   Court?

15   A    Good morning.  My name is Logan Bahm.  Currently employed

16   by the National Park Service stationed at Yellow Stone National

17   Park.

18   Q    And when you say you are currently employed by the National

19   Park Service, what is your title or job?

20   A    I am a law enforcement officer at Yellow Stone National

21   Park.

22   Q    In August of 2022, where were you stationed?

23   A    In August of 2022, I was a seasonal law enforcement officer

24   with the National Park Service stationed at Sleeping Bear Dunes

25   National Lakeshore.

1    Q     And what is Sleeping Bear Dunes National Lakeshore?

2    A     Sleeping Bear Dunes National Lakeshore is several thousand

3    acres of federal land west of Traverse City with several miles

4    of Lake Michigan shoreline as well as two islands off of the

5    coast.

6    Q     Is Sleeping Bear Dunes National Lakeshore managed by the

7    National Park Service?

8    A     It is.

9    Q     Where within Sleeping Bear Dunes were you stationed in

10   August of 2022?

11   A     I was currently -- well, I was stationed at the Platte

12   River District.

13   Q     And what does it mean that it's the Platte River District?

14   A     The Platte River District covers the southern half of the

15   Sleeping Bear Dunes National Lakeshore with several miles of

16   the Platte River running through it.  About three to four.

17   Q     How long have you worked for the National Park Service?

18   A     In total approximately two to three years.

19   Q     And what are your general responsibilities as a law

20   enforcement officer for the National Park Service?

21   A     Detect and investigate crimes against property, people and

22   national resources in the national park units.

23   Q     So you mentioned that Sleeping Bear Dunes includes portions

24   of the Platte River.  Can you describe generally where Sleeping

25   Bear Dunes includes the Platte River?

1    A    Sleeping Bear Dunes includes the mouth of the Platte River

2    entering Lake Michigan in Platte Bay.  Approximately, again,

3    three to four miles upstream until it exits the park and

4    continues on.

5    Q    And so you mentioned where it empties into Lake Michigan

6    and the Platte Bay, can you explain the relationship between

7    Lake Michigan and the Platte Bay?

8    A    The same body of water, however, just a name that kind of

9    covers a safer harbor, a national harbor of water.

10   Q    In terms of visitation, how busy is the Platte River in the

11   summer season?

12   A    Extremely busy during the months of June, July and August.

13   Several thousand vehicles per month, up to 90,000 visitors per

14   month.  It's probably our busiest area in the national lake

15   shore on a busy weekend.

16   Q    And what kind of recreation is common in the Platte River

17   or the Platte Bay area?

18   A    In the Platte River, Platte Bay area we have many different

19   users.  However, kayaking, paddling, canoeing, fishing and

20   hiking as well as beach goers.

21   Q    What type of fishing is common in the area?

22   A    Fishing for salmon is the predominant use, coho salmon.

23   Q    And approximately when is coho salmon season?

24   A    Typically late summer and throughout the fall months.

25   Q    Is there a boat launch for the fishermen to use?

1    A    There is.  In the park at the Lake Michigan launch ramp.

2    Q    And if we could please pull up Exhibit 1?  What are we

3    looking at here?

4    A    This image shows the Lake Michigan launch ramp at the top

5    left of the screen as well as the Platte River running along a

6    side and parallel to Platte Bay.

7    Q    Is this region, does it have a name that you refer to it

8    as?

9    A    Commonly known as Platte Point.

10   Q    And you mentioned Lake Michigan is to the right.  Does that

11   also include Platte Bay that you have been discussing?

12   A    It -- it does.  Correct.

13   Q    This photo is taken in May of 2022, correct?

14   A    Correct.

15   Q    Can you generally describe the flow of the river at that

16   time in May of 2022 when the photo was taken?

17   A    It flows from the top left of the screen downstream until

18   it runs parallel to the Platte Bay, and then exits down towards

19   the bottom of the screen.

20   Q    So on this photo I don't see where the river actually exits

21   into Lake Michigan.  Could you describe where off the photo it

22   would exit?

23   A    Several hundred feet down from that photo.

24   Q    How would the National Park Service describe the flow of

25   the river in May of 2022?

1    A    Describing it sort of slow meandering at a slow pace.

2    Q    So you mentioned that there was a boat launch at the top

3    left of the screen near the -- near the gray parking area.  Was

4    there an easy way for boaters to move from the boat launch to

5    Lake Michigan?

6    A    Ease of access was limited, and it would restrict some

7    type -- some types of vessels.

8    Q    So if a boater wanted to launch at that boat launch and get

9    into Lake Michigan how would they do it?

10   A    They would potentially have to get out of their boat, walk

11   their boat down river.  If they were unable to, often times

12   they would have to turn around and relaunch somewhere else.

13   Q    And why is that?  Why were they unable to often make it out

14   to the lake?

15   A    Sediment buildup was typically high in this area with the

16   amount of rocks and sediment that would build up along the

17   banks of the river.  Ease of access was difficult due to the

18   depth.

19   Q    Are there other nearby boat launches in the area that

20   fisherman could use to get out to the Platte Bay easily?

21   A    There are.  There are several boat launches in Empire as

22   well as more developed boat launches in Leeland and Frankfort.

23   Q    And approximately how far away are those boat launches?

24   A    Potentially -- from Frankfort to Platte Bay potentially up

25   to 30 minutes.

1    Q    Okay.  And so --

2         MR. VALENTINE:  I'm sorry.  I didn't hear how long;

3    how far?

4         THE WITNESS:  Potentially up to 30 minutes.

5         MR. VALENTINE:  Thanks.

6    BY MS. BIKSACKY:

7    Q    And so if a boater was unable to access the Platte Bay from

8    this boat launch depicted, they would have to go potentially up

9    to 30 minutes to another nearby boat launch?

10   A    Correct.

11   Q    So why is the area of the Platte River and Platte Point

12   significant for coho salmon?

13   A    This area is in one of the areas of the first salmon fish

14   hatcheries at the Platte River introduced in the 1960s.  Coho

15   salmon became -- rapidly became part of the fishing culture in

16   Michigan.  In the late 1960's, 1967, there was a large storm

17   with many salmon fishermen caught out in the -- in Platte Bay.

18   This led to seven fatalities after that storm.  In years after

19   that storm dredging operations had started on the Platte River

20   to have fishermen gain easier access.

21   Q    So let's break that down.  After a significant storm with

22   fatalities you said dredging operations began on the Platte

23   River.  What did those dredging operations look like?

24   A    Dredging operations looked like taking large heavy

25   machinery out into the river and scraping out the bottomlands

1   of that river and basically channelizing so boaters and

2   fishermen could have easier, straighter access to that river

3   for safer harbor.

4   Q    Okay.  And so when you say easier access, essentially a

5   portion of the barrier between the Platte River and Lake

6   Michigan was opened up so that there was a more direct route

7   from the boat ramp to the lake?

8   A    Correct.

9   Q    And it doesn't look from this photo to me that the river is

10  dredged in May of 2022.  Was the river dredged in May of 2022?

11  A    It was not.

12  Q    So what can you tell me briefly about the history of the

13  dredging of the river?

14  A    So after that storm dredging operations started on the

15  Platte River either by the state or the National Park Service

16  until the year of 2013, and in 2014 and '15, due to some

17  circumstances, lower water levels, dredging operations did not

18  occur in those years.  However, in 2016, that was the last year

19  that dredging occurred on the Platte River.

20  Q    Okay.  So since 2016 the government has not dredged access

21  for boaters to go from the boat ramp to Lake Michigan?

22  A    Correct.

23  Q    And do you have a general understanding of why the decision

24  was made not to dredge?

25  A    The spoils of the dredging operations were piled up along

1    Platte Point on either side.  The park service in the 2010s

2    started environmental assessment impacts as well as several

3    other reviews of the area.  The decision was made to restore

4    fluvial flows of the river and restore those natural states of

5    the river to appease aesthetic as well as endangered habitat

6    for piping plovers as well.

7    Q    Was the decision for the government not to dredge

8    controversial in the area?

9    A    I believe the decision was open to public comment and there

10   were split comments.  Roughly half for or against.

11   Q    So some people in the area were not happy with the

12   government's decision to stop dredging, is that fair to say?

13   A    Correct.

14   Q    Looking at Government's Exhibit 1, this was from May of

15   2022, but are you familiar with what -- what generally the

16   river looked like in early August of 2022?

17   A    It looked similar to this picture.

18   Q    Okay.  So to be clear, in early August of 2022, there was

19   no channel or no dredge out to Lake Michigan at Platte Point?

20   A    Correct.

21   Q    Where were you working now, switching gears, on August

22   15th, 2022?

23   A    On August 15th, 2022, I was working in the Platte River

24   District on general patrol.

25   Q    And did anything significant happen that day?

A     On that day I was called to investigate reports from a
reporting party at Platte Point that vessels were traveling the
river.  The concerns of the reporting party were that some of
these boaters were coming close with beach goers and swimmers
in the river.

Q     And looking at Exhibit 1, is that the same general area
that you investigated on August 15th?

A     It is.

Q     Where were you investigating in relation to the boat launch
in the upper left corner?

A     I parked my vehicle at the boat launch and traveled in this
picture to the right out towards Platte Point where that bend
in the river occurs.

Q     And when you arrived out toward Platte Point what did you
observe?

A     I observed that there was a sort of channelization or an
opening in the river that had occurred basically diverting flow
of the water out to Platte Bay.

Q     Where were you observing this from?

A     I was observing this from Platte Point along the beach on
the bank of the Platte River.

Q     So you mentioned you observed a diversion.  Did you observe
any individuals that were of interest to your investigation?

A     I observed an individual with a shovel digging at the far
bank of the Platte River scraping away sediment so that it

1    would fall into the river and be carried out towards Lake

2    Michigan.

3    Q    Do you know approximately when you first observed this

4    person digging?

5    A    Approximately 18:20 hours.

6    Q    And what did you do after you saw this person digging?

7    A    After observing for a few minutes I was able to return back

8    to my vehicle, make a phone call to my supervisor, and kind of

9    formulate a plan in an attempt to investigate this further.

10   Q    And after speaking to your supervisor, what did you do?

11   A    After instruction was made to attempt to identify the

12   individual I returned to an observation point along the Platte

13   River and observed for several more minutes.

14   Q    If we could please pull up Government Exhibit 3?  What is

15   Government Exhibit 3?

16   A    Government Exhibit 3 is a viewpoint from the observation

17   point I was located in with a view out towards the new channel

18   that had been made in the Platte River with an individual

19   standing on the middle of the -- of the former channel.

20   Q    And if you could please use a laser pointer to point out?

21   You have been mentioning a diversion.  Where is the diversion

22   on this?

23   A    So this would be the diversion of the location of the new

24   outflow towards Lake Michigan.

25   Q    So prior to when you approached on August 15th, you had not

1    seen an outflow to Lake Michigan at that area?

2    A    I had not.

3    Q    And you patrol that area regularly as part of your duties?

4    A    I do.

5    Q    You mentioned you were observing from this point.  Did you

6    approach the diversion at some point?

7    A    I did approach the diversion and the individual.

8    Q    Were you wearing a body camera?

9    A    I was.

10   Q    Have you reviewed the body camera footage prior to today?

11   A    I have.

12        MS. BIKSACKY:  If we could please play Government

13   Exhibit 2A?

14           (Video started, 9:23 a.m.)

15           (Video stopped, 9:23 a.m.)

16   BY MS. BIKSACKY:

17   Q    And I see at the top right of this body camera there is a

18   timestamp that says 22:54.  Have you verified whether that time

19   is accurate?

20   A    That time is accurate.  It is in coordinated universal

21   time.  So in eastern standard time this would be approximately

22   18:53 or exactly 18:54 hours.

23   Q    And what did we just observe in this clip with respect to

24   your approach?

25   A    I approached initially staying off for several seconds just

1    in more of an observation phase.  Additionally the individual

2    in the khaki shorts or khaki shirt and black shorts was lifting

3    a rock at this time.

4    Q    And to be clear, you have been speaking about an individual

5    that was digging when you first observed.  Is that the same

6    person that's now shown in the video stacking rocks?

7    A    This is.  Yes.

8            MS. BIKSACKY:  If we could play Government's Exhibit

9    2B?

10           (Video started, 9:24 a.m.)

11           (Video stopped, 9:25 a.m.)

12   BY MS. BIKSACKY:

13   Q    At the end of the clip a person says, I think I am making

14   some headway though.  At some point were you able to identify

15   who said that?

16   A    Yes.  I was.

17   Q    And who said it?

18   A    Mr. Howard.

19   Q    So to be clear, we haven't yet spoken about Mr. Howard.  At

20   some point did you identify the individual in the khaki shirt

21   and the black shorts as Andrew Howard?

22   A    I did.

23   Q    How did you identify him?

24   A    During this interview by driver's license number as well as

25   first and last name.

1  Q    Do you see the man that you observed digging in the river

2  and moving rocks in the courtroom here today?

3  A    I do.

4  Q    Could you please describe what he is wearing?

5  A    He is wearing a dark colored suit with a red and plaid tie.

6       MS. BIKSACKY:  Let the record reflect that the witness

7  has identified the Defendant as the person he saw moving rocks.

8       MR. VALENTINE:  No objection, Your Honor.

9       THE COURT:  It will reflect so.

10 BY MS. BIKSACKY:

11 Q    Did you see anyone else other than the Defendant moving

12 rocks or shoveling?

13 A    I did not.

14 Q    Was the man still holding the shovel when you approached

15 him?

16 A    He was not.  The shovel is seen placed on the bank of the

17 shore there with the same descriptors that I saw earlier.

18 Q    Was there anything else on the bank of the shore near the

19 shovel?

20 A    Next to a shovel is a 16-ounce Miller Lite can.

21      MS. BIKSACKY:  If we could play Government's Exhibit

22 2C, please?

23           (Video started, 9:26 a.m.)

24           (Video stopped, 9:26 a.m.)

25 BY MS. BIKSACKY:

1    Q    So why did you respond the way you did when he said that he

2    didn't dig the trench?

3    A    Initially I was attempting to get more information out of

4    Mr. Howard in an attempt to start the interview process and get

5    Mr. Howard to speak on why he was there.

6    Q    Did you see him digging near the trench?

7    A    I did.

8    Q    And was that with a shovel?

9    A    It was.

10   Q    And can you please use the laser pointer to highlight the

11   general area where you saw?

12        THE COURT:  I am a little concerned about Mr. Brandell

13   and the laser.  Can you just be very careful that you not rake

14   him with the laser?

15        THE WITNESS:  Yup.  Towards this bank on the new

16   diversion, just left out of the screen on this photo.

17        MS. BIKSACKY:  If we could please play Government's

18   Exhibit 2D?

19             (Video started, 9:28 a.m.)

20             (Video stopped, 9:28 a.m.)

21   BY MS. BIKSACKY:

22   Q    So the Defendant again said that he was adding to the

23   trench.  How did that inform your investigation?

24   A    That was correct.  I did not see him channel the entire

25   trench through towards Lake Michigan.  However, the individual,

1    Mr. Howard, was digging so that the river appeared to have

2    easier flow out towards Lake Michigan without having to travel

3    around the bend towards the former outlet into the lake.

4    Q    And was that consistent with his statements regarding

5    access?

6    A    This was.  Yes.

7            MS. BIKSACKY:  If we could play Government's Exhibit

8    2E?

9            (Video started, 9:29 a.m.)

10           (Video stopped, 9:29 a.m.)

11   BY MS. BIKSACKY:

12   Q    So the two of you were discussing a term wing dams.  What

13   do you mean by wing dams?

14   A    Commonly known in the Platte River these structures are --

15   are large areas, large piles of rocks that sort of act to

16   divert and control water flow through the river.

17   Q    And in that conversation you said that you knew he didn't

18   build the dams.  That they were there before.  To be clear,

19   what did you see him doing with respect to those dams?

20   A    There were several wing dams in the area prior to this

21   interaction.  However, Mr. Howard was seen adding rocks to them

22   and I had not seen any diversions or structures divert flow out

23   towards a new river mouth like I had that day.

24           MS. BIKSACKY:  If we could play Government's Exhibit

25   2F, please?

1          (Video started, 9:30 a.m.)

2          (Video stopped, 9:31 a.m.)

3    BY MS. BIKSACKY:

4    Q    So he mentioned trying to get better access.  On that

5    specific date, prior to the diversion of the river, what was

6    the access like with the natural flow of the Platte River out

7    to Lake Michigan?

8    A    Access restricted the type of vessels able to launch at the

9    Lake Michigan launch ramp and throughout the Platte River.

10   Access was limited to shallow draft boats.  One of our patrol

11   boats had made the trip earlier that month, however, with some

12   difficulty.

13          MS. BIKSACKY:  Okay.  If we could please play

14   Government's Exhibit 2G?

15          (Video started, 9:31 a.m.)

16          (Video stopped, 9:32 a.m.)

17   BY MS. BIKSACKY:

18   Q    So did the comments that it was his home river and it was

19   killing him that there wasn't better access, was that

20   significant to your investigation?

21   A    It -- it was.  It showed me that his -- his personal

22   beliefs -- his intention was -- was personal.

23          MR. VALENTINE:  Excuse me, Your Honor.  I don't think

24   that's a fair comment on the evidence.  That's argument.

25          THE COURT:  Ms. Biksacky?  I mean, it sounds like he

1    is attributing some motive to the witness.  I mean, he can

2    testify to what he saw, what he heard, but I don't know that he

3    can testify to what was in the Defendant's mind when he was --

4         MR. VALENTINE:  That's better.  That would be my

5    objection.  Better put, Your Honor.  Thank you.

6         THE COURT:  So Ms. Biksacky, you going to rephrase?

7         MS. BIKSACKY:  I'll move on, Your Honor.

8    BY MS. BIKSACKY:

9    Q    So in terms of where Mr. Howard was located when he took

10   these actions, where does that relate to historically where the

11   government would dredge out to Lake Michigan?

12   A    This was the exact location of the historical spot of

13   dredging.

14        MS. BIKSACKY:  If we could play Government's Exhibit

15   2I, please?

16        (Video started, 9:33 a.m.)

17        (Video stopped, 9:34 a.m.)

18   BY MS. BIKSACKY:

19   Q    So in that clip Mr. Howard just explicitly stated that he

20   came down today with the intention of digging that very trench.

21   Did that stated intention align with the personal observations

22   you made of Mr. Howard's actions that day?

23   A    It did.

24        MS. BIKSACKY:  If we could play Government's Exhibit

25   2J, please?

1        (Video started, 9:35 a.m.)

2        (Video stopped, 9:36 a.m.)

3   BY MS. BIKSACKY:

4   Q    So Mr. Howard just stated he took his shovel and was

5   enhancing the trench and throwing rocks.  Was that consistent

6   with your observations of Mr. Howard that day?

7   A    Yes.  It was.

8        MS. BIKSACKY:  If we could play Government's Exhibit

9   2K?

10        (Video started, 9:36 a.m.)

11        (Video stopped, 9:37 a.m.)

12   BY MS. BIKSACKY:

13   Q    Did you write Mr. Howard a ticket that day on August 15th?

14   A    I did not.

15   Q    Why not?

16   A    Per direction from supervisor and leadership, I was

17   directed to identify or attempt to identify the individual and

18   regroup for further counsel.

19   Q    If we could pull up Government's Exhibit 2L, please?

20        This is a screenshot taken from Exhibit 2, the body

21   camera footage we have been watching.  Could you please point

22   out where you saw Mr. Howard digging the trench?

23   A    Initially I saw Mr. Howard digging along this bank of the

24   river.

25   Q    And can you please point out where you saw Mr. Howard

1    moving rocks?

2    A    Along this area of the new diversion.

3    Q    After your encounter with Mr. Howard that day, how would

4    you describe your role with respect to the investigation?

5    A    As a seasonal law enforcement officer I was in an assist

6    capacity.  However, I did intake and manage some of the tips

7    that came in through the investigative service tip line that

8    was set up for us.

9    Q    And were you -- despite the fact you had a more minor role

10   in the investigation, were you generally aware with what

11   happened to the river in the days following August 15th?

12   A    I was.

13   Q    If you could please flip through Exhibits 4 through 8 in

14   your binder and generally describe what those photographs are?

15   A    These photographs were taken by a United States Coast Guard

16   helicopter that was flown over the location in days following

17   the 15th and the events on the 15th.

18   Q    And those photographs were taken on August 18th, 2022.

19   Does that sound right?

20   A    This is correct.

21   Q    If we could pull up Government's Exhibit 4, please, and

22   we'll walk through all those photographs now?

23         So can you generally describe what happened to the

24   river in the days following August 15th?

25   A    In the days following August 15th, more and more water

1   started flowing out towards this new location out in Platte

2   Bay.  This area of water became stagnant and cut off.

3   Q    And in the body camera footage Mr. Howard mentioned wing

4   dams that had prevented his boat from traversing the river.

5   Are the wing dams shown in this photograph as well?

6   A    They are.

7   Q    Could you describe generally where those are?

8   A    Those are in those locations here.

9   Q    If we could look at Government's Exhibits 5, please?  This

10  shows a different angle of the river that day?

11  A    It does.

12  Q    And generally, between August 15th and August 18th, I don't

13  need specific measurements, but generally what happened to that

14  diversion?

15  A    The diversion grew in width, and more -- it seemed more

16  water had started flowing out in that direction.

17  Q    And so the wing dams that are in these photographs, if they

18  were causing an issue with river flow, why didn't the National

19  Park Service remove them immediately?

20  A    Lengthy permitting processes were in place to prohibit

21  expedient removal of these, and while those were ongoing, it

22  was -- it was not something that we could do haphazardly.

23  Q    If we could look at Government's Exhibit 6, please?  Where

24  is the boat launch in this photograph?

25  A    The boat launch is located on the top right end of the

image.

Q    And what does this photograph show after August 15th with respect to access from the boat launch to the Platte Bay in Lake Michigan?

A    Instead of having to traverse several hundred feet down river in the shallower section towards the outlet, access was shortened out to Platte Bay.

Q    Take a look at Government's Exhibit 7, please.  Could you point out in this photograph where you generally observed Mr. Howard shoveling and stacking -- moving rocks?

A    In this location.

Q    And so that's towards the center of the screen where the diversion is present?

A    It is.

Q    And if we could look at Government's Exhibit 8?  Did the channel remain wide like this in the days or months following August 18th?

A    It did.  I left employment at Sleeping Bear Dunes National Lake Shore in November, late October, but it remained like this until then.

Q    And what did you observe with respect to boaters accessing Lake Michigan after this diversion occurred?

A    We saw an increase in boater traffic out towards Platte Bay from the Lake Michigan launch ramp.

Q    Did the Defendant say that he obtained any permission or

1    authorization from the National Park Service to alter the river

2    in any way?

3    A    He did not say.

4         MS. BIKSACKY:  No further questions, Your Honor.

5         THE COURT:  All right.  Mr. Valentine, cross

6    examination?

7         MR. VALENTINE:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9    BY MR. VALENTINE:

10   Q    So I expect the locals were a little happier they could get

11   to the big lake from the Platte River, is that a fair

12   statement?

13   A    What was that?

14   Q    I guess the locals were happier they could get to the

15   Platte Bay off the Platte River, is that a fair statement?

16   A    There were some sentiments from fishermen accessing the new

17   outflow.

18   Q    I am trying to get a handle on how long it was between the

19   time that you were called and the time that you responded?  Can

20   you give me a general idea?  I am not quite on top of your

21   timestamps on your video what you testified to when you told

22   Ms. Biksacky that you were called to the -- called to the area?

23   A    I was called several minutes prior to arriving.  I did

24   arrive in the area approximately 18:20 hours or 6 -- 6:20 hours

25   or 6:20 p.m.

Q    You were called approximately then, what, 6:00 p.m.?

A    I'd have to look at my notes.

Q    Do you have your notes?

A    I am not sure if they are in this.  I don't believe so.

Q    Maybe I can shortcut it.  So what I understand you to say is that you don't recall the time at which you were notified that you needed to show up there, correct?

A    Correct.  I do not.

         MR. VALENTINE:  May I approach the witness, Your Honor?

         THE COURT:  You may.  Have you showed that to Ms. Biksacky, whatever you intend to show to the witness?

         MR. VALENTINE:  No.  Apologize, Your Honor.

BY MR. VALENTINE:

Q    Officer Bahm, I am handing you a document what appears to be a report generated by you and wondering if that refreshes your recollection as the time that you were called to the scene there?

A    It does.

Q    It does.  And what time would that --

A    About 16:00 -- or 18:00 hours.

Q    About 6:00 p.m.?

A    Correct.

Q    You arrived approximately how much later than that or how far after that?

1    A    Some time between 18:00 and 18:20.

2    Q    And how do you fix that 18:20 time?

3    A    I do not recall exactly the start of the observation.

4    Q    The purpose, according to your report, that you were called

5    there, was that there were boats going through a -- traveling

6    down the mouth of the Platte River in Lake Township, correct?

7    A    There were reports of that.

8    Q    A report of that.  And at that time you stood and watched

9    Mr. Howard for a while before you approached him and turned on

10   your body cam, is that correct?

11   A    That is correct.

12   Q    Approximately how long was that time?

13   A    The observation period, again, was 18:20 to 18:25, where at

14   that time I returned to my vehicle, made a phone call to a

15   supervisor.

16   Q    Okay.  And then you returned again to watch Mr. Howard?

17   A    I did.

18   Q    So approximately -- that's about five minutes that you were

19   gone, and approximately how long did you watch him before you

20   turned on your body cam?

21   A    I am not sure of what time I returned to the observation

22   point.

23   Q    Approximately how many, if you can, rocks, did you actually

24   see Mr. Howard place on what has been referred to now as wing

25   dams?

1    A   I do not recall the exact amount of rocks.  Several.

2    Q   Well, several would be what, more than three?

3    A   I do not recall.

4    Q   Well, maybe we can talk about it a little different way.

5    How long did you see Mr. Howard putting specific activity --

6    putting rocks onto what has been referred to now as wing dams?

7    A   While in the position I returned to the observation

8    location for several minutes as well as -- as I approached and

9    the body camera footage that was seen.

10    Q   Would it be fair to say a handful of rocks, half dozen?

11    A   I would say that.

12    Q   All right.  And you also testified that you saw Mr. Howard

13    digging on the -- in the channel, is that right?

14    A   That is.

15    Q   Do you recall which side of the channel that you observed

16    him digging?  I apologize.  I cut you off.  I am sorry.  We can

17    talk about is the waters flowing out the left side or the right

18    side?

19    A   On the new channel it was on the left side, so the far bank

20    across from the river from me.

21    Q   And approximately how much -- how many shovelfuls do you

22    think Mr. Howard dug, just generally?  We are not -- this

23    isn't --

24    A   I do not recall the exact number of attempts at shovels or

25    shovel that he was, but at least five minutes.

1    Q    About five minutes there are attempted shovels and then

2    there were completed shovels?  I didn't understand.

3    A    At least five minutes of shoveling activity.

4    Q    And just to be clear -- and this is an overarching idea --

5    you didn't see that channel open up, correct?

6    A    I did not see that channel open up.

7    Q    All right.  From what you have testified to, the -- I'll

8    withdraw that question.

9         Now, one of the things that Mr. Howard mentioned to

10   you was that there was -- there had been digging down the

11   channel, or excuse me, down, let's call it the left bank of the

12   original flow of the river, is that correct?

13   A    I had not seen any other trenches prior to that.

14   Q    Okay.  I have got to take it apart a little bit here.  One

15   of the things that Mr. Howard told you was that he had seen a

16   trench that had been dug down that stretch between the original

17   flow of the river, the sand there, and Lake Michigan, is that

18   right?

19   A    That's what I was told.

20   Q    That's what he told you.  Okay.  And you actually went down

21   there and looked for a trench, didn't you?

22   A    I did.

23   Q    And did you find a trench?

24   A    I did not see any trench that day.

25   Q    Okay.  One of the things that you mentioned was that a

1    catastrophe during what, the year 1967, not long after coho

2    salmon had been introduced into Lake Michigan, is that right?

3    A    I believe that's right.

4    Q    With a number of fatalities in that Platte Bay, is that

5    right?

6    A    Yes.

7    Q    Now, one of the things that having obviously a better

8    access to the lake, right or wrong, was that it also allows not

9    only boaters to get out to the lake but also persons to assist

10   boaters that get in trouble on the lake, is that right?

11   A    That would be right.

12   Q    Okay.  So the -- so instead of driving 30 miles or whatever

13   it is to the different locations you told us there were boat

14   launches, you could actually use that as a means of getting

15   onto the lake in order to help somebody, is that a fair

16   statement?

17   A    That is.

18   Q    Now, we have admitted not only government exhibits but we

19   have also admitted into this trial Defense exhibits, is that

20   right?  Did you hear that when you were sitting in court?

21   A    I was not there.

22        MR. VALENTINE:  All right.  Well, may I approach the

23   witness, Your Honor?

24        THE COURT:  As long as Ms. Biksacky has seen what you

25   are about to --

1     MS. BIKSACKY:  Yes, Your Honor.  The binder on the

2  witness stand has the Defense exhibits as well.  They are

3  labeled beginning with the letter A.

4  BY MR. VALENTINE:

5  Q    If you could open that binder to Defendant's Exhibit A,

6  would you please?  Do you have Defendant's Exhibit A in front

7  of you?

8  A    I believe I do.  It's not labeled.  However, it's in that

9  location.

10  Q    All right.  I'll label those, Your Honor.  I'll do that

11  when we get a break.

12     What you should be looking at is a series of 11

13  photographs on a single sheet of paper, is that right?

14  A    It is.

15  Q    All right.  Now, on Defendant's Exhibit A there, do you --

16  you mentioned that when the Platte River was dug, dredged I

17  think was the term you used, that one of the problems with

18  dredging it was that a lot of the dredgings would pile up on

19  the shore along that area, is that right?

20  A    That is correct.

21  Q    Now, not the greatest pictures in the world, but we

22  certainly have 11 of them over the years on Defendant's

23  Exhibit.  Do you see any evidence of any kinds of dredgings

24  piling up on the shore on any of those photos?

25  A    I cannot say really from these photos.

```
 1     Q    Okay.  So you don't see any?

 2     A    Not from this angle.

 3               MR. VALENTINE:  Okay.  May I have just a second, Your

 4     Honor?

 5               THE COURT:  Certainly.

 6               MR. VALENTINE:  If I may have a moment?

 7               Your Honor, that's all I have on cross.  Thank you.

 8               THE COURT:  All right.  Ms. Biksacky, very brief

 9     redirect?

10               MS. BIKSACKY:  No redirect, Your Honor.

11               THE COURT:  All right.  Officer Bahm, you may step

12     down.  Thank you for your testimony.  How do you spell your

13     last name?

14               THE WITNESS:  B-a-h-m, as in Mary.

15               THE COURT:  B-a-h-m.  Okay.

16               THE WITNESS:  Thank you, Your Honor.

17               MS. BIKSACKY:  If the Court would like, Your Honor, I

18     do have a printout of the spelling of the witness names that I

19     had provided to Mr. Brandell before.

20               THE COURT:  Oh, okay.  Great.

21               MS. BIKSACKY:  May I approach?

22               (Witness excused, 9:55 a.m.)

23               THE COURT:  You may.  All right.  Ms. Biksacky, call

24     your next witness.

25               MS. BIKSACKY:  The government calls Mr. Zachary
```

1      Hatfield.

2                     ZACHARY HATFIELD, GOVERNMENT

3                     having been first duly sworn, testified as follows:

4                     (Witness sworn, 9:56 a.m.)

5                     DIRECT EXAMINATION

6        BY MS. BIKSACKY:

7        Q    Good morning.

8        A    Good morning.

9        Q    Would you please introduce yourself?

10       A    My name is Zachary Hatfield.

11       Q    What do you do for a living, Mr. Hatfield?

12       A    A teacher and a cross country coach.

13       Q    Where at?

14       A    Chippewa Hills High School.

15       Q    Were you at the Platte River on August 15th, 2022?

16       A    I was.  Yes.

17       Q    What were you doing there?

18       A    We had cross country camp.  It was our first day, and we --

19       usually we stay at the Platte River campground, and then we

20       stayed -- went down to the beach before dinner.

21       Q    And you said before dinner.  Do you have an approximate

22       timeframe of when you went down to the beach?

23       A    It was, like, five or six o'clock.

24       Q    And can you describe the area of the Platte River that you

25       went to?

1    A    Yeah.  So where you -- where you park, we walked down to

2    the right towards the mouth of the river.  At this point there

3    is kind of a beach, and then the river comes out, and then

4    there is, like, a peninsula of beach as well and then Lake

5    Michigan.  So we were along that beach that's on the land side

6    on the riverside.  Not out on Lake Michigan, but we could kind

7    of look out at the mouth and Lake Michigan.

8    Q    And if we could please pull up Government's Exhibits 9?  Do

9    you recognize this area in the photo?

10   A    Yes.  I do.

11   Q    And is this the general area that you have been describing

12   where you were located with the cross country team?

13   A    Yup.  Right there.

14   Q    Had you been to this specific area of the Platte River

15   before?

16   A    Yeah.  We have been there I think 10 to 15 years.  We have

17   gone to camp up there so we have been there several years.

18   Q    That year, on August 15th, did you notice anything unusual

19   at the river?

20   A    Yeah.  The mouth of the river was different.  In the past

21   years it had been flowing all the way down to the right, and

22   you can see in the picture where it kind of has another island

23   of sand or the mouth of the river was -- was going off the

24   direction that way.

25   Q    Did you notice any individuals that appeared to be out of

place?

A    Yeah.  We were -- we were there and there was a gentleman

that was there that had a shovel, and he was digging kind of in

that trench there.  That -- that open spot that goes straight

out directly to the river or from the, excuse me, to the lake.

Q    How would you describe his shovel?

A    It was just a regular shovel.  He was -- he was shoveling

kind of in that vicinity that goes through.  I -- I guess the

way I think of it is like when you were a kid and you were

playing in mud puddles and you were trying to connect one

puddle to another kind of digging the water to go from one

spot.  It kind of looked like he was trying to do that and

through that section.

Q    What was he digging with the shovel?

A    He was digging, like, sand and rocks and different things.

He was -- you can kind of see that berm of rocks on the -- on

the bottom side of the picture.  He was kind of adding piles,

rocks to that, or if -- if some other kids were swimming, like

not necessarily associated with us, but he would kind of point

them and say kind of jokingly, hey, toss those -- toss those

rocks over there and things like that.

Q    So I'd like to break that down.  First, you said that you

saw him piling rocks on the berm that is on the right side of

this photograph?

A    Yes.

Q    Can you describe a little bit more where he was getting the

rocks from, how he was moving them to the berm?

A    Yeah.  So you know, I was expecting -- or digging --

digging down he would get a shovel pull of dirt or sand and

then maybe come into a rock or two and that's where they were

kind of coming from where he was digging right there.

Q    You also mentioned that you heard this person directing

children?

A    Yeah.  We were sitting there kind of talking amongst

ourselves.  I was trying to figure out what was going on, and

he kind of jokingly pointed out to some of the young kids that

were just kind of swimming and floating down the river just to

kind of, to direct, hey, I think the exact words were, if you

want to play with those, you know, play with them and toss them

over there and pointed towards the berm.

Q    Did you notice whether this man was drinking a beer?

A    It did appear -- that was a discussion that we had.  At

first it looked like he might have been a ranger.  He had a

brown shirt on or a tan shirt on, and then we saw that this

looked like he was drinking a beer and kind of discussed that

maybe he wasn't on work business.

Q    Did you approach this man to have a conversation with him?

A    I did not.  No.

Q    Did anyone from your group approach this man to have a

conversation?

1    A    We did have one of our athletes approach him.

2    Q    If we could pull up Government's Exhibit 10, please?  Are

3    you familiar with this photograph?

4    A    Yes.  I am.

5    Q    Were you there when the events in this photograph took

6    place?

7    A    Yes.  I was.

8    Q    And what does this photo show?

9    A    One of our athletes, she walked across the river to ask him

10   what he was doing.  She was curious.  The kids were kind of

11   talking about it and she was the one that went over there.

12   Q    Okay.  And I don't want you to talk about what she may have

13   heard, just your personal knowledge.

14   A    Yup.

15   Q    And so this photograph was taken at approximately 6:06 p.m.

16   on August 15th.  Does that sound accurate to you?

17   A    Yes.  It does.

18   Q    And if we could look at Government's Exhibit 11?  Does this

19   appear to be the same scene just a little bit more zoomed out?

20   A    Correct.  Yes.

21   Q    And looking at this photo, could you describe where you saw

22   the man with the shovel when he was digging?

23   A    He was digging in that open area to the right where the

24   water flows out to the -- to the lake.

25   Q    So if I called that a channel out to Lake Michigan, you saw

1    him digging in that channel towards Lake Michigan?

2    A    Correct.

3    Q    If we could look at Government's Exhibit 12, please?   There

4    is a black box or redaction on this photograph.   Have you

5    viewed the original photograph without the black box?

6    A    Yes.  I have.

7    Q    And could you describe generally what is behind the black

8    box?

9    A    It's a partial team picture of the kids that we took to

10   camp.

11   Q    And were you present when this team photograph was taken?

12   A    Yes.  I was.

13   Q    And do you see the man that you saw shoveling in this

14   photograph?

15   A    Yup.  Yup.  Right there to the right.

16   Q    And what is that man wearing in this photograph?

17   A    That tan shirt and had a pair of shorts on.

18   Q    If we could look at Government's Exhibit 13, please?

19   Again, there are some black boxes.  Have you seen the photo

20   before the black boxes were put there?

21   A    Yes.  I have.

22   Q    And do you see the man that you saw digging that day in

23   this photograph as well?

24   A    Correct.  Yes.

25   Q    And where do you see him?

1    A    Kind of in that low, right above the river there, at the

2    bottom of the lake kind of in the middle of the black box area.

3    Q    Government's Exhibit 12 and 13 were taken at approximately

4    6:11 and 6:12 p.m.  Does that sound about right to you?

5    A    Yes.  It does.

6    Q    And I don't expect you to remember exact times, but do you

7    have an estimate of approximately how long in total you were at

8    the Platte River?

9    A    Approximately an hour, or an hour and-a-half is about what

10   we usually spend there and that was about the same as normal.

11   Q    Did you leave shortly after the team photographs were

12   taken?

13   A    Yes.  We did.

14   Q    Was the man that you saw digging, was he there the entire

15   time?

16   A    Yes.  He was.

17   Q    Other than the children that he was pointing to and

18   directing to, did you see anyone else digging in the area?

19   A    We did not.

20   Q    Did you see anyone else digging with a shovel?

21   A    No.

22   Q    Did you see anyone else other than the children that he was

23   pointing to and directing to building the berm of rocks?

24   A    No.  I did not.

25        MS. BIKSACKY:  No further questions, Your Honor.

1          THE COURT:  All right.  Mr. Valentine, cross

2   examination?

3          MR. VALENTINE:  Thank you, Your Honor.

4                 CROSS EXAMINATION

5   BY MR. VALENTINE:

6   Q    You are a cross country coach?

7   A    Yes, sir.

8   Q    Familiar with the clothes that cross country runners wear?

9   You wouldn't describe -- and we can have that last government

10  exhibit up there.  You mentioned -- from the exhibits you have

11  seen, you wouldn't describe the shorts that Mr. Howard was

12  wearing that day -- from what you saw that day you wouldn't

13  describe the shorts he was wearing as running shorts, would

14  you?

15  A    No.  I would not.  I was -- I was on the far side.  I

16  didn't get up close to him.

17  Q    They are not running shorts, are they?  Are they?  Running

18  shorts are shorter shorts, correct, like gym shorts?

19  A    I mean, they are shorts.  Yes.

20  Q    Quite a bit shorter than what Mr. Howard had on, correct?

21  A    Our uniform bottoms are, but basketball shorts are a lot

22  longer.  I am not sure.

23  Q    We are talking bottoms?

24  A    Yes.

25          MR. VALENTINE:  Thanks very much.

1          THE COURT:  Any redirect, Ms. Biksacky?

2          MS. BIKSACKY:  No redirect, Your Honor.  I ask that

3    the witness be excused.

4          THE COURT:  Mr. Hatfield, you may step down.  Thank

5    you for your testimony.

6               (Witness excused, 10:05 a.m.)

7          MS. BIKSACKY:  And I believe we should have our next

8    witness here, Your Honor.  Our next witness is Ms. L.S.

9          THE CLERK:  If you would stand and raise your right

10   hand?

11              L.S., GOVERNMENT

12              having been first duly sworn, testified as follows:

13              (Witness sworn, 10:06 a.m.)

14         THE COURT:  All right.  Try not to be nervous, okay?

15   You have only one job here today and that's just to tell the

16   truth.  So whoever is asking you the questions, just give them

17   the honest answer and you have done your job.

18         THE WITNESS:  Okay.

19         THE COURT:  All right.

20              DIRECT EXAMINATION

21    BY MS. BIKSACKY:

22   Q    Would you please introduce yourself?

23   A    I am L.S.

24   Q    How old are you?

25   A    Fifteen years old.

1   Q    Do you remember going to the Platte River on August 15th of

2   2022?

3   A    Yes.

4   Q    Approximately how old were you then?

5   A    Fourteen.

6   Q    Who did you go to the Platte River with?

7   A    My cross country team.

8   Q    And what were you doing with your cross country team down

9   there?

10  A    We were swimming and laying on the beach.

11  Q    Do you -- did you notice anything unusual when you were at

12  the beach?

13  A    We saw a man digging in the sandbar.

14  Q    Was he digging with his hands or digging with a tool?

15  A    He was digging with a shovel.

16  Q    Do you remember what the shovel looked like?

17  A    It was long and had a square bottom.

18  Q    What was he digging?

19  A    He was digging in the sandbar, like a big gap.

20  Q    I didn't hear the last word you said.  I'm sorry.

21  A    A big gap in the sandbar.

22  Q    Okay.  He was digging a big gap in the sandbar.  So was he

23  digging soil from that sandbar?

24  A    Yes.

25  Q    Did you see whether he was digging rocks?

1   A   Yes.

2   Q   And was he digging rocks?

3   A   Yes.

4   Q   Okay.  And when you were at the river, were you able to see

5   Lake Michigan from where you were at the river?

6   A   Yes.

7   Q   And you mentioned that a gap was nearby, is that correct?

8   A   Yes.

9   Q   Where was the man in relation to that gap?

10  A   He was right by it.  A little father away, but...

11  Q   Did you approach the man with the shovel?

12  A   Yes.

13  Q   And did you have a conversation with him?

14  A   Yes.

15  Q   Why?

16  A   I wanted to know why he was digging.

17  Q   And why were you curious about that?

18  A   Because I didn't know why he was digging.

19  Q   If we could look at Government's Exhibit 10, please?  Are

20  you in this photograph?

21  A   Yes.

22  Q   Where are you?

23  A   I am the one in the purple top.

24  Q   Who else is in the photograph?

25  A   The man digging.

1    Q    Okay.  And so how would you describe what the man that you

2    saw digging was wearing?

3    A    A tan top, black shorts.

4    Q    When you had a conversation with the man that you saw

5    digging, what did he say to you?

6    A    He said that he was trying to make a gap big enough to get

7    his boat through.

8    Q    Did he say anything else?

9    A    He said that he wanted to fish in the boat.

10    Q    Did he say what specific type of fish he was fishing for?

11    A    Coho salmon.

12    Q    And did he tell you what his name was?

13    A    Andy.

14    Q    Did he tell you if he had a nickname?

15    A    His nickname was Coho Andy.

16    Q    And he told you that?

17    A    Yes.

18    Q    Looking at Government's Exhibit 11, please.  Is this a

19    similar photograph that's zoomed out a little bit?

20    A    Yes.

21    Q    Looking at this photo could you please describe where you

22    saw the man with the shovel digging?

23    A    He was just to the left of the gap.

24    Q    And when you say to the left, do you mean his left or the

25    left on this photo?

1    A    The left on this photo.

2    Q    Okay.  So just to the left of where that gap out to Lake

3    Michigan is where you had observed him digging?

4    A    Yes.

5    Q    If we could look at Government's Exhibit 12, please?  Have

6    you seen this photo before?

7    A    Yes.

8    Q    And have you seen it without the black box?

9    A    Yes.

10   Q    Were you in that photo?

11   A    Yes.

12   Q    Okay.  And do you see the man that you saw digging in this

13   photograph?

14   A    Yes.

15   Q    And if we could look at Government's Exhibit 13, please?

16   Were you in this photograph as well?

17   A    Yes.

18   Q    And do you see the man digging that you saw digging in this

19   photograph?

20   A    Yes.

21   Q    Did you hear the man directing anyone else to move rocks or

22   dig?

23   A    Yes.  He was directing kids to move the rocks out of the

24   way.

25        MS. BIKSACKY:  No further questions, Your Honor.

1          THE COURT:  All right.  Mr. Valentine, cross

2    examination?

3          MR. VALENTINE:  Thank you, Your Honor.

4                    CROSS EXAMINATION

5    BY MR. VALENTINE:

6    Q    Can you tell us about how many other kids he was having

7    move rocks or dig?

8    A    About 10.

9    Q    About 10.  And could I have the last photograph up there,

10   please?  And let's see.  How about Government Exhibit 11,

11   please?  And is that -- that's the scene of you standing there

12   with the -- with Andy and talking to him, is that right?

13   A    Yes.

14   Q    And are those -- the kids in the photo that you were

15   talking about are the ones that he was telling to dig and move

16   rocks?

17   A    Yes.

18   Q    And how many -- how many would you say you see in that

19   picture; about five; fair statement?

20   A    Yes.

21   Q    You don't see them digging or moving any rocks, do you?

22   A    No.

23          MR. VALENTINE:  All right.  That's all I have.  Thanks

24   very much, Your Honor.  Thank you very much.

25          THE COURT:  Any redirect?

1      MS. BIKSACKY:  No redirect, Your Honor.

2      THE COURT:  All right.  Great job, L.  Thank you.  You

3  may step down.

4      (Witness excused, 10:12 a.m.)

5      THE COURT:  And do a report on this experience for

6  your government's class.

7      MS. BIKSACKY:  The government's next witness is

8  Ms. Jamie Nelson.

9      JAMIE NELSON, GOVERNMENT

10     having been first duly sworn, testified as follows:

11     (Witness sworn, 10:12 a.m.)

12                 DIRECT EXAMINATION

13   BY MS. BIKSACKY:

14  Q    Would you please introduce yourself?

15  A    Yes.  My name is Jamie Nelson.

16  Q    And where generally do you live?

17  A    I live on the north side of Chicago.

18  Q    What do you do for a living?

19  A    I am the head of special collections and archives at DePaul

20  University.

21  Q    Do you remember going to the Platte River on August 15th,

22  2022?

23  A    Yes.

24  Q    What were you doing there?

25  A    I was on vacation for the week and I had taken my sons to

1    the beach.

2    Q    Had you been to the Platte River before?

3    A    I have been to the Platte River before in previous years,

4    probably about six or seven years.  We go in August every year.

5    Q    Do you know approximately what time you arrived at the

6    Platte River on August 15th?

7    A    About 3:45.

8    Q    And at some point while you were at the Platte River did

9    you notice anything out of the ordinary?

10   A    I noticed a man who was using a large shovel to move rocks

11   across an area where the river comes kind of parallel to the --

12   to the Lake Michigan shoreline.

13   Q    And how would you describe the shovel?  Was it a toy shovel

14   or a utility shovel?

15   A    I would describe it as a utility work shovel.  It was like

16   the long handled adult sized tall shovel with the metal blade.

17   Q    And why did this man stick out to you?

18   A    It stuck out to me because most people who have shovels at

19   the beach have little plastic beach shovels and are there with

20   families or kids, and I didn't see this gentleman interacting

21   with family or working with kids to build something small.  He

22   was using a large shovel to move rocks.

23   Q    So you mentioned he was using the shovel to move rocks.

24   What can you tell me about that?

25   A    I mean, sometimes the shovel wasn't being employed for

1   this, but often he would use it like a leverage to get under a

2   larger rock so he could then pick it up, and he was moving

3   rocks to the area of the mouth where it goes parallel to the

4   shore, sometimes tossing the rocks into the pile.  But the

5   shovel was being used as an aid to get rocks.

6   Q    Okay.  So he was using the shovel to get the rocks and then

7   after he got the rocks and the shovel what did he do with them?

8   A    He was placing them in a built increasingly taller

9   structure at that section of the river.

10  Q    And to place them on that structure was he moving the rocks

11  from their original location?

12  A    Yes.

13  Q    So you mentioned some families and children.  Were children

14  playing in the river at that time?

15  A    Children were nearby playing in the river.  People -- it's

16  a busy beach, and it was one of the busy days in my memory.  My

17  children had been in that section of the river and I directed

18  them to no longer be there because sometimes he was tossing

19  rocks and I didn't want them nearby.

20  Q    And so you directed them no longer to be there because you

21  felt it was a safety concern for your children?

22  A    I did.

23  Q    If we could please pull up Government's Exhibit 14?  Do you

24  recognize this photo?

25  A    I do.

1    Q    Tell me about it.  Did you take it?

2    A    I did.  I took this photo.

3    Q    And did you take this photo on August 15th?

4    A    Yes.

5    Q    Why did you take this photo?

6    A    Because I felt it was a strange occurrence.  I had been

7    taking photos of my sons playing and then I saw this happening

8    and it was out of the ordinary to me so I just took a photo of

9    it.

10   Q    So you have mentioned that you saw a man with a shovel who

11   moved rocks and placed rocks in a structure.  Is that man in

12   this photograph?

13   A    The man is the one who is bending over with a light colored

14   long sleeve shirt wading in the water.

15   Q    Okay.  You reference a structure of rocks.  Is that in this

16   photograph as well?

17   A    Yeah.  It's the line of rocks from the shoreline into the

18   river.

19   Q    And you also mentioned a shovel.  Is that in this photo as

20   well?

21   A    That is the shovel that's stuck into the sand in the

22   foreground.

23   Q    And can you describe where generally on this photograph you

24   saw the man using the shovel?

25   A    Either from within the river bed sometimes there is larger

1    rocks in the river bed or along the shoreline there is larger

2    rocks.

3    Q    This timestamp on this photo is approximately 6:24 p.m.

4    Does that sound right to you about when you observed this?

5    A    Yes.

6    Q    Do you know approximately how long after you took this

7    photo you left the beach?

8    A    Not exactly, but probably an hour and-a-half, somewhere in

9    there.

10   Q    While you were at the beach, did you observe any changes to

11   the flow of the river?

12   A    What I noticed is that the water is starting to ripple

13   around.  It's rippling around where it can't go through where

14   the rocks are, and as it's rippling around it starts to hit the

15   sand on the other side.

16   Q    On August 15th did you see anyone else digging with a

17   shovel?

18   A    I didn't see any adults.  I only saw -- like, you can see a

19   little boy playing in the water across the way.  I saw children

20   with shovels at shore lines.

21   Q    When you say you saw children with shovels, were those

22   shovels like the shovel you saw the Defendant with?

23   A    No.  When I say children with shovels at the beach they are

24   about this long and plastic.

25   Q    Okay.  So aside from the children that you saw playing at

1    the beach or using a toy shovel, did you see anyone else

2    digging at that time?

3    A    I did not.

4    Q    And did you see anyone else stacking rocks on this

5    structure when you were there?

6    A    I did not.

7              MS. BIKSACKY:  No further questions.

8              THE COURT:  All right.  Mr. Valentine, cross

9    examination?

10                   CROSS EXAMINATION

11   BY MR. VALENTINE:

12   Q    You didn't see five to ten kids putting rocks on that

13   structure or any other at the beach that day?

14   A    I did not.  No.

15             MR. VALENTINE:  I don't have any further questions.

16   Thank you.

17             THE COURT:  All right.  Anything else, Ms. Biksacky?

18             MS. BIKSACKY:  No, Your Honor.

19             THE COURT:  All right.  You may step down.  Thank you

20   for your testimony.

21             (Witness excused, 10:18 a.m.)

22             MS. BIKSACKY:  The next witness, Your Honor, is Carrie

23   Allgaier.

24             CARRIE ALLGAIER, GOVERNMENT

25             having been first duly sworn, testified as follows:

| | |
|---|---|
| 1 | (Witness sworn, 10:19 a.m.) |
| 2 | DIRECT EXAMINATION |
| 3 | BY MS. BIKSACKY: |
| 4 | Q    Good morning. |
| 5 | A    Good morning. |
| 6 | Q    Would you please introduce yourself to the Court? |
| 7 | A    My name is Carrie Allgaier. |
| 8 | Q    And what do you do for a living, Ms. Allgaier? |
| 9 | A    I am a dietician and a lactation consultant. |
| 10 | Q    Were you at the Platte River on August 15th, 2022? |
| 11 | A    Yes. |
| 12 | Q    What were you doing? |
| 13 | A    I spent the day kayaking on the Platte River with my |
| 14 | family, and then we ended at the beach where the river meets |
| 15 | Lake Michigan. |
| 16 | Q    And I am not looking for an exact time, but if you had to |
| 17 | approximate the time of day, approximately what time of day |
| 18 | were you at the end where the river meets Lake Michigan? |
| 19 | A    Late afternoon. |
| 20 | Q    And approximately how long were you at the area where the |
| 21 | river meets Lake Michigan? |
| 22 | A    I would say approximately two hours. |
| 23 | Q    Did you see anything out of the ordinary when you were |
| 24 | there? |
| 25 | A    Yes.  I was watching my children ride a current, and I was |

1    just watching them closely, and there was a man standing there

2    with a full size shovel in his hand scooping rocks and placing

3    them aside kind of up on the bank.

4    Q    How would you describe what that man looked like?

5    A    He was an older man wearing gym shorts and a button up tan

6    colored shirt with the sleeves rolled up and he had on a hat

7    and sunglasses.

8    Q    And what area of the river did you see this man?  How would

9    you describe it?

10   A    It was where the river starts flowing into Lake Michigan,

11   but there was a cut in the opening, the main opening.  There

12   was a cut before that where water was kind of rushing through,

13   and that's where my kids were riding tubes there.

14   Q    And where was this man with the shovel in relation to that

15   cut that went to Lake Michigan?

16   A    He was standing in it, wading in it.

17   Q    And is that where he was shoveling?

18   A    Yeah.  He was scooping.  He appeared to be feeling for

19   rocks with his feet and scooping them out.

20   Q    Okay.  And that was near the cut that you have been

21   referring to?

22   A    Yes.  Standing in it.

23   Q    Did you have a conversation with the man that you saw using

24   the shovel?

25   A    Yes.  He asked me if those were my kids and noticed that I

1    was watching them closely, and I commented yeah.  I was afraid

2    that they would slip on the rocks.  And then he mentioned

3    something about being there either the day before or before and

4    had slipped and got his shorts wet, and he had $100 in his

5    pocket that he was going to use to pay some Mexicans to bring

6    his boat through.  That was really the end of the conversation

7    because I thought that was kind of strange, so I just kind of

8    disengaged from the conversation and continued watching my

9    kids.

10   Q   And approximately how long did you observe the man digging

11   with the shovel?

12   A   I don't know exactly.  I was probably there with my kids

13   for maybe a little less than an hour in that exact spot, and he

14   was just kind of wading in that area.

15   Q   Was he wading in the area or digging with his shovel the

16   entire time that you were at the river?

17   A   When I was in that spot it was kind of on and off.  It

18   wasn't vigorous constant digging or anything.  It was more just

19   wading and kind of feeling around for rocks it seemed like what

20   he was doing.

21   Q   And you saw him the entire time that you were at the place

22   where the river meets Lake Michigan for the duration of your

23   visit there?

24   A   Yeah.

25   Q   And did you see anyone else digging with a metal shovel

```
1   while you were there?

2   A    No.  Not while I was there.  I did not see anyone else.

3             MS. BIKSACKY:  No further questions, Your Honor.

4             THE COURT:  All right.  Cross examination,

5   Mr. Valentine?

6             MR. VALENTINE:  None, Your Honor.  Thank you.

7             THE COURT:  All right.  You may step down.  Thank you

8   for your testimony.

9             (Witness excused, 10:23 a.m.)

10            THE COURT:  We are going to take a short recess.

11  Technical difficulties everybody.  We won't be long.  Will we?

12            MS. BIKSACKY:  Your Honor, is Ms. Allgaier needed

13  anymore?

14            THE COURT:  No.  No.  I excused her.

15            MS. BIKSACKY:  I wasn't sure if there was a technical

16  difficulty with the hearing of her testimony.

17            THE COURT:  No.  I think we are okay there, aren't we,

18  Paul?

19            MS. BIKSACKY:  Thank you.

20            THE CLERK:  All rise, please.  Court is in recess.

21            (Recess taken, 10:24 a.m.)

22            (Resume Proceeding, 10:36 a.m.)

23            THE CLERK:  Court is back in session.  Please be

24  seated.

25            MR. VALENTINE:  Your Honor, may I address the Court on
```

1     a witness issue at this time?

2              THE COURT:  Sure.

3              MR. VALENTINE:  Your Honor, I have -- I have

4     subpoenaed three witnesses, and frankly, I, in talking with the

5     government about the case, and the government was anticipating

6     that my cross examinations would go longer than they have, I

7     told them initially to be here at two o'clock, and then I said

8     one o'clock, and I just texted each of them and told them to

9     please case as soon as possible, yeah, post haste.  I apologize

10    to the Court.

11             THE COURT:  Don't.  Don't.  If we have to take a break

12    we'll just take a break, and, you know, when Ms. Biksacky

13    completes her witnesses then we'll just take a break and when

14    your people are ready to go we'll just go back on the record.

15    It's the beauty of no jury, right?

16             MR. VALENTINE:  I guess the alternative would be for

17    me to stand there and keep repeating really, or --

18             THE COURT:  Let's not do that.

19             MR. VALENTINE:  All right.  Thanks very much.

20             THE COURT:  You are welcome.

21             Ms. Biksacky, next witness.

22             MS. BIKSACKY:  Your Honor, the government calls Kirk

23    Walby.

24             THE COURT:  The seat of honor, right here.

25             THE WITNESS:  I think that would be yours.

```
1              THE COURT:  Thank you.

2              KIRK WALBY, GOVERNMENT

3         having been first duly sworn, testified as follows:

4         (Witness sworn, 10:38 a.m.)

5                 DIRECT EXAMINATION

6    BY MS. BIKSACKY:

7    Q    Would you please introduce yourself?  And Mr. Walby, I

8    understand that you have a hearing aid problem.  Are you able

9    to hear me?

10   A    Yes.  I can hear you.

11   Q    If at any point you cannot hear me or opposing counsel just

12   let us know and we can work on adjusting that.

13              Would you please introduce yourself?

14   A    My name is Kirk Walby.

15   Q    What do you do for a living?

16   A    I am the plant manager at an office furniture manufacturing

17   facility.

18   Q    Were you at the Platte River on August 15th, 2022?

19   A    Yes.  I was.

20   Q    What were you doing there?

21   A    Watching some friends swim.  We had just got done kayaking.

22   Q    Had you been to the Platte River before?

23   A    Yes.  Many times.

24   Q    I am not looking for an exact timeframe, but if you had to

25   approximate, what time of day were you at the Platte River?
```

1    A    It was between 5:00 and 7:00 p.m.

2    Q    And approximately -- so that's approximately two hours that

3    you were there?

4    A    Yes.

5    Q    And for those two hours were you in the area where the

6    Platte River sort of empties out into Lake Michigan?

7    A    Yes.  I was.

8    Q    When you were at that area where the Platte River empties

9    out into Lake Michigan, did you see anything out of the

10   ordinary?

11   A    Did I see any what?

12   Q    Did you notice anything out of the ordinary?

13   A    I saw a gentleman stacking rocks, picking up rocks from one

14   side of the river and stacking them or tossing them into a pile

15   on the other side of the river.

16   Q    Okay.  And when you say picking them up, where was he

17   picking them up from?

18   A    From a pile of rocks that was directly across the river

19   from where he was tossing them.

20   Q    Okay.  And where was he tossing them?

21   A    Into a pile, I guess, on the -- where the -- where the

22   river was flowing out into the lake.  He was tossing them into

23   a pile, I guess, on the far side of that.  It would be the

24   eastern side of that I guess.

25   Q    And what did the gentleman that was tossing the rocks look

1    like?

2    A    He was, I am guessing, around 60 years old, slightly heavy

3    set.  He had glasses on, dark rimmed glasses.  May have even

4    been sunglasses.  They may have been the glasses that, you

5    know, change with the -- with the sunlight, but dark glasses,

6    khaki shirt.  Not too sure about the color of the shorts or

7    whatever he was wearing down below but khaki button down shirt.

8    Q    Did you see a shovel at all?

9    A    I did see a shovel.  Yes.

10   Q    Where?

11   A    It was stuck in the sand on the beach on, I guess all I can

12   say is national park property beach.

13   Q    If we could please pull up Government's Exhibit 14?  Do you

14   recognize anything in this photograph?

15   A    Yes.  I do.

16   Q    What do you recognize?

17   A    The gentleman bent over by the pile of rocks and the shovel

18   that's stuck in the sand.

19   Q    And when you say that you recognize the gentleman bent over

20   by the pile of rocks, what do you mean?

21   A    The fact that he was picking up rocks from there, walking

22   maybe halfway across that current and tossing the rocks into

23   the other pile that's by that turquois -- turquois floaty thing

24   there.

25   Q    Okay.  So the man in Government's Exhibit 14 that's bending

1   down, that's the same person you have been describing with

2   respect to the rocks?

3   A    Yes.

4   Q    Okay.  And you mentioned a turquois floaty in the middle of

5   the photograph and another pile of rocks, is that correct?

6   A    That's correct.

7   Q    And so you saw him building the pile of rocks that was by

8   the turquois floaty?

9   A    That's correct.

10  Q    Okay.  So did you speak with this man at all?

11  A    He spoke with me.

12  Q    And what do you mean by that?

13  A    After tossing a few rocks he took the liberty of just

14  walking over to me.  I believe I was standing a little bit to

15  his right out of the frame there.  He made it a point to

16  mention to me that as he tossed rocks or placed rocks that they

17  were doing some good to help the flow of that current go out to

18  Lake Michigan.

19  Q    Did he say anything else in that conversation with you?

20  A    He did mention that earlier in the day or in the morning he

21  took his boat out.  Apparently that outlet right there wasn't

22  there at the time, and he took his boat probably a quarter to a

23  third of the mile down the beach where the natural river mouth

24  was in order to fish out in Platte Bay, and -- and then when he

25  came to come back up the river he couldn't get his boat back up

1  the river because of the shallowness of the river.  So he took

2  the liberty to tell me that he went into town, bought some

3  shovels, took $300 out of the bank, hired three Mexicans to

4  help him dig his way up the river and get his boat back up the

5  river.

6  Q   At some point when you were there did you see a park ranger

7  approach the man?

8  A   I did eventually see a park ranger approach the man.  Yes.

9          MS. BIKSACKY:  And if we could please play

10  Government's Exhibit 2B?

11          (Video started, 10:44 a.m.)

12          (Video stopped, 10:45 a.m.)

13  BY MS. BIKSACKY:

14  Q   Do you see yourself in this body camera footage?

15  A   Yes.  I do.

16  Q   Where are you?

17  A   I am kind of standing on a little outcropping there.  I

18  have got a hat on, a tank top.

19  Q   Is that the person directly behind where the shovel is

20  sticking up?

21  A   Yes.  Right.  Yes.  Right behind and to the right of the

22  shovel, that's me.

23  Q   And was this the general area where you were when you

24  observed the man stacking and throwing the rocks?

25  A   Yes.  I don't think I ever left that spot the whole time I

1     was there.

2     Q     Approximately how long do you think you observed the man

3     moving the rocks?

4     A     Probably about a half hour, maybe a little bit more.

5     Q     So after this National Park Service officer left the area,

6     did you speak with the man again or did he speak with you

7     again?

8     A     So he -- yes.  So after he talked to the officer from NPS,

9     which was probably about -- if you can see the shadow, it was

10    probably right about there, and after he talked to him the

11    gentleman said, I dodged a big ticket right there.

12          MS. BIKSACKY:  No further questions.

13          THE COURT:  All right.  Mr. Valentine, cross

14    examination?

15          MR. VALENTINE:  Thank you, Your Honor.

16                    CROSS EXAMINATION

17    BY MR. VALENTINE:

18    Q     Mr. Walby, you can hear me fine?

19    A     Yes.  I can.

20    Q     Good.  That part of the Platte River that a boat might have

21    gone down before this trench was -- was dug, it may be clear to

22    everybody, but it's also clear to you that the current flows

23    down a long channel, is that right, before the trench is dug?

24    A     Yes.  It flows very close to the beach.  Probably the

25    deepest part of that river, you know, is probably -- was only

1    10 feet from the beach.

2    Q    Okay.  And it would be equally clear to you that if

3    somebody needed help with his boat to get it back in, it would

4    be to get his boat up that channel?  Now, we are talking before

5    the trench was dug, is that right?

6    A    Yes.  If you took a boat out there, chances are you would

7    need help getting it back up.

8    Q    Right.  He is there to go with the current out to the big

9    lake?

10   A    Yes.

11   Q    Tougher to bring it back up that same channel?

12   A    Yes.  It is.

13   Q    If he needed help from anybody you'd likely need to coming

14   back up the channel, is that right?

15   A    That's correct.

16   Q    All right.  You got there about 6:00 p.m. is what you told

17   us, is that right?

18   A    Between 5:00 and 7:00 p.m. is when I was there.  I did not

19   have a watch.  I did not have a cell phone.  I am just going by

20   how long I knew it took us to get down the river, put our

21   kayaks in our vehicles and then walk down to Platte River

22   point.

23   Q    All right.  But you talked to Ms. Biksacky, pardon me,

24   before you testified here today, correct?  Might have been

25   yesterday; might have been on the phone; might have been

1    whenever, right?

2    A    Yes.

3    Q    And you testified when she first asked you here, when you

4    arrived you said approximately 6:00 p.m., is that correct?

5    A    Yes.  That's correct.

6              MR. VALENTINE:  Okay.  Thank you.

7              MS. BIKSACKY:  No redirect examination.

8              THE COURT:  Okay.  Mr. Walby, thank you for your

9    testimony.

10             THE WITNESS:  Okay.  You are welcome.

11             THE COURT:  You may step down.  Appreciate your time.

12             (Witness excused, 10:49 a.m.)

13             MS. BIKSACKY:  The government calls Scott Dekkers.

14             SCOTT DEKKERS, GOVERNMENT

15             having been first duly sworn, testified as follows:

16             (Witness sworn, 10:49 a.m.)

17                     DIRECT EXAMINATION

18      BY MS. BIKSACKY:

19    Q    Would you please introduce yourself?

20    A    My name is Scott Dekkers.

21    Q    What do you do for a living?

22    A    I am a supervisor and law enforcement officer with the

23    National Park Service currently stationed at Sleeping Bear

24    Dunes National Lakeshore.

25    Q    How long have you been with the National Park Service?

1    A    I have been working with the National Park Service in a law

2    enforcement capacity since 2010.

3    Q    And you said you were currently stationed at Sleeping Bear

4    Dunes?

5    A    That's correct.

6    Q    How long have you been at Sleeping Bear Dunes?

7    A    I transferred to Sleeping Bear Dunes in May of 2019.  So I

8    have been there approximately five years.

9    Q    You mentioned you were a supervisory law enforcement

10   officer.  What does that mean?

11   A    I supervise one of the districts at Sleeping Bear Dunes

12   National Lakeshore.  I supervise employees in all aspects of

13   law enforcement.

14   Q    And what district do you supervise?

15   A    I supervise in the Platte River District.  Sleeping Bear

16   Dunes National Lakeshore is divided into two districts.  I've

17   got the Leelenau District and the Platte River District and I

18   supervise employees in the Platte River District.

19   Q    And does the Platte River district include the Platte Point

20   area that we have been discussing at trial today?

21   A    Yes.  It does.

22   Q    Were you present at the Platte Point area on August 15th

23   when Officer Bahm approached the Defendant?

24   A    No.  I was not present.  I was on a regularly scheduled day

25   off.

Q    And Officer Bahm testified that he contacted his supervisor

about the situation.  What can you tell me about that?

A    Yes.  Officer Bahm called me that particular day on August

15, 2022, while he was at home at my residence.  I accepted his

phone call and we had a discussion about what he observed.

That call was at approximately 6:10 to 6:15 p.m.

Q    And was -- were directions given to Officer Bahm about how

to respond to what he observed?

A    Yes.  I gave him direction to identify the individual,

conduct what we considered to be a field interview, and not

issue any citations, and will do further assessments after the

fact to determine if damage was done and whether to submit his

report or any further investigation to the prosecutor.

Q    Okay.  And after that initial call, where you were in a

supervisory role, did you have any involvement with the case

after that?

A    Yes.

Q    Could you generally describe what your involvement in the

case has been?

A    Yeah.  Generally I acted as a supervisor and supported my

staff as they investigated the crime.  Additionally, I acted as

a liaison between management and the National lakeshore, and

throughout the next several weeks following August 15, I met

with professionals and experts such as hydrologists and natural

resource managers while we conducted assessments of the damage

1    to the Platte River.

2    Q    So in the days and weeks following August 15th, did you

3    yourself personally go observe the Platte River with those

4    teams of folks that you mentioned?

5    A    Yes.  I did.

6    Q    Could we please pull up Government's Exhibit 15?  Do you

7    recognize this photograph?

8    A    Yes.  I recognize that photograph.

9    Q    It's dated August 17th, 2022.  Does that sound accurate?

10   A    Yes.  That's accurate.  And I took that photograph.

11   Q    Okay.  And what does the photograph show?

12   A    I am standing up on the bluff, or the dune, just before the

13   Platte River, and I am looking out, and this photograph faces a

14   new channel where the river had been diverted.

15   Q    And so to be clear, this photograph was taken two days

16   after Officer Bahm encountered the Defendant, correct?

17   A    That's correct.

18   Q    And was this photograph taken at the same area where

19   Officer Bahm encountered the Defendant?

20   A    Yes.  This is the exact location where he contacted him.

21   Q    So how generally does the size of the channel on this day,

22   August 17th, compare to the size of the channel when Officer

23   Bahm encountered the Defendant?

24   A    The size of the channel had grown substantially.  As you

25   can see in this photograph it had grown approximately 200 feet

wide.

Q    Do you have a general sense of why the channel grew?

A    Yeah.  After the new channel was created, which was much smaller, two days prior, just the natural power of the river, along with the rock dam that was created and built upon, encouraged the river to follow this new channel, and by following this new channel, little by little, it took sand and deposited it out into Lake Michigan and grew in size as it -- as sand sluffed off the left-hand side of that photo on that sand berm.

Q    If we could please pull up Government's Exhibit 18?  Do you recognize this photograph?

A    Yes.  I took that photo.

Q    And the date was August 18th, 2022, does that sound correct?

A    Yes.

Q    What does this photo show?

A    It's the same view relatively same point with the new channel.

Q    It's just taken at a different day and a different time of day?

A    In a slightly different angle but primarily the same location, and we refer to this area as Platte Point as we have discussed previously.

Q    So in this photograph we see a large outlet or channel out

1    to Lake Michigan.  Did the National Park Service explore

2    whether the park should refill in the sand or in other words

3    restore that area to prevent the channel out to Lake Michigan?

4    A    Yes.  There were discussions at the management level.

5              MR. VALENTINE:  Objections, Your Honor.  Hearsay.

6              MS. BIKSACKY:  Your Honor, I asked whether the

7    National Park Service explored this.  You know, there was some

8    intimation in pretrial conferences and the cross questions that

9    the Defendant didn't do all of this or maybe the damage wasn't

10   as great as they thought.  We are not going to go into

11   extensive details about any costs of filling in the sand,

12   however, it's important to understand the effect of the trench

13   from August 15th.

14             THE COURT:  I mean, he is a representative of the

15   national forest service.

16             MR. VALENTINE:  His statement was that there were

17   discussions at management level, not that he was a part of

18   those discussions.  Any information that he got from anybody at

19   management level that bears on the things that Ms. Biksacky is

20   talking about is likewise hearsay.

21             MS. BIKSACKY:  I can lay some foundation, Your Honor.

22             THE COURT:  All right.  Try.

23   BY MS. BIKSACKY:

24   Q    Were you in any discussions about whether that channel

25   should be restored?

```
1     A    Yes.

2     Q    Okay.

3     A    I apologize if I worded that incorrectly before.

4     Q    Okay.

5     A    But I was involved in those decisions.

6     Q    Let me ask you some specific questions.  Did the National

7   Park Service decide to restore that channel?

8              MR. VALENTINE:  Objection, Your Honor.

9              THE COURT:  Overruled.  I'll allow it.  You may

10  answer.

11             THE WITNESS:  No.  They decided not to -- we have

12  decided not to restore it.

13  BY MS. BIKSACKY:

14    Q    And as the supervisor of the Platte River area you were

15  integral to those discussions as well?

16    A    Yes.  I was.

17    Q    Okay.  If we could look --

18             MR. VALENTINE:  I withdraw my objection, Your Honor.

19  I apologize.  I anticipated a much different answer, and just

20  so the record is clear.

21             THE COURT:  That's all right.

22             MR. VALENTINE:  I have diffused an issue for appeal.

23  Thank you.

24             THE COURT:  Thank you.

25  BY MS. BIKSACKY:
```

1    Q    If we could look at Government's Exhibit 16, please?  What

2    are we looking at in this photo?

3    A    We are looking at a different angle but the new channel.

4    You can see the rock dam, the wing dams, as well as the newly

5    diverted channel.

6    Q    Okay.  You mentioned the rock dams.  This photo was taken

7    approximately three days later on August 18th, correct?

8    A    That's correct.

9    Q    So the rock dams were still there at that time?

10   A    That's correct.

11   Q    Why didn't you just go remove those rock dams to prevent

12   any further degradation of the sand bars?

13   A    There is significant red tape in doing so as well as

14   compliance in permitting that must take place in order to do

15   work such as that in the Platte River.  It was not something

16   that could be done in an instant or in a day or two.

17   Q    And when you went to the river in the days following the

18   incident, did you obtain a general sense of how the rock dams

19   were influencing the natural flow of water?

20   A    Yes.  In a general sense it was stopping the flow of water

21   down the original channel and diverting it to the new channel.

22   Q    If we could look at Government's Exhibit 17, please?  Do

23   you recognize this photograph?

24   A    Yes.  This photograph was taken by me.

25   Q    Also on August 18th?

1    A    Yes.

2    Q    And what does this show?

3    A    This shows the natural channel of the Platte River.  This

4    is downstream from the new diversion, and you can see in this

5    photograph that this previous channel is starting to dewater,

6    meaning that the water level is dropping.

7    Q    Okay.  And so when you say it shows the natural flow, prior

8    to August 15th, if a boat launched and wanted to get to Lake

9    Michigan, that boat would have to meander down this pathway to

10   the original outlet in Lake Michigan, is that correct?

11   A    That's correct.  You can see the natural mouth of the

12   Platte River down there on the far end of that stream or river.

13   Q    And what was the word you used about the water levels?

14   A    It was -- the water level had dropped and I call it

15   dewatering.

16   Q    Dewatering.  And what can you tell me -- did you take any

17   measurements in water levels in the days after August 15th?

18   A    I did.  At a location upstream approximately one-half mile

19   upstream at a location named Eldorado.  We have some decking in

20   that location.  It's another boat launch into the Platte River.

21   Although not a very good boat launch.  That decking, the

22   measurements I had taken indicated that water had dropped nine

23   inches in total.  Additionally, from that location around

24   Eldorado you could see riparian areas that had been dewatered,

25   having significant impacts on the resource.

Q   And I think you mentioned before that the channel grew to 200 feet?

A   That is correct.

Q   How do you know that?

A   I took measurements with an exactly 200-foot tape measure, and it was approximately 200 feet wide when I took the measurements, which was several days after the river had been diverted.

Q   Okay.  So what happened to the channel for the remainder of the summer 2022 season?  Did it still exist or did it close up on its own?

A   The new channel where the water had been diverted to remained, and the old channel, or the natural channel of the Platte River, which we are looking at right here, in time had completely dewatered, and it now just looks like the beach.

Q   Did you notice any increase in fishing boats in the area?

A   We did.  Following the diversion and easier access essentially into Platte Bay there was a significant increase in the number of boaters that came to the area, and the boaters that flocked to the area were fishermen, primarily coho fishermen, coho salmon fishermen.

Q   In your opinion, did the newly created channel impact the safety of the pedestrians who were in the river and at Platte Point?

A   Yes.  The increase in boaters to the area became somewhat

1    controversial.  It resulted in additional calls for service in

2    what we would call recreational user conflict, and so we had

3    disorderly situations where swimmers and families were getting

4    in arguments with boaters that were coming through.  The

5    concern is for the safety for those that are in the river that

6    are swimming.  Propellers on boats can certainly -- do create

7    significant injury if someone were to come in contact with a

8    propeller.

9    Q    So you mentioned you have been involved in the case

10   investigation somewhat since August 15th.  In the course of

11   your investigation have you become aware that some children

12   were involved with playing in the sand, digging or stacking or

13   moving rocks?

14   A    Yes.  We received tips from several witnesses that observed

15   children in the area digging and moving rocks around.

16   Q    When you were investigating and prosecuting this case, how

17   did you view the role of the children versus the role of the

18   Defendant?

19   A    The children -- through the course of the investigation we

20   determined that the children was nothing more than -- than

21   child's play, digging in the sand with what we would consider

22   to be toy shovels and other plastic toy tools such as sand

23   castle toys.

24   Q    And to be clear, you did not recommend charges against

25   those children, right?

1    A    That's correct.  We don't recommend charges against those

2    children.  There was a significant difference in what we

3    observed the children -- or witnesses stated the children were

4    doing versus what Mr. Howard had done, come down there

5    intentionally with a full size shovel in order to divert the

6    river.

7    Q    What does the Platte River look like today?

8    A    So I had mentioned it a little bit earlier, but the Platte

9    River now exits out this new diversion.  It still looks

10   relatively the same at the new diversion as pictures we have

11   seen here today, but this channel that we are looking at in

12   Exhibit 17 has completely dewatered.  That now just looks like

13   the beach.  There is a new mouth to the Platte River.

14              MS. BIKSACKY:  No further questions.

15              THE COURT:  All right.  Mr. Valentine, cross

16   examination?

17              MR. VALENTINE:  Yes, Your Honor.  Thank you.

18                    CROSS EXAMINATION

19   BY MR. VALENTINE:

20   Q    Agent Dekkers?  Officer Dekkers?  Which is the --

21   A    Yes, sir.  You can call me Officer Dekkers.

22   Q    Officer.  Thank you.  Officer Dekkers, it's a fair

23   statement generally that the amount of water in that longer

24   stretch that you say is now dry varies with whether or not the

25   new channel we're talking about today or dredging in the past

1    exists or not; fair statement?

2    A    Can you rephrase that again, please?

3    Q    Sure.  If a channel has been dredged or a channel had been

4    dug or however a channel is created up where the facts show

5    Mr. Howard was in this case, that affects the flow down that

6    stretch that you claim is now dry.  Fair statement?

7    A    Yes, sir.  That is correct.

8    Q    All right.  And that's -- it's always been the case, isn't

9    it, whether it's dredged or not determines how much water is

10   going to go that way instead of straight out to the lake?

11   A    Right.  If it's -- if it's dredged there is less water or

12   no water in the original channel.

13   Q    Okay.  In fact, if you take a look at the batch of

14   historical photos that are identified as Defendant's Exhibit A,

15   and it may not be marked that way, but it's the first

16   Defendant's exhibit.

17   A    I see it.  Yes, sir.

18   Q    That shows that, doesn't it -- for instance, take a look at

19   1998, a year it was apparently dredged.  There is no water

20   flowing down the long stretch of beach, is there?

21   A    That's correct.  There is no water flowing parallel to Lake

22   Michigan.

23   Q    And the same in 2005, correct?

24   A    Correct.

25   Q    2007, correct?

1    A    Correct.

2    Q    2009, '10, '16 on that page of photos, fair statement?

3    A    That's correct.  And in 2016, that was the last time that

4    either the state or the NPS dredged.

5    Q    All right.  Now, as I understand things, you weren't there

6    when that channel opened up on August 15, were you?

7    A    I was not present.  No, sir.

8    Q    All right.  You did not see children digging there,

9    therefore, correct?

10   A    Correct.

11   Q    You did not see the intensity and the number of children

12   that were digging, did you?

13   A    No, sir.  I was not present.

14   Q    Now, it's not a fair impression that rock dams are new or

15   of relatively recent creation in that stretch of the river, is

16   it?

17   A    The National Park Service was aware that there is rock

18   formations in that river.  They moved over time.

19   Q    Well, if you look back on the historical photos, all right,

20   and I am going to -- I'm going to get to that in just a second.

21   If you look back on the -- if you look back at the photo taken

22   on -- in Defendant's Exhibit E.  Can you take a look at that?

23   If you count five pages, it should be the fifth page.

24   A    I see it.  Is this the aerial photograph you are referring

25   to?

1    Q    It's the aerial photograph.  It's identified Defendant's

2    Exhibit E, and it is titled Google Earth Pro Image 2.  Do you

3    see that on it?

4    A    I do now.  Yes.

5    Q    Look roughly under that box that says Google Earth Pro

6    Image 2.  Look down there about an inch and-a-half on the

7    bottom edge of that box.  Do you see in that photograph what

8    appear to be dark, and I am going to suggest, rock dams

9    protruding into the long channel that flows down into the end

10   of that stretch of river?

11   A    Yes.  I see a formation.

12   Q    Pardon me.  You see a formation?

13   A    A formation of something.  A dark line.

14   Q    Okay.  It wouldn't be inconsistent with what are the rock

15   dams that have been described earlier, would it?

16   A    No.  Not inconsistent.

17   Q    And as far as your testimony goes as to what I think you

18   described as a deck or a dock or something up river from this

19   area?

20   A    Yeah.  That's correct.  There is some decking that

21   overhangs into the Platte River at Eldorado.

22   Q    All right.

23   A    It's a launch site on the Platte River.

24   Q    And that would likewise vary.  The water level there would

25   vary depending on whether the channel had been dredged or not.

1    Fair statement?

2    A    It could vary.  Yes, sir.

3    Q    With the channels being dredged meaning there would be a

4    lower level of water there, is that correct?

5    A    You would expect it.  Yeah.  When I took my measurements I

6    could -- you can tell the high watermark on a four-by-four

7    post, and I measured from the high watermark down to the top of

8    the water level at that time.

9    Q    And noticed that the water level had dropped naturally, is

10   that right?

11   A    That's correct.

12   Q    I don't mean naturally.  I mean logically, right?

13   A    That is correct.

14            MR. VALENTINE:  All right.  May I have a second, Your

15   Honor?

16            THE COURT:  Of course.

17            MR. VALENTINE:  Your Honor, that's all I have.  Thank

18   you.  Your Honor, that's all I have.  Thank you.

19            THE COURT:  You are welcome.

20            Ms. Biksacky, brief?

21            MS. BIKSACKY:  No redirect, Your Honor.

22            THE COURT:  Okay.  All right.  Officer Dekkers, you

23   may step down.  Thank you.  Thank you for your testimony.

24            THE WITNESS:  Thank you, Your Honor.

25            (Witness excused, 11:12 a.m.)

1    THE COURT:  Ms. Biksacky, additional witnesses?

2    MS. BIKSACKY:  Your Honor, that is the government's

3    case in chief.  I do see our witness coordinator.

4    Mr. Valentine and I have been chatting with him to see if any

5    of Mr. Valentine's witnesses have come.  If we could have a

6    moment to speak with them he could apprise the court of that

7    status.

8    THE COURT:  Sure.  Absolutely.

9    MR. VALENTINE:  I have my first witness here.

10   MS. BIKSACKY:  With that, Your Honor, the government

11   rests our case in chief and the Defendant's first witness is

12   downstairs.

13   THE COURT:  Okay.  We'll take a pause while we get the

14   witness up here.

15   MR. VALENTINE:  Thank you, Your Honor.

16   THE CLERK:  All rise, please.

17   (Recess taken, 11:12 a.m.)

18   (Resume Proceeding, 11:20 a.m.)

19   THE CLERK:  Court is back in session.  Please be

20   seated.

21   THE COURT:  All right.  Mr. Valentine, call your first

22   witness.

23   MR. VALENTINE:  Thank you, Your Honor.  Your Honor, I

24   don't have any opening statement to make, and I would propose

25   that we proceed with the Defendant's first witness.

1          THE COURT:  Let's do it.

2          AMY ROCHE, DEFENSE

3          having been first duly sworn, testified as follows:

4          (Witness sworn, 11:21 a.m.)

5          THE CLERK:  You may be seated.

6                        DIRECT EXAMINATION

7    BY MR. VALENTINE:

8    Q    Would you state your name for the record and then spell

9    your last name?

10   A    Amy Roche, R-o-c-h-e.

11   Q    And Ms. Roche, where are you joining us from today?  Where

12   did you come from?

13   A    Bloomington, Indiana.

14   Q    Go Hoosiers.  I went there.  Anyway.  Ms. Roche, just to

15   simplify things, you were at the beach at Platte Point on

16   August 15?

17   A    Yes.

18   Q    The afternoon of August 15, 2022?

19   A    Yes.

20   Q    And when you were there did you notice a big event that

21   caused a lot of hubbub and a lot of excitement among the people

22   that were around that area?

23   A    Yes.  I did.

24   Q    What was that event?

25   A    That was the digging of the outer berm bank of the end of

1    the Platte River right before its mouth that basically rerouted

2    the river into the lake.

3    Q    And -- and when -- when that river -- when that river

4    rerouted --

5    A    Yup.

6    Q    -- in your words, it caused a lot of excitement, is that

7    right?

8    A    Yes.

9    Q    All right.  Well, let's move -- let's -- let's go back

10   before that point in time and talk about what you saw going on

11   at that time.  All right.  What did you see -- first of all,

12   what time did you arrive at the beach there?

13   A    I don't recall exactly but it was mid-afternoon.

14   Q    Okay.  And when you got there, what did you see going on at

15   that time that -- at that point we are talking about?

16   A    At that exact spot on the bank?

17   Q    Right.

18   A    Yeah.  I wasn't looking at that spot when I first arrived.

19   There was -- there were many, many people on the beach so there

20   was play going on in the water and on the bank.  At the point

21   that I noticed that area specifically there was some very

22   vigorous digging going on in the bank.

23   Q    Was the word you used vigorous?

24   A    Vigorous.  Yes.

25   Q    And was that digging being done by adults and children?

A     I would say predominantly children and teenagers, possibly

adults.  I couldn't say for certain what their age was.

Q     Okay.  Approximately --

A     Mostly younger people.

Q     All right.  Did you refer to them as -- previously as kids

digging?

A     That's likely.  Yeah.  They were kids.

Q     And approximately how many kids did you see digging?

A     Ten to twenty.

Q     And when you saw those kids, 10 to 20 kids digging, did you

see any -- what were they digging with?

A     They were digging with what I would call sand toy tools and

buckets.

Q     And hands, too?

A     And their hands?  I don't recall specifically at this

point.

Q     Okay.  Did you see any what I think you have previously

referred to as legitimate tools?  Did you see any adult tools?

A     No.

Q     Did you see any shovels at all?

A     No.

Q     All right.

A     Sand toy shovels like children's shovels but not, you know,

construction tool shovel.

Q     And when you first saw that channel open up that you talked

```
 1    about --
 2    A    Yes.
 3    Q    -- can you tell us approximately how wide that channel was?
 4    A    I think about 10 feet wide.
 5    Q    And is that what caused your attention to be -- to move to
 6    that -- that -- that section after watching them dig was that
 7    water channel opening up?
 8    A    My attention and my friend's attention were on that area as
 9    soon as the excitement of the group started to mount.  They
10    were, you know, sort of yelling and egging each other on and
11    seemingly getting excited that they were getting close to this
12    point that would cause the -- yeah.
13    Q    Did you see -- did you see any children moving rocks?
14    A    Yes.
15    Q    And did you see where they were putting those rocks?
16    A    They were placing -- they were moving rocks around in the
17    existing river per se.
18    Q    Were they putting rocks on -- do you remember whether or
19    not they were putting rocks on any preexisting dams on the
20    Platte River?
21    A    Yes.  On seemingly handmade dams of a row of rock
22    perpendicular to the flow of the river with a gap in that row
23    that seemed to be for increasing its flow, if that makes sense.
24    Q    It makes sense.
25    A    Okay.
```

1          MR. VALENTINE:  That's all I have.  Thank you, Your

2     Honor.

3          THE COURT:  You are welcome.

4          Ms. Biksacky, cross examination?

5          MS. BIKSACKY:  Yes, Your Honor.

6                    CROSS EXAMINATION

7     BY MS. BIKSACKY:

8     Q    Ms. Roche, you mentioned you were at the Platte River in

9     mid-afternoon on August 15th, is that correct?

10    A    Yes.  Yes.

11    Q    And so to be clear, you weren't at the river at all that

12    morning?

13    A    Correct.

14    Q    And you weren't at the river at all the night before?

15    A    Correct.

16    Q    And you weren't at the river into the evening of August

17    15th?

18    A    I was not.

19    Q    Okay.  So you don't have any personal knowledge of what

20    might have happened at the river when you weren't there,

21    correct?

22    A    Correct.

23    Q    When you arrived you saw at least one pile of rocks that

24    you have been describing, is that correct?

25    A    I would call it a row, but yes.

1    Q    Okay.  And so you don't know originally who constructed

2    that row of rocks?

3    A    Right.

4    Q    And when you arrived I think you said there was an

5    approximately 10-foot wide channel or trench out to Lake

6    Michigan, is that correct?

7    A    In the outer bank, like dug into the outer bank.

8    Q    Yes.

9         MR. VALENTINE:  I'm sorry.  I didn't hear the question

10   when she arrived.

11        MS. BIKSACKY:  Yes.

12   BY MS. BIKSACKY:

13   Q    When you arrived was there a channel out to Lake Michigan?

14   A    No.

15   Q    Okay.  So what time do you think approximately that you

16   arrived?

17   A    I don't know exactly because I didn't have my phone with me

18   to -- to verify, but I would estimate that I was there

19   approximately 1:00 to 3:00 p.m.

20   Q    Okay.  And after you left at 3:00 p.m., you have no

21   personal knowledge of what happened to that trench, correct?

22   A    Correct.

23   Q    If we could please pull up Government's Exhibit 14?  You

24   have no personal knowledge about the man seen on the right side

25   of this photograph bending down near the rocks, is that

correct?

A    I do not have any personal knowledge of him.

Q    And you do not know whether after you left someone stacked rocks on the row of rocks that were there when you were present, correct?

A    Correct.

MS. BIKSACKY:  No further questions, Your Honor.

THE COURT:  All right.  Any brief redirect?

MR. VALENTINE:  If I may, Your Honor?  What was the last exhibit that you showed, Exhibit 14?

THE COURT:  14.

MR. VALENTINE:  I have no questions.  Thank you.

THE COURT:  Ms. Roche, you may step down.  Thank you for your testimony.

THE WITNESS:  Thank you.

(Witness excused, 11:29 a.m.)

THE COURT:  Great.  All these people going to the beach without their cell phones.  I just love that.  The way it should be.  Mr. Valentine, do you have another witness ready?

MR. VALENTINE:  I have a witness here who might have -- will last be excused.  I don't intend to call him.

THE COURT:  Okay.  And is that -- do you have other witnesses?

MR. VALENTINE:  I have two other witnesses, one who I expect any moment, and then finally Mr. Howard.

1      THE COURT:  Okay.  I don't know.  Thoughts?  Should we

2  break for lunch?  Come back in --

3      MR. VALENTINE:  I think that would be perfect.

4      THE COURT:  A little early, but makes sense.

5      MS. BIKSACKY:  Yes, Your Honor.

6      THE COURT:  All right.  We'll break for lunch.  We'll

7  see you all in -- an hour work?

8      MR. VALENTINE:  Perfect.  Thank you.

9      THE COURT:  All right.  We'll see you in an hour.

10      THE CLERK:  All rise, please.

11      (Recess taken, 11:30 a.m.)

12      (Resume Proceeding, 12:32 p.m.)

13      THE CLERK:  Court is back in session.  Please be

14  seated.

15      THE COURT:  All right.  Mr. Valentine?

16      MR. VALENTINE:  Thank you, Your Honor.  Your Honor, we

17  would call our next witness, and she is named Laura Calleja.

18      THE COURT:  Could you spell her last name?

19      MR. VALENTINE:  Yes, Your Honor.  It is C-a-l-l-e-j-a,

20  Laura common spelling.

21      THE COURT:  All right.

22      LAURA CALLEJA, DEFENSE

23      having been first duly sworn, testified as follows:

24      (Witness sworn, 12:32 p.m.)

25           DIRECT EXAMINATION

BY MR. VALENTINE:

Q    Laura, where are you coming from today?

A    Metro Detroit.  Well, I did spend the night in Kalamazoo last night but my home is in Livonia, Michigan.

Q    You stayed in your daughter's dorm.  Apparently a long time since you have done that?

A    Yes.  Very much a long time.

Q    Ms. Calleja, what do you do for work?

A    I am a teacher, middle school English, reading.

Q    I want to take you back to August 15 of the year 2022, roughly the afternoon of that day.  Do you recall where you were?

A    Yes.  I floated down the Platte River with my daughter and her friend and we ended up at the Platte beach.

Q    At the Platte beach did you say?

A    Yeah.  I think it's -- bay.

Q    And when you got to the beach what did you do?

A    Set up, you know, blankets.

Q    All right.

A    And towels and such.

Q    And when you set up your -- your -- your blankets, was there anything by where you were setting them up?

A    Yes.  I was -- there was what I am calling like a two-foot trench on the beach.

Q    And were you on -- we've -- you know, it's a little

1      confusing, and we have talked about this, and that is that the

2      beach there, although it may feel like it runs north/south, it

3      actually runs east/west?

4      A    Yes.

5      Q    Is that your understanding?

6      A    So I was east of the trench.  It was to my left, which

7      would have been west.

8      Q    Okay.  Approximately how far from that trench did you set

9      your blankets up?

10     A    Pretty close to it.  My daughter and her friend were on the

11     west of me.

12     Q    On the other side of the trench?

13     A    No.  No.

14     Q    Okay.  On the west --

15     A    We were all east of the trench.

16     Q    I follow.  All right.  And when you say pretty close, a

17     matter of a few feet?

18     A    Yes.

19     Q    Five feet, how much?

20     A    Well, where the girls set up I would say probably within

21     three feet, but they had to move.

22     Q    They had to move.  Why did they have to move?

23     A    The beach disappeared.  As the kids were digging the trench

24     got larger.

25     Q    All right.

1    A    So they ended up moving, I'm sorry, to the other side of

2    me.

3    Q    So you say they were digging the trench.  Let's explore

4    that a little bit.  Who was digging the trench?

5    A    Lots of kids.

6    Q    And can you tell me the approximate number when you say

7    lots?

8    A    It varied from time to time, but at times 10 to 15.

9    Q    All right.  And were they under any kind of adult

10   supervision?

11   A    No.  It didn't appear that way.

12   Q    All right.  Did you see -- well, I guess I can ask you flat

13   out, did you ever see a fella named, the guy sitting at this

14   table next to me, the Defendant, Andy Howard?

15   A    No.  No.  Not that I am aware of.  No.

16   Q    All right.  When was the first time you saw him?

17   A    In the hallway.

18   Q    Today?

19   A    Today.  Today.

20   Q    All right.  Yes.  Well, let's talk a little bit about

21   the -- these children digging this trench.  All right.  Now,

22   when you say there were -- and tell me the number you said

23   again?  I apologize.

24   A    You know, it varied because as kids play on a beach some

25   join, some leave, some join, and so I don't -- you know, it

1    could be honestly sometimes as low as, you know, as kids are

2    changing, their kids are getting called, I don't know, six, but

3    then again there were bigger groups at times, too, as, you

4    know, the kids saw them playing in the sand they came over.

5    Q    You were close enough to see what they were digging with

6    I -- I expect, is that right?

7    A    With their hands.

8    Q    With their hands.  Were they using toy shovels too?

9    A    They could have been but it was -- it was a very much

10   hands-on activity.

11   Q    All right.  Is there any kind of -- any way you would

12   describe the vigor or the energy with which they were digging?

13   A    Yes.  They were, I think I may have even used the mob

14   mentality as in that they were very excited about what they

15   were doing, and somewhat I -- I believe to, in response to my

16   interaction, brief interaction, I believe they responded even

17   more vigorously because I was not fond of what they were doing.

18   Q    Okay.  Okay.  So you were there and you are a teacher you

19   said?

20   A    Yes.

21   Q    All right.  And so they heard somebody say to them -- what

22   did you say to them?

23   A    Well, at this point when they got very close, because

24   again, my daughter and her friend were to my left, which was to

25   the right of the trench, to the east of the trench, but so much

1   sand had disappeared because of the digging that both of them
2   had to get up and move onto the other side of me.  There was no
3   more real estate.  So I am thinking by that point it was
4   probably about 10 feet at least of sand that had disappeared
5   and I said, I am not moving, stop getting dirt on me.  Go dig
6   over there.
7   Q   You were getting, would you say, dirt?  Are you referring
8   to sand?
9   A   Yeah, yeah, yeah, yeah, yeah, yeah.  Because again, it was,
10  you know, almost like how a dog, you know, kicks behind them.
11  They were very excited.
12  Q   So you got sand on you from this digging?
13  A   Yeah.  A little bit until I -- again, as a teacher there is
14  something, sorry, but we feel like we can tell everybody what
15  to do.
16  Q   You think they sensed you were a teacher and it was
17  summertime and they mattered at all or not?  I withdraw that
18  question.  It's silly.  I apologize.
19          At the same time, though, what ultimately happens as
20  you are sitting there?
21  A   I believe the attention that I gave it may have even made
22  them a little more excited to work as a team because they
23  started chanting.  You know, I can't remember all of it, but it
24  was like when are we going to stop?  Never.  And you know, so
25  the kids were just very excited in what they were doing.

Q    What -- what -- did anything result from what they were
doing?

A    Very much so.

Q    Did anything happen?  What happened?  What resulted from
that?

A    The -- the river was diverted.  It was very fun for the
beach goers because as people were approaching the water was
rushing so much people were bringing their floaties up, kids
were kind of rafting down.  It was a toy to them.  And when it
was time for us to leave, it was very difficult to even walk in
that current because, you know, we had to get to that other
side to go to the parking lot.  So it was -- honestly, it was
an amazing thing that it happened as quickly as it did.

Q    Did you happen to take some photographs that day?

A    Yes.

Q    I am going to direct your attention to what is Defendant's
Exhibit M.

        Now, may I approach the witness and help her find that
exhibit, Your Honor?

        THE COURT:  You may.

        MR. VALENTINE:  Because these aren't numbered, or
excuse me, these aren't lettered.

        THE WITNESS:  M looks like the first picture I took
when I was there.

        MR. VALENTINE:  Let's see which one it is because I

1    have a numbered set here.

2              THE WITNESS:  Is it under or before?

3              MR. VALENTINE:  They are not numbered but they are

4    tabbed, aren't they?

5              THE WITNESS:  Yes.  Here and after.

6    BY MR. VALENTINE:

7    Q    Let's go to -- let's go to Exhibit M, please.  Can we put

8    it on the screen?

9    A    So that's N.

10   Q    That's not my N.

11   A    You are looking for M as in Mary.

12   Q    I am saying N as in Nancy.

13   A    Okay.

14   Q    No.  I'm sorry.

15             THE DEFENDANT:  That's N.

16             MR. VALENTINE:  That's not what I am looking for.  The

17   one before that.

18             THE DEFENDANT:  M.

19             MR. VALENTINE:  M, please.  I apologize.

20   BY MR. VALENTINE:

21   Q    Do you recognize that picture?

22   A    Yes.

23   Q    Is it one that you took?

24   A    Yes.  It's the first of mine.

25   Q    And what do you see in that picture?

1    A    That is what I am calling the trench that was dug out when

2    I got there.  So that, to me, is looking like an approximately

3    about two feet wide.

4    Q    Okay.

5    A    And so I was -- if you are looking at it I was seated to

6    the right.

7    Q    We don't see in the picture, but do you recall how far and

8    we'll say back or how far away from the lake that trench

9    extended?

10   A    So from -- you are talking from the waves backwards?

11   Q    Correct.  I am talking from roughly its bottom center back,

12   did it extend?

13   A    I would possibly -- maybe as wide as this room maybe.  I

14   don't -- like, behind --

15   Q    Are you talking about the distance over the we'll call it

16   the sand --

17   A    Yes.

18   Q    -- to the river?

19   A    Yes.

20   Q    Okay.  And so it was the trench that you were sitting next

21   to?

22   A    Um-hum.

23   Q    Getting sand on you from the digging and --

24   A    Yes.

25   Q    That you can identify that as the trench, is that right?

1    A    Yes.

2    Q    Now, you described, I think, ultimately that trench is

3    opening up as a result of this digging, is that correct?

4    A    Yes.

5    Q    All right.  Would you take a look at Exhibit N, please?

6    Now, do you recognize that picture?

7    A    Yes.  I took it.

8    Q    Okay.  Approximately how long after the first picture was

9    taken was that one, if you know?

10   A    You know, I would say probably got there about 2:30.  This

11   was probably maybe about 3:45 maybe.  It could have been a

12   little bit later because they were floating.  You know, you can

13   see the kids floating, you know, down.  So they are doing that

14   for a while.

15   Q    We'll get to that one in a second.  I think I might not

16   have asked you earlier.  At any point in time you didn't see

17   Mr. Howard by that trench?

18   A    No, sir.

19   Q    Whether it was at the time it was being dug or at the time

20   it opened up, is that correct?

21   A    Correct.

22   Q    All right.  So that's -- so then let's turn to Defendant's

23   Exhibit O, please.  That would be the next one following.  Do

24   you recognize that picture?

25   A    It's possible.  It looks like some of the pictures I did

1    take, but I honestly, without looking at my --

2    Q    It's not one you recognize as you having taken?

3    A    Right.  But I have several like this so I can't be certain.

4    Q    Okay.  That's -- ultimately what do you see in that

5    picture?

6    A    Where the trench was I would say taken over by water.  This

7    could have been one as I was leaving, but I don't think I was

8    that far out, but where the water is rushing, that was the,

9    what I was calling real estate that we were hanging out on the

10   beach.  That's eroded into the water.

11   Q    When you were there at the beach that day, did you notice

12   children doing anything with rocks on -- in any location there?

13   A    Maybe ones that were part of the, you know, just in the

14   sand or something, but nothing -- I didn't notice any.

15   Q    You didn't see rockers piled up?

16   A    No.  No.  I didn't.

17   Q    Okay.  Finally, let's go to Defendant's Exhibit T, please.

18   A    T?

19   Q    T as in Tony, and you will see that as --

20             THE COURT:  Hold the button.

21             THE WITNESS:  You know, there is nothing under T.

22             THE COURT:  Well, you are getting the important one

23   then.  I am teasing.  All right.  Mr. Valentine, what do we

24   have?

25             MR. VALENTINE:  All right.  Would you play Exhibit T?

1                    (Video started, 12:45 p.m.)

2                    (Video stopped, 12:45 p.m.)

3       BY MR. VALENTINE:

4       Q    Did you see that video?

5       A    I did.  I saw myself in the video.

6       Q    Okay.

7       A    And my daughter and her friend.

8       Q    So does that -- that -- that -- that's what anybody would

9       have saw if they had been there on that date at that time,

10      correct?

11      A    Yes.

12      Q    All right.  Let's go now to, if we could, Exhibit -- and I

13      am going backwards here, but it would be Defendant's Exhibit H,

14      and you don't have it.  It's going to be on the screen.

15      A    Okay.

16                   (Video started, 12:46 p.m.)

17                   (Video stopped, 12:47 p.m.)

18      BY MR. VALENTINE:

19      Q    Do you recognize that video as well?

20      A    Yes.

21      Q    The one you took?

22      A    I did.

23      Q    All right.  And that shows the water going from the

24      original channel out to the lake, correct?

25      A    Yes.

1        MR. VALENTINE:  I understand now.  I am sorry.  I put

2  it altogether.  That's all I have.  Thank you very much.

3        THE COURT:  All right.  Cross examination --

4        MR. VALENTINE:  Not yet.

5        MS. BIKSACKY:  -- Ms. Biksacky?

6                     CROSS EXAMINATION

7   BY MS. BIKSACKY:

8   Q    Ms. Calleja, you testified that when you arrived there was

9   some existing trench in the area, correct?

10  A    Yes.

11  Q    You were not at the area earlier in the morning, right?

12  A    Correct.

13  Q    And you weren't there the night before?

14  A    No.

15  Q    And so you don't have any personal knowledge about who may

16  have dug that existing trench?

17  A    No.  I don't.

18  Q    Okay.  And you mentioned you saw the children playing and

19  digging in the area.  To be clear, none of those children had

20  large garden shovels, did they?

21  A    No.

22  Q    And approximately how long were you at the beach that day?

23  A    Two-thirty to about five.  So a little over two hours, two

24  and-a-half hours.  We just come off the Platte, rafting down

25  the flood Platte.

1    Q    And I think in the video, one of the videos we watched that

2    you were in there was a pile of rocks in the water.  Do you

3    remember that?

4    A    Yes.  Yeah.

5    Q    You don't know who initially built those piles of rocks, do

6    you?

7    A    No.  They -- I had been there two weeks prior and it seemed

8    similar to what it looked then.

9    Q    Okay.

10   A    But yeah, it was only my second visit there.

11   Q    If we could please pull up Government's Exhibit 14?  You

12   did not see the man in the tan colored shirt building the rock

13   piles while you were there, correct?

14   A    Oh, no.

15   Q    Okay.  And you didn't see anyone while you were there

16   digging with that shovel, correct?

17   A    No.

18   Q    And so you don't have any personal knowledge about what

19   happened at the river after you left that day, correct?

20   A    Correct.  Correct.

21        MS. BIKSACKY:  No further questions.

22        THE COURT:  All right.  Any redirect, Mr. Valentine?

23        MR. VALENTINE:  No, Your Honor.  Thank you.

24        THE COURT:  All right.  Ms. Calleja?

25        THE WITNESS:  Calleja.

1        THE COURT:  Calleja.  So sorry.

2        THE WITNESS:  That's okay.

3        THE COURT:  Thank you so much for your testimony.  You

4   are excused.

5        THE WITNESS:  All right.  Thank you.

6        THE COURT:  Have a nice day.

7        (Witness excused, 12:50 p.m.)

8        THE COURT:  Mr. Valentine?

9        MR. VALENTINE:  Thank you, Your Honor.  Your Honor, we

10  would next call the Defendant, Andrew Howard.

11        ANDREW HOWARD, DEFENSE

12        having been first duly sworn, testified as follows:

13        (Witness sworn, 12:50 p.m.)

14                DIRECT EXAMINATION

15  BY MR. VALENTINE:

16  Q   Mr. Howard, please spell your name, and excuse me, please

17  state your name and spell your last name.

18  A   Andrew Blair Howard, H-o-w-a-r-d.

19  Q   Mr. Howard, how old are you?

20  A   Sixty-three years old.

21  Q   And what do you do for work?

22  A   I am a financial advisor.  I have my own office here in

23  town with staff for 41 years.

24  Q   Does that -- you work for a company that has a name?

25  A   Premier Financial Consultants, Inc.

Q    And what is your level of education and any certifications
that you might have to do what do you?

A    I have my bachelor of science in business from Central
Michigan University and my chartered financial consultant
degree from the American College in Bryn Mawr, Pennsylvania.

Q    Is there anything remarkable as far as that chartered
financial consultant degree goes and you in obtaining it?

A    It is considered, like, a graduate degree, a master's type
degree in financial planning.  Very similar to a certified
financial planner.  It's one of the higher degrees you can earn
as a financial advisor.

Q    Are you familiar generally with the area around Sleeping
Bear?

A    Yes.  I have been going there since 1982.

Q    And do you have any -- what are your ties to the place, to
the location, to the area?

A    I began going there even in my latter college days.  My
first time down the Platte River in a boat watching the sunrise
come up over Sleeping Bear Dunes I said, this is a place for
me.  I fell in love and wanted to be there as much as I could.
I had a cottage in Baldwin that I would drive up an hour and 26
minutes to fish the coho salmon in Platte Bay, and then
eventually the wife and I had kept our eye open for property.
We ended up building a home in 2005 on West Platte Bay.  I can
actually see the mouth of the Platte River out my living room

1   window.

2   Q    I heard the word coho.  Do you have a nickname in those

3   parts?

4   A    Coho Andy.  I am a bit of a fishing fanatic.  One of my

5   favorite hobbies and over the years getting to know some of the

6   more ardent old boy fishermen have learned a lot of the tricks,

7   and so I usually am holding my own quite well on the catch out

8   there.

9   Q    Do you engage in any other activities while you are up

10   there?

11   A    Yeah.  I enjoy golfing, hiking, kayaking.  Just -- just

12   being there is a treat.

13   Q    And do you -- you say you go out on the lake a lot.  Do you

14   have a boat?

15   A    I do.  I have a 16-foot Lund and a 14-foot Jon boat.  The

16   Lund is a deep V boat, quit a heavy, well built aluminum boat

17   with a 50 horse motor.  The Jon boat is a 14-foot with a 9.9

18   horse motor.  I could access the bay with either boat but as

19   the river got shallower and faster I was sometimes forced to go

20   in a -- you know, it's not fun to go in Lake Michigan on -- in

21   a 14-foot Jon boat because you don't have the protection with

22   the sides of the boat.  Your safety is -- is as much at risk

23   especially with the weather changes that can occur.

24   Q    And the Jon boat is the flat bottom boat, is that right?

25   A    Yes, but if you have to fish you are going to get out there

1    one way or another.

2    Q    All right.  I am going to take you back to August 15 of

3    2022, and we can start with how you started that day?

4    A    I started that day at 6:00 in the morning going down the

5    old river bed because there had been no diversion at that

6    point.  Because of the current of the river it was favorable to

7    help me push my boat out.  I never had to get out of my boat.

8    Maybe at the sandbar at the very mouth.  I can't recall

9    exactly.  But I was able to navigate down the river.  I went

10   out.  Fished for four hours, caught the first three coho of the

11   season, which is a really big deal.  I mean, when they first

12   show up it's a pretty exciting event amongst the salmon

13   fisherman that, you know, they are here.  They have arrived.

14   And -- and so then navigating back up the river was very

15   difficult.  I had to get out of my boat.  And I was pulling it

16   through probably six inches to a foot of water with the rocks,

17   and there was no way that I could get the boat out alone.

18   There were some very kind swimmers, five men volunteered,

19   grabbed around the sides of the boat, and I never would have

20   gotten the boat out that day without the help of them.

21         So I eventually got out at noon, around noon that day,

22   and then drove home, cleaned my fish, drove into the Frankfort

23   hardware at 4:23 p.m. and bought two shovels.

24   Q    All right.  Let's -- let's back up a little bit before we

25   get to any shovels, and that is that you -- so you were fishing

1    there for approximately how long?

2    A    Four hours.

3    Q    Okay.  And you came back around noon, is that correct?

4    A    I came out, pulled my boat out at around noon and left.

5    Q    All right.  And what did you do then?

6    A    I went home and cleaned my fish, probably took, you know,

7    the regular nap during the midday from getting up and getting

8    going early.

9    Q    And where did you go from there?

10   A    I left my house and I went to Frankfort, the Frankfort

11   hardware, and purchased two shovels, and then proceeded back to

12   the Platte River, which is approximately a 30-minute drive.

13   Q    And could we take a look at Defendant's Exhibit E on the

14   screen, please?  Let me ask if you recognize that?

15   A    Yes.  That's the -- the old river bed since it had not been

16   dredged.  So yes.

17   Q    All right.  And when you say you had difficulty getting

18   your boat back in, are you referring to the long existing

19   channel?

20   A    Yes.  The weather, the blowing, the dune increasing, the

21   Lake Michigan being at record level high was allowing the lake

22   to keep pushing sand up and moving that river mouth down the

23   shoreline further and further.  So the Lake Michigan level has

24   quite a lot to do with where that river decides to go out.

25   Q    So you had an easier time of getting out than you did

1   coming in, is that correct?

2   A   Yes.

3   Q   Now, you heard testimony earlier about it being easier to

4   get in one direction and out one direction.  You have just

5   talked about it now.  Are there other concerns other than

6   people's fishing that permit, or excuse me, that are affected

7   by this long stretch that you had difficulty getting back in

8   once you got out?

9   A   There are concerns.  The -- I am a resident of Lake

10  Township, and so I happen to have a parking pass that, you

11  know, I can park in the first spot above the boat ramp.  Lake

12  Township and the State of Michigan have both expressed desire

13  to have that river accessible for emergency use, and in 2016, I

14  saved one of two men that went out the river in their kayak.

15  And it was calm near shore, but with the southwest wind they

16  kayaked out and got caught in the high winds, and Josh Parish,

17  as a 22 year old man that I went out in the dark in probably

18  three feet waves, 180 feet of water, and rescued him, called

19  the coast guard in.  We were not able to save his friend Tyler.

20  The helicopter came in.  The coast guard boats with lights, I

21  pointed them to the location I had pulled Josh out, and you

22  know, if -- if -- the quicker the access to him, I was one of

23  the last -- there were only two of us out there in boats and

24  had we not been there, it was getting dark, they both would

25  have perished.

1    Q    Now, getting back to that day, Saturday -- I apologize for

2    interrupting you.  So you went home and cleaned your fish and

3    said you possibly took a nap, probably took a nap?

4    A    Kind of the normal routine.

5    Q    All right.  And then what did you do?

6    A    Well, when I left my house I went to Frankfort hardware and

7    purchased two shovels and drove back to the Platte River.

8    Q    Could we have Exhibit S, please, on the screen?  The first

9    page.  Do you recognize Exhibit S?

10   A    Yes.  That is the receipt from the hardware for $56 for the

11   two shovels that I purchased.

12   Q    And do you recognize -- could we have Exhibit S, the second

13   page of that exhibit?

14           THE COURT:  Mr. Valentine, I have a hard copy of the

15   exhibit.

16           MR. VALENTINE:  That's fine.

17           THE COURT:  And it appears to me to simply be more of

18   the receipt.

19           MR. VALENTINE:  It is, but I wanted to go to 2 so I

20   can go to 3.

21           THE COURT:  Can we get 3?

22           MR. VALENTINE:  May I approach the witness, Your

23   Honor?  Never mind.  I'll let you catch up to me.

24           THE COURT:  Give her one second.

25           MS. KOL:  Are you asking for page 3 or Exhibit 3?

1          MS. BIKSACKY:  I think there is a question, Your

2     Honor, if he is asking for page 3 or Exhibit 3?

3          MR. VALENTINE:  Page 3.  Exhibit S, page 3.

4          MS. BIKSACKY:  And I believe there were some changes

5     made to the exhibits, so I think the electronic versions we had

6     did not have pages 2 and 3.  The government has seen pages 2

7     and 3, but I think that's accounting for when these were loaded

8     into the system.  There were some additional pages added and so

9     I think we'll have to use the hard copy.

10         MR. VALENTINE:  That will be fine.

11         THE COURT:  I have hard copies.

12         MR. VALENTINE:  You have it?

13         THE COURT:  Yes.  I do.

14         MR. VALENTINE:  You have it in front of you towards

15    the very back?

16         THE COURT:  It's the shovels.

17         THE WITNESS:  Yeah.

18    BY MR. VALENTINE:

19    Q    Shovel one.

20    A    Yes.  I have it.

21    Q    All right.  Those are the -- those last two things we

22    referred to, Exhibit S, page 3, and Exhibit S, page 4, you

23    recognize those as pictures of the shovels that you bought that

24    day, is that correct?

25    A    Yes.

1   Q    All right.  So after you bought those shovels, what did you

2   do?

3   A    I drove back down to the Lake Township parking lot and

4   carried one shovel down to the river having no idea that it had

5   been diverted.

6   Q    All right.

7   A    With the idea of moving some rocks and trying to make

8   better access if I had to go down the old branch the next time.

9   Q    All right.  Did you see on Exhibit S, page 1, any time

10  noted at the time you purchased the shovels at the hardware

11  store?

12  A    4:23 p.m.

13  Q    And that's from the first page of Exhibit S?

14  A    Yes.

15  Q    All right.  And so you got back to the -- you got back to

16  the Platte River there, and what did you do next?  Excuse me.

17  How long a drive is it from Frankfort -- let me finish,

18  please -- from Frankfort hardware store in Frankfort to the

19  Platte River?

20  A    Approximately 30 minutes.

21  Q    Okay.  So what time did you get back there as best you

22  recall?

23  A    Five to five-thirty.

24  Q    All right.  And when you got back there, what did you do?

25  A    I took one of the shovels and I hiked down along the river

1    with the thought in mind that I would try to move some

2    hazardous rocks as I have done for many years without ever

3    being questioned, sometimes for hours at a time, moving rocks

4    and improving the passage of the boat.  And so when I walked

5    down there and saw the new river diversion where they used to

6    drudge it I was in shock and I was also elated.  I was actually

7    ready to sing the hallelujah chorus and dance around because I

8    could not believe -- it was like a miracle of God that this

9    river opened up from when I left at noon and come back here.

10   It's blasting and wide open right exactly where all of us

11   fishermen would have preferred it be for the last five years.

12   There have been plenty of conversation about different ways we

13   could go down and try to open it and a lot of different

14   strategies came up over a five year period, but it was really

15   something to see without knowing how it even happened.  I

16   just -- it just -- it just felt miraculous.

17   Q    You've seen the exhibits, and you have heard the testimony

18   regarding the activities there as far as dredging went over the

19   years from, say, the year 2000 of roughly up until about

20   2016 -- 2016, is that correct?

21   A    Yeah.  The drudging even went back into the '80s.  It was a

22   long history of dredging.

23   Q    And that was something that you obviously favored from what

24   you are telling us.  Is that the case?

25   A    Yes.  It was.  I mean, there is -- there is large parking

areas both in the national park side and the Lake Township park. There's -- and -- and fishermen with their boats and trailers would park up both sides of the road sometimes for a half a mile both sides of the road with both lots filled. That was how much enjoyment was happening because that is the home of the coho salmon. That is -- Honor, Michigan is where the coho festival is. That's where they all return to where they were raised and planted there, and so it's -- it's a big deal.

Q    Let's focus a little more now on what you did when you got there. What did you do when you got down to that lake with -- down to that channel with your new shovel?

A    Well, when I went down there, instead of working on the old branch of the river I crossed over to where the new branch was and I was digging in the sand. There would be new rocks that would appear out of the sand because the river was like white water. I could hardly stand up it was rushing so hard. And so it was revealing new rocks, so I was taking those rocks, moving them to the side. But I felt the power of the water. If I would stick my shovel in the sand where I was shown at the new bank, it was like a glacier melting.

There was two feet deep of sand walls that were just falling in due to the current. So me sticking my shovel in was of, like, no consequence to the outcome. Had I done absolutely nothing, had I gotten back into my car, the outcome of this river diversion would not have changed. My actions did not

1    impact the outcome of the diversion of that river in one

2    respect.  And I told the ranger, I did not move one grain of

3    sand before that new river diversion opened up.  I had

4    absolutely zero to do with the opening of the new branch of the

5    river, otherwise, I wouldn't be sitting here today if I would

6    have done it.  I would have pled guilty and accepted my

7    rightful punishment.

8    Q    Well, that's talking about the sand, but what about rocks?

9    Were you down there and did you do anything with rocks?

10   A    Yes.  There were -- there were rocks that would appear from

11   the -- the river flowing out.  There were also rocks in the old

12   wing dam of the river that I would take and maybe throw into

13   the other side of the river to influence the current going out

14   the new branch, yes.  But the -- you have to understand the

15   number of rocks that are there.  If we look through some, you

16   know, we have seen that in some of our pictures already.  There

17   were hundreds of rocks and wing dams on both sides of the

18   river.

19   Q    Excuse me.  Hundreds of rocks?

20   A    Hundreds of rocks in each wall.

21   Q    And wing dams?

22   A    And so I would have to be superman to have come down there

23   at 5:30 p.m. and built the sized rock wall that were there.  So

24   I -- yes, I added to it, but I feel like my addition to it was

25   insignificant to the outcome of the -- the overall diversion.

1   Q    You heard testimony and saw exhibits on the screen

2   regarding wing dams.  Were wing dams something that first

3   appeared on that stretch of the Platte River during the summer

4   of 2022?

5   A    No.  Wing dams have always been built on the river.  They

6   were built both by the swimmers and the fishermen.  It's been a

7   common thing.  It's -- it's kind of enjoyable in a way.  I

8   mean, myself, I enjoy working down on the river.  I do stream

9   improvement on the Little Manistee River on a property that

10  I've got, and it's -- it's fun to actually work in the water,

11  and I had no ill intention.  I mean, to -- you know, to say

12  that I was being a vandal to my home river was just -- it's

13  just mind boggling.  So no, for me, it was I was enjoying

14  just -- just being there and just --

15  Q    How long did this activity that you are describing either

16  with the shovel or with the rocks, how long did that go on?

17  A    I would say approximately one hour.

18  Q    Now, when you were there that day, I mean, it may seem

19  obvious, but was the park open?

20  A    Yes.

21  Q    And does it close?  Do you know the hours or what they are?

22  A    I am not aware of any park closure time.

23  Q    Okay.  And do you -- you are not prohibited in any way from

24  being at that park, are you?

25  A    No.  No.  No.  I am a -- I am a township resident and even

1    have my own little private parking spot there.

2    Q    And you saw -- you have a private parking spot?

3    A    Not with my name but for township residents.  So they have

4    reserved about, oh, about 50 spots for township residents.  I

5    have the sticker on my dash for that.

6    Q    You recently, quite recently saw the exhibits that

7    Ms. Calleja testified to, is that right?

8    A    Yes.

9    Q    All right.  And I am going to show you some that involved

10   just a trench that had been dug there that was still dry and

11   nothing had gone through it.  Did you participate in any way in

12   the creation of that first trench, the two-foot wide trench

13   that she described?

14   A    I had no participation whatsoever in anything to do with

15   the trench.

16   Q    Did you participate in any way in digging out that trench

17   at the times that Ms. Calleja showed the waters -- that she

18   showed the pictures of the water rushing through?

19          THE COURT:  One at a time.

20   BY MR. VALENTINE:

21   Q    You have to let me finish.

22   A    I did not have anything to do with any change in the new

23   trench.

24   Q    And is it your opinion that what you did was something

25   insignificant as to whether that trench was going to get bigger

1     or not?

2     A     My actions would not have changed the outcome of the

3     diversion of the river in any respect because the power of the

4     amount of water that was coming down was so strong that my --

5     my activities there were just to make it more passable for the

6     next time I was going out the new branch with my boat.

7     Q     Would your answer be any different if the question were

8     regarding what has been referred to as wing dams in this case?

9     A     No.  I don't think the amount that I added to wing dams was

10    significant.  The number of rocks that I moved compared to the

11    number that were already in place is a small percentage.

12              MR. VALENTINE:  That's all I have.  Thank you.

13              THE COURT:  All right.  Cross examination,

14    Ms. Biksacky?

15                        CROSS EXAMINATION

16      BY MS. BIKSACKY:

17    Q     Mr. Howard, you just stated that it was -- it's your belief

18    that your actions would not have changed anything at the river

19    that day, is -- is that correct?

20    A     Yes.

21    Q     If your actions wouldn't change anything then why did you

22    spend an hour making your enhancements?

23              MR. VALENTINE:  Objection.

24              THE WITNESS:  Pure enjoyment.

25              MR. VALENTINE:  I apologize.  I did not hear the

1    question.  I just plain didn't hear it.

2    BY MS. BIKSACKY:

3    Q    The question was, if your actions wouldn't change anything

4    then why did you spend at least an hour making your

5    enhancements?

6    A    Pure enjoyment of being there, seeing the new branch opened

7    up, and to move rocks that would be detrimental to my propeller

8    going out my next time out.

9    Q    Okay.  So do you admit that your actions were making it

10   more passable for your boat in the future?

11   A    Yes.

12   Q    Okay.  And if we could please pull up Government's Exhibit

13   2B and play that?

14        (Video started, 1:14 p.m.)

15   BY MS. BIKSACKY:

16   Q    And I want to listen to your words at the end of this

17   video.

18        (Video stopped, 1:15 p.m.)

19   BY MS. BIKSACKY:

20   Q    So you said, I think I am making some headway.  Isn't that

21   true?

22   A    Yes.

23   Q    You were making headway channelling the water in the

24   direction that you wanted it to go, weren't you?

25   A    I wouldn't say making headway.  I think it's a play on

1    words the way you are phrasing it.  I would say making the

2    river more passable for my boat, and I didn't know there was

3    anything illegal about doing that.  How could I never have a

4    violation in all the years I have gone down the river?  I carry

5    a hard back rake in my boat and move rocks on almost a daily

6    basis.  I go down that river just about every day that it's

7    passable.

8    Q    So to direct you back to my question, you said you were

9    making headway at that moment, correct?

10   A    Yes.

11   Q    Okay.  And you admit that you moved rocks on August 15th,

12   correct?

13   A    Yes.

14   Q    They weren't your rocks to move, were they?

15   A    Who -- who owns the rocks?

16   Q    Do you have a deed for Platte Point?  Do you personally own

17   the property at Platte Point?

18   A    No.  It's public.

19   Q    Correct.  It's public land that is governed by the National

20   Park Service, right?

21   A    Yes.  So why would my moving a rock suddenly be a violation

22   that day and never were ever before?

23   Q    So to direct you back to my question, you admit that on

24   August 15th, you did move rocks --

25   A    Yes.

1   Q    -- correct?  And you admit that on August 15th, you threw

2   rocks in the river as well?

3   A    Yes.

4   Q    And you admit that on August 15th, you used that shovel in

5   the photo to dig up portions of the river basin?

6   A    Yes.

7   Q    Okay.  And we can take that exhibit down.

8           So you testified that you made it out to Lake Michigan

9   in your Lund fishing boat on the morning of August 15th,

10  correct.

11  A    Yes.

12  Q    And you caught three salmon that day?

13  A    Yes.

14  Q    Your first coho of the season?

15  A    Yes.

16  Q    But you were unable to make it back from Lake Michigan to

17  the boat launch?

18  A    Right.  By myself.

19  Q    By yourself.  So you had to get the help of approximately

20  five swimmers in the area?

21  A    They volunteered.  Very -- very -- there is a very kind

22  spirit down there.

23  Q    Was that the first time that your boat got stuck in the

24  Platte River in your years of fishing it?

25  A    No.

1   Q    So how often would you say that your boat would get stuck

2   in the Platte River?

3   A    It varies whether you have had rains.  So the amount of

4   water flow, the depth of the river, the way swimmers move rocks

5   around, sometimes there are barriers that are very difficult

6   to -- to get through from one day to the next.  So I would say

7   it's almost a regular practice since the river wasn't dredged

8   that we would pull our boat up, oh, at least a third of the

9   way.  We expected we could motor a certain distance and then

10  you almost kind of knew when you have to hop out and pull your

11  boat the rest of the way.

12  Q    And so when the river is dredged there are far fewer

13  incidents of your boat getting stuck, is that accurate?

14  A    Yes.  It's beautiful.  You go in and out.  You don't get

15  out of your boat.  It's -- I mean, back in the old days they

16  even put red and green buoys with chains on each side of the

17  new channel.

18  Q    And so would it be fair to say that when your boat gets

19  stuck in the river that's not ideal for you as a fisherman?

20  A    It's one of the hazards you have to tolerate.  If you want

21  to fish in heaven and paradise, then that's one of the things

22  you tolerate.

23  Q    And in this case you indicated to the park ranger that the

24  dams were making it near impossible for you to get back up, is

25  that correct?

1    A    Yes.  Especially in the photos where the two large wing

2    dams exist it makes the water about four feet deep and the

3    current extremely fast, and so alone you are pulling on the

4    front of your boat.  I would use my 16 foot rope to let the

5    boat out a ways, climb over the rocks and then pull the boat up

6    through.

7    Q    And did you call the National Park Service to let them know

8    that the wing dams were causing issues on August 15th?

9    A    Not on August 15th.

10   Q    Okay.  So instead you decided to take matters into your own

11   hands?

12   A    Well, I -- I guess I don't see anything different than I

13   have done in the past as far as moving rocks that are causing

14   problems with passage.

15   Q    Well, let me clarify that.  You are not a volunteer park

16   ranger for Sleeping Bear Dunes?

17   A    No.

18   Q    You have never been granted any authority by the National

19   Park Service to improve or enhance the river bed on their land?

20   A    I was never aware of any violation of doing that.  There is

21   no signage, no warnings.  I was surprised to see that there was

22   even code sections in the law that defined tampering and

23   vandalism, and so no, I was never aware and having never been

24   reprimanded.  This came as a surprise to me.

25   Q    So to direct you back to my question, you have never been

1    authorized by the National Park Service to make improvements to

2    their land?

3    A    No.  I do not think I was required to.

4    Q    Okay.  And you mentioned that you had a house nearby since

5    2005, is that right?

6    A    Yes.

7    Q    But you were fishing the Platte River for years before

8    that?

9    A    Yes.

10   Q    And it was your home river?

11   A    It was especially my home river since I built a home there,

12   but I fish all the waterways of Michigan.  I fish all the lakes

13   and rivers.

14   Q    You are a fishing fanatic I think were your words?

15   A    It's one of my -- yeah.  I'd say yes.

16   Q    And because of your house in the area, and because you

17   fished the area, you were aware of the dredging activities that

18   had occurred in the past at the Platte River?

19   A    Did you say judging activities?

20   Q    Dredging.

21   A    Oh, yes.  Absolutely.

22   Q    You were not happy with the decision for the government to

23   no longer dredge the Platte River, were you?

24   A    No.  And neither were any of the other fishermen.

25   Q    Okay.  So you and the other fishermen would often

1    commiserate about the lack of dredging, is that fair?

2    A    There were plenty of jokes and wise cracks and strategies

3    casted about.

4    Q    And I think on direct examination you said that you had

5    conversations with others and you would discuss how you could

6    go up and open it up, right?

7    A    Yes.

8    Q    Okay.  So you were talking about how you could dredge the

9    river?

10   A    All kinds of ideas.  I mean, I know a gentleman that owns

11   the excavating company in Honor.  We talked about him coming

12   down at night with his excavator.

13   Q    You spoke with a man who owns an excavating company about

14   going at night and opening up that river?

15   A    Yes.

16   Q    And the reason it was at night is because it's dark and it

17   would be harder to see, right?

18   A    Yes.  But I mean, there was no -- there was nothing serious

19   about it.  I mean, it was -- it was said jokingly.

20   Q    Okay.  But people do things at night when they don't want

21   to get caught, right?

22   A    They don't risk major companies in the area for a foolish

23   act.

24   Q    So you think dredging the river would be a foolish act?

25   A    To come down with an excavator, yes.  I had no idea what --

1    what the laws were regarding doing it with shovels.

2    Q    Okay.  So your belief was it would be foolish for an

3    excavator to do it, but to do it with shovels wouldn't be

4    foolish?

5    A    I didn't -- I -- I thought for sure that it would be with

6    an excavator because it always had to be permitted by the parks

7    service, but to come down with shovels I did not know that that

8    would be an equivalent violation.

9    Q    So you were aware that permits were necessary to dredge the

10   river?

11   A    I knew that permits had to be issued for the excavating

12   companies to be hired to go down in the past.

13   Q    And to be clear, to the best of your knowledge, no one had

14   a permit, including yourself, to dredge on October 15th --

15   excuse me, August 15th?

16   A    No.  And I didn't even know who did it.

17   Q    Okay.  So the timeline that you established on direct

18   examination was that your boat got stuck in the morning and it

19   was unstuck by noon, right?

20   A    Yes.

21   Q    And you did not go to the hardware store in Frankfort until

22   after 4:00 p.m., after potentially taking a nap and cleaning

23   your fish, correct?

24   A    Right.

25   Q    So you did not buy that shovel to undig your boat from the

1    sand, correct?

2    A    No.

3    Q    You went to the hardware store with the intention of buying

4    a shovel and going to the Platte River after your boat was

5    unstuck?

6    A    Yes.

7    Q    Okay.

8    A    I have never had to use a shovel to get my boat unstuck.

9    Q    Okay.  And you went to the Platte River with the intention

10   of opening up that trench to Lake Michigan, correct?

11   A    I did not.  No.  I did not.  I went to the Platte River

12   with the intention of improving the old river bed that had

13   given me so much trouble getting up that morning.

14   Q    If we could please play Government Exhibit 2I, please?

15          (Video started, 1:25 p.m.)

16          (Video stopped, 1:26 p.m.)

17   BY MS. BIKSACKY:

18   Q    You came down to the river on August 15th with the

19   intention of shoveling that very trench, correct?

20   A    It was only a thought.

21          MR. VALENTINE:  Excuse me.

22          THE WITNESS:  I would not expect --

23          MR. VALENTINE:  Your Honor, and it's a rather soft

24   objection, but it's one I nonetheless make.  You know, this is

25   a general intent sort of statute, or excuse me, regulation we

are dealing with here.  What his intentions were, his specific

intent to come down to do something at the river, was not -- is

not an element of this offense for purposes of the Court's

finding of guilty or not guilty.  So I mean, we have gone over

it and over it and that is that he has expressed an intent to

do any number of things, and I think this is now rehashing the

same thing over again.

MS. BIKSACKY:  May I respond, Your Honor?

THE COURT:  Sure.

MS. BIKSACKY:  This door was opened on direct

examination where counsel specifically asked him about his

intentions and whether they were, you know, evil, not evil was

the word, or whether they were ill intentioned.  So we are

simply going into the questions that counsel raised and exactly

clarifying what his intentions were that day.

MR. VALENTINE:  I don't think --

THE COURT:  Irrespective of that, even though it may

not be directly, the government may not have to prove it as an

element, I think it adds background to -- I have to find what

Mr. Howard's actions were, and I think his intentions, you

know, are at least relevant to provide background for what

those actions were.

MR. VALENTINE:  I will withdraw the objection now

anyway.  Thank you, Your Honor.

BY MS. BIKSACKY:

1    Q    You went down on August 15th with the intention of

2    shoveling that very trench, didn't you?

3    A    I would never expect to be able to dig the trench -- if you

4    look at the size of the banks and the volume of dirt that was

5    moved, I would never expect to be able to do that with a hand

6    shovel.  So it was more a thought and a comment, but not a

7    reasonable expectation.

8    Q    Okay.  If we could please pull up Government's Exhibit 14?

9    That's you in this photograph, isn't it?

10   A    Yes.

11        MS. BIKSACKY:  No further questions.

12        THE COURT:  All right.  Mr. Valentine, brief redirect?

13        MR. VALENTINE:  Only briefly, Your Honor.

14                    DIRECT EXAMINATION

15   BY MR. VALENTINE:

16   Q    Putting aside this discussion about your intentions.  Could

17   we have Exhibit C, please?  Your statements about making

18   headway or any success or lack of success you were having, is

19   it your testimony today that anything that you did caused what

20   we see in Exhibit C, which happens to be Exhibit 7, Government

21   Exhibit 7, Defense Exhibit C and Government Exhibit 7?  Did

22   anything that you did -- do -- did on that day in any way

23   affect ultimately what the outcome --

24   A    No.

25        THE COURT:  Mr. Valentine, why don't you restate your

1     question.

2           MR. VALENTINE:  I will, Your Honor.

3     BY MR. VALENTINE:

4     Q    Taking a look at Exhibit C, taking a look at -- that's

5     Defense Exhibit C.  Taking a look at Government's Exhibit 7, is

6     there anything that you did as you described what you did with

7     that shovel and that water rushing through that sand and those

8     existing wing dams and any rock that you might have placed on

9     one, would that in any way have affected what we see in Exhibit

10    7, which is the coast guard photograph of that channel now

11    three days after it was dug?

12    A    I do not believe my actions changed the outcome of the

13    river diversion in any respect.

14          MR. VALENTINE:  Thank you.  That's all I have.

15          THE COURT:  All right.  Mr. Howard, you may step down.

16    Thank you for your testimony.

17          THE DEFENDANT:  Thank you.

18          (Witness excused, 1:30 p.m.)

19          THE COURT:  Mr. Valentine, additional evidence?

20          MR. VALENTINE:  No, Your Honor.  The Defense rests.

21    Thank you.

22          THE COURT:  You are welcome.  The parties wish to give

23    closing arguments?

24          MS. BIKSACKY:  Yes, Your Honor.

25          THE COURT:  All right.  Why don't we take a break,

1    maybe 15 minutes, or is that fine?

2           MS. BIKSACKY:  Yes, Your Honor.

3           THE COURT:  Mr. Valentine?

4           MR. VALENTINE:  Yes, Your Honor.  Thank you.

5           THE COURT:  Okay.  Why don't we take 15 minutes.

6    We'll come back in here for closing arguments.

7           (Recess taken, 1:31 p.m.)

8           (Resume Proceeding, 1:49 p.m.)

9           THE CLERK:  Court is back in session.  Please be

10   seated.

11          THE COURT:  All right.  We'll hear closing arguments

12   now.  Ms. Biksacky --

13          MS. BIKSACKY:  Yes, Your Honor.

14          THE COURT:  -- the floor is yours.

15          MS. BIKSACKY:  I got pretty determined, so I took my

16   shovel and I just kept -- all I was doing was trying to keep

17   enhancing it and throwing these rocks to make it go that way.

18   Those were the words of the Defendant on August 15th, 2022,

19   describing what he did at Sleeping Bear Dunes.  He bought a

20   shovel and he intentionally altered the river by digging in the

21   sand and moving rocks.  He made a dam, or in his words,

22   enhanced what was already there, so that the flow of the river

23   would be diverted directly out to Lake Michigan for fishing

24   boat access.  The Defendant did it and he admitted it.  He

25   admitted his actions on August 15th and he admitted them on the

stand today.

Why did he do it?  He did it for coho salmon.  His name was Coho Andy.  He had been fishing that river for decades.  It was his home river, the home of the coho salmon, and his fishing boat was not able to traverse or access the Platte River easily when the river wasn't dredged.  What happened that day his boat got stuck?  He had to have people help him get it out.  And so what did Coho Andy do?  After his boat got stuck he went to the hardware store and he bought shovels, and then using one of those shovels he started digging up sediment to enhance that channel out to Lake Michigan.

He was a local fisherman, and the local fishermen were not happy with the access that the National Park Service had granted them or the lack of access that they had granted with them -- for them.  But it isn't Mr. Howard's decision to make. He doesn't get to decide what the National Park Service does with their land.  The government does.  The park service does. The ecologists that work for the government, the environmental assessments get to decide what happens with the land, not Mr. Howard.

You heard from several eyewitnesses today, all of whom confirmed that they saw Mr. Howard at the Platte River on August 15th, shoveling, digging near the trench, moving large rocks, placing them on a dam.  One of those witnesses, a high school cross country student, talked with Mr. Howard and he

admitted to her exactly why he was doing it, to make a gap so that his boat could get better access.

Another witness, Jamie Nelson, who was vacationing from Chicago, described that as she was there she saw Mr. Howard taking these actions and the river was reduced and more of the water was diverted out to the lake.

And then Kirk Walby also described an interaction with the Defendant where the Defendant said that his actions were doing some good.  And then we even saw on the body camera footage in the cross examination of Mr. Howard, after he threw a rock, he also acknowledged that his actions were doing some good in diverting the river.

It's uncontroverted that Mr. Howard was at the river on August -- on August 15th.  There he is with the shovel caught red handed.  There he is talking with Ms. S. about why he was doing it.  And there is the trench right there, the trench that witnesses seen him digging in the area of.

Now, to convict the Defendant of tampering and vandalism the government has a couple elements, and so I am going to talk about how Mr. Howard's actions in digging and in stacking those rocks meet the elements.

The Court has seen a before and after of the Platte River.  The photo on the left was taken in May.  The photo on the right was taken after August 15th.  Now, what I want the Court to listen to as I walk through the elements is that none

1    of the elements require we prove that Mr. Howard diverted a
2    river.  None of the elements require that we prove that
3    Mr. Howard did it single handedly or alone.  The reason the
4    government presented these before and after photos is so that
5    the Court could get an understanding of the background of the
6    dredging history and what actually happened in August.  The
7    government does not need to prove that Mr. Howard is the only
8    reason why that trench opened up into Lake Michigan.

9            So what the government does need to prove for
10   tampering are two elements, and I am going to go out of turn
11   and talk about the second element first, and the second element
12   here is not at issue and it's not at issue because both parties
13   have stipulated as to the second element.  And the Court read
14   that stipulation at the beginning of the proceedings.  The
15   Defendant's actions at issue in this matter, which occurred
16   on/or about August 15th, 2022, occurred within waters subject
17   to the jurisdiction of the United States located within the
18   boundaries of the National Park Service, Sleeping Bear Dunes
19   National Lakeshore, which includes navigable waters and areas
20   within their ordinary reach.

21           So the second element tampering has been met.  So all
22   that remains is the first element, that the Defendant tampered
23   or attempted to tamper with property or real property or moved,
24   manipulated or set in motion any of the parts thereof except
25   when such property is under one's lawful control or possession.

Now, you heard from the national parks and you heard from Mr. Howard that that land was not under his lawful control or possession.  His house was down the bay.  That is federal land, land that is entrusted to the government to protect and preserve for the enjoyment of everyone, not just for Mr. Howard and his fishermen friends.

Moreover, the evidence has shown that the Defendant moved both sediment and large rocks with a shovel.  That alone is sufficient to meet element No. 1.  He used his shovel to dig out sediment and to dig out large rocks.  He then moved the large rocks, stacking them and throwing them into dams.  That is enough on its own.

In addition, the government has shown that he has tampered with property as well.  So the plain meaning of tamper means to alter, misuse or corrupt, and again, it's not in dispute that Mr. Howard altered that waterway.  Now, Mr. Howard said, well, I have done it before and I never got in trouble so why should I get in trouble now?  That is not an answer to the criminal elements.  It does not matter if someone commits a crime and gets away with it.  What matters is what he did on August 15th, and what he did on August 15th was to move sediment and rocks and to tamper with the river basin of the Platte River.

Moving now to the second count, vandalism.  Again, the same second element is present, and again, the stipulations

1    mean that that element is no longer at issue.  So looking to

2    the first element, that the Defendant destroyed, injured,

3    defaced or damaged property or real property, and again, the

4    evidence has shown that he has done all of those items in red.

5    He injured the property when he dug up rocks and sediment.  He

6    defaced it by building structures, and he damaged it.

7            Now, it is true that the government cannot give a

8    quantifiable damage number at this time.  There has not been

9    evidence at the guilt stage about exactly how much of the

10   damage was caused by Mr. Howard, but the government does not

11   need to prove that at this stage.  The statute simply requires

12   some level of injury, defacement or damage.  And there are

13   actually other felony offenses that do require specific amounts

14   of damage or there is a felony offense that requires damage of

15   $1000 or more.  That is not what Mr. Howard is charged with

16   here.  What Mr. Howard is charged with here does not require

17   any specific amount of damage.

18           Now, in the cross examinations and in his own

19   testimony, the Defendant contended that he arrived at the beach

20   after the initial trench was dug, after the children were

21   digging in the sand and opened up that trench.  But again, in

22   looking at the elements the government does not need to prove

23   that Mr. Howard acted alone.  He does not need to prove that

24   there were not -- the government does not need to prove that

25   other people were not partially responsible, and the government

1    doesn't need to prove that he was the sole cause of any

2    diversion.  The statute is not diverting a river.  There

3    actually is a felony offense for diverting a waterway and not

4    having permission of the army corps of engineers.  Mr. Howard

5    is not charged with that.  He is charged with vandalism,

6    something that the government has proven.

7         All of Defendant's arguments here about what he deems

8    a negligible effect from his actions, those are all

9    inappropriate at the guilt stage.  Those are all inappropriate

10   at trial.  Those are sentencing arguments.  Those are

11   restitution based arguments.  Those are arguments that relate

12   to what this Court will have to decide after the guilty

13   verdict.

14        Now, in this case the government doesn't need to prove

15   intent.  I think we have had some discussions about that

16   throughout the proceedings, because these are general intent,

17   not specific intent crimes.  But in this case there actually is

18   no dispute that the Defendant's actions were both purposeful

19   and deliberate, and that purposeful and deliberate actions

20   provide helpful background to understand exactly what

21   Mr. Howard was doing there.

22        Mr. Howard's intentions were clear.  I came down today

23   with the intention of shoveling that very trench.  He said,

24   well, that was just his intention.  He didn't actually do it,

25   but we heard from witnesses that he was shoveling in the area

of the trench and he was moving rocks and stacking them.

I got three coho this morning, first time, and a laker.  And so that was the first cohos of the year, but you know, I wanted to come back and fish again, and with my Lund.  I just didn't think I could physically do it.  That's why I got pretty determined to come down today.

In his own words the Defendant was determined.  He wasn't an innocent child playing in the sand with shovels or with hands trying to understand the flow of the water or to get a tube down the river.  No.  He was a man on a mission.  He was determined to enhance the channel.  It was opened up like that and so I took my shovel and I just kept -- all I was doing was just trying to keep enhancing it and throwing these rocks to try to make it go that way.

Mr. Howard claimed, although he is not a hydrologist, that everything he did didn't actually make any -- any actual effect.  He was moving the rocks to try to make an effect.  It doesn't matter whether it did or not.  It matters whether he tampered and whether he vandalized.

But what was important was that he agreed that he was upset with the dredging decision.  That he would meet with his fishing buddies, his local buddies in the area, and they would commiserate about how unfortunate it was that they didn't have access to Lake Michigan.  They schemed about how they -- and dreamed and schemed about how they might go in and open up that

1    channel with an excavator in the dark of night because they

2    knew they didn't have a permit.  Mr. Howard knew he didn't have

3    a permit.  He knew that what he was doing would be wrong.

4    Mr. Howard was caught in the act with a shovel, a beer, and

5    placing rocks on August 15th.

6            The government has conclusively established with its

7    proofs and with its evidence that the Defendant violated both

8    the tampering and vandalism provisions of the law.  Find the

9    Defendant guilty of both counts.  Thank you.

10            THE COURT:  You are welcome.

11            MS. BIKSACKY:  And I would ask to have time allowed

12    for a brief rebuttal after Mr. Valentine's.

13            THE COURT:  Certainly.

14            Mr. Valentine?

15            MR. VALENTINE:  Thank you, Your Honor.

16            Your Honor, we are not saying that the Defendant's

17    actions were negligible.  We are saying they just flat out

18    didn't matter.

19            Now, the government has chosen not to bring in an

20    expert witness in this case.  The only testimony, the only

21    evidence the Court has in front of it is that it just plain

22    didn't matter.  Yeah.  He claims it didn't matter, and nobody

23    has said otherwise in this trial.  That has to do with Count 2,

24    the vandalism statute.  Although it does -- excuse me,

25    vandalism reg.  Although it does pour over a little bit into

1    the first Count.

2         I am going to try to confine my arguments to what

3    the -- you know, to what we know for sure.  I mean, you know,

4    we have had talk here about, oh, maybe suggesting that Andy

5    Howard had somebody assist him or that he might have come in

6    the middle of the night because people -- people do things when

7    they don't want to be seen that are bad at night.  And a

8    conviction in this case would be wrong for so many reasons, but

9    I want to start with the elements of the two charges, starting

10   with the one tampering, and I'll read it right now.

11        Tampering.  It's an offense to tamper, tampering or

12   attempting to tamper with real property or moving, manipulating

13   or setting in motion any of the parts thereof that is the real

14   or personal property when such property is under one's

15   lawful -- when such property is not under one's lawful

16   control or -- except when such property is under one's lawful

17   control or possession.  And it's that last part, Your Honor,

18   except when such property is under one's lawful control and

19   possession.

20        When courts interpret statutes, Your Honor, they do so

21   according to the plain meaning of the words in that statute.

22   So the question becomes whether those rocks, whether that land,

23   whether -- excuse me, whether the water and sand and rocks was

24   under Andy Howard's lawful control or possession?  And you have

25   heard nothing to suggest that those were not under his lawful

1    control or possession.  In fact, the evidence points quite

2    completely in the opposite direction.  You haven't heard

3    anything to suggest that Andy Howard, when he is on that beach,

4    can't have -- can't hold sand or rocks that he has however

5    briefly in his possession except when the property is under his

6    lawful control or possession.

7         Now, you might ask yourself, but did he do something

8    wrong with those things in his possession?  And we may all

9    disagree that what Andy Howard did under that very first

10   regulation, the tampering regulation, with the things that were

11   in his possession is wrong.  Maybe none of us in this courtroom

12   would do that, but that sand, that rock was something he could

13   pick up and hold.  What he did with it, whole 'nother question,

14   but his possession of those things was lawful.

15        Why?  How do we know that?  Well, he was there when

16   the park was open.  He was there doing just what everybody else

17   was doing with those -- with that sand and rocks when they were

18   at the beach.

19        So in a sense that language at the end of the reg is

20   really the first thing we ought to be looking at because it's

21   an exception.  The sand and the rocks were in his lawful

22   control.  He could pick them up.  As I said, he was in the park

23   legally.  The beach was open.  He was there with hundreds of

24   other people.  He had the right to be there in his own space.

25   He had the right to be there just plain period.  He could swim.

1    He could pick up a rock.  He could play in the sand if he chose

2    to, and he had the possession of those things when he was

3    there, and they were lawfully in his possession.  He controlled

4    those things.  Of course, they could claim that he has done

5    something illegal with those things and we will talk about

6    that, but at the same time there is still things that he had in

7    his lawful control and possession.

8         And the government has argued, they said, well,

9    Mr. Howard doesn't own that beach.  It belongs to the federal

10   government or belongs to all of us, and they are right.  It

11   doesn't belong to him, but that's not what I am saying.  It

12   doesn't have to do with his ownership.  If you think about --

13   if you think about ownership and control or possession, a

14   landlord owns an apartment or a house that he might rent, but

15   he rents it to somebody who has possession of it, who has

16   control over it, who has control over it to the extent that

17   what that person does with it can be the subject of a crime.

18   You could have a loud party at a house you rent.  You are still

19   responsible because you control it, but you lawfully control it

20   and that's part of what makes you responsible for it.  But in

21   this statute where the statute says, or prohibits tampering or

22   attempt to tamper real property or moving, manipulating or

23   setting in motion any of the parties thereof except when such

24   property is under one's lawful control or possession, I am

25   suggesting to the Court that when Andy held a rock, when Andy

1    held a shovel full of sand, those were things in his lawful

2    control and possession.  I am not asking the Court to do

3    anymore than to give that regulation, give the regulation cited

4    in the -- in the -- in the complaint in this matter, to give

5    those words their plain meaning.

6              There was no part of that beach that said off limits.

7    Andy, you can't be in here.  That would bear on whether or not

8    what he was doing in there was lawfully possessing or holding

9    rocks or sand or water, whatever he chose to.  But people go to

10   the park to pick up sand and to pick up rocks and when they do

11   they lawfully control and possess those items.  In fact, I

12   can't imagine a beach where that wouldn't be permitted.

13             And again, you don't have to excuse Andy Howard's

14   conduct.  You don't have to say we are not going to look.  We

15   don't like it when they dig in a river.  We don't like it when

16   they dig in a beach.  It's okay when it's a little toy shovel.

17   It's okay when its their hands but it's not okay when you use a

18   big shovel.  Doesn't change the fact that the property, the

19   sand, the rocks, were under Andy Howard's lawful control and

20   possession.

21             That's the -- that's on the -- that's on the charge of

22   tampering, Your Honor.

23             THE COURT:  Okay.

24             MR. VALENTINE:  On the vandalism charge, you heard,

25   again, what is uncontroverted evidence.  The parties -- the

parties agree on it.  They agree that what Andy Howard did when he stuck that shovel into the sand and lo and behold this bank -- this bank is caving away anyway.  What -- or threw a rock on what we saw were wing dams that had been there forever. What he did, his conduct just plain didn't matter.

Now, again, the government has called no expert to show that, well, there was property destroyed.  What was destroyed?  The same sand, the same beach, the same rocks is there.  It happens to be in a different location.  Is that destroyed?  No.  Why?  Or was it Andy's destruction of it or was it Andy's injury of it or was it Andy's defacement of it or damaging of it?  No.  It's not.  Because again, the testimony, without dispute, the evidence without dispute is what Mr. Howard did, it just plain didn't matter.

You can take a look at exhibits -- Exhibits C and 7 I believe.  They are the same thing the parties agree.  When that photograph was taken by the coast guard helicopter some two or three days later, Andy's -- what Andy did in the matter is not -- isn't just negligible, it's nonexistent.  It had no bearing on what ultimately happened in this case, which is the damage defacement injury of real property, that beach.  It just plain didn't matter, didn't matter to any -- according to anybody's testimony in this case.  And they haven't -- the government hasn't offered any -- any expert to show any connection to what Andy Howard did and what ultimately happened

1    in this case.

2         And again, you know, we bogged down -- we bogged down

3    on intentions, and if you were to ask Andy Howard, I expect

4    Andy Howard would tell you that as far as that beach goes,

5    yeah, he'd love to have it 20-foot deep.  Maybe he has eyes on

6    a bigger boat than his 16-foot one because there are bigger

7    fishing boats, but I expect he'd tell you, I wish that channel

8    were 20 feet deep.  But what Andy Howard did on August 14th --

9    excuse me, on August 15, 2022, did not cause that channel to

10   open and did not contribute to ultimately what we see in the --

11   from the start, from the start to the end that trench as we

12   first saw it.  The water, as it came through, and the scene as

13   we last saw it, and in exhibits that both the government and

14   the Defense agree on, it just plain didn't matter.

15        That's all I have.  Thank you very much.

16        THE COURT:  Thank you, Mr. Valentine.

17        Ms. Biksacky, brief rebuttal?

18        MS. BIKSACKY:  Yes, Your Honor.

19        With respect to the first Count, there was a lot of

20   discussion about whether it was -- the rocks and the sand were

21   under his lawful control or possession.  Counsel's

22   interpretation of that provision is nonsensical.  It does not

23   give the plain meaning of that phrase.  What would be something

24   under someone's lawful control and possession when they go to

25   the beach?  Their cell phone, their beach chair, their towel.

1     That's what this provision is referring to, something that

2     someone possesses or controls on their own legally.

3          That clause does not apply to real property, the

4     lands, the waters, the soil of the National Park System.  If it

5     did, what counsel is suggesting would mean that any time

6     someone is able -- I think counsel said if you can pick it up

7     then it's in his lawful possession.  That means any time

8     someone decided to pick up something at a national park or a

9     national monument or a national museum it would be within their

10    lawful control and possession.  If someone went to a museum and

11    there was an object sitting on the table that was part of an

12    exhibit, if they picked it up, well, now it's in my lawful

13    possession and control according to counsel so let me just

14    break it.  Let me just remove it.  Let me just put it somewhere

15    else.  Let me mar it or destroy it.  That is not the meaning of

16    lawful control and possession.  What the evidence has shown is

17    that Mr. Howard did not have permission to take any of the

18    actions he did with the real property at Sleeping Bear Dunes

19    National Lakeshore.  He didn't have permits.  No one gave him

20    the permission.  He didn't have a deed to that land, and no way

21    was it under his lawful possession and control.

22          I think the analogy counsel used is this is like a

23    landlord/tenant situation where, you know, the landlord may own

24    the place but the tenants have control or possession of it.

25    But that's -- that's an agreement between two parties.  There

1    is a lease involved.  The landlord is giving up a portion of

2    his rights to possession to another person.

3           This was a national park.  There was no lease

4    agreement for Mr. Howard to do as he pleased with the land.

5    Patrons are invited and encouraged to enjoy these places but

6    that does not give them carte blanche authority to change

7    whatever they can fit in their hand and to pick it up and to do

8    what they want with it.  It is not -- it was not under his

9    lawful possession and control.

10          Second, with respect to vandalism, counsel has

11   repeatedly argued that the government didn't bring in an expert

12   to say exactly why Mr. Howard's actions mattered, and we agree.

13   We didn't because the elements don't require it.  We do not

14   need to prove that Mr. Howard was the sole cause or was the

15   primary cause or was a but for cause of the diversion of the

16   river.  The statute allows for -- involves the destroying,

17   damaging, injuring or defacing.

18          Mr. Valentine focused a lot on that first word,

19   destroy.  Well, Mr. Howard didn't destroy the river.  Other

20   people did that.  And you noticed in my cross -- excuse me, in

21   my closing I actually highlighted some of the other words in

22   that statute, damage, injure or deface, and I think the easiest

23   one for the Court to find would be defacement, which has the

24   plain meaning of marring the appearance of or disfiguring.

25   When Mr. Howard dug sand from the basin, moved that sand, dug

1    up large rocks, moved the rocks and added to those wing dams he

2    was defacing and disfiguring the appearance, the natural

3    appearance of that river.

4              He also damaged and injured the river, but again, the

5    government does not need to show any quantifiable damage under

6    the statute.  There was testimony about the river levels

7    dropping.  Again, we understand that some of that may be the

8    result of other people.  We don't need to charge those other

9    people and we don't need to prove that Mr. Howard was the sole

10   cause.  He damaged, he injured, and he defaced.  He did it and

11   he admitted it and he knew better.  That's why at the end after

12   the ranger left he said, wow, I dodged a big ticket there.

13   Find the Defendant guilty.

14             THE COURT:  All right.  Thank you, Ms. Biksacky.

15             All right.  Now it's my turn to take some time.  So I

16   am going to take some time to consider.  You know, hang nearby.

17   Fifteen to thirtyish minutes and I'll come back and give you my

18   decision.  We are adjourned.

19             THE CLERK:  All rise, please.

20             (Recess taken, 2:19 p.m.)

21             (Resume Proceeding, 2:52 p.m.)

22             THE CLERK:  Court is back in session.  Please be

23   seated.

24             THE COURT:  All right.  We are back on the record.

25             It's time for me to announce my decision.  As I said

1    at the outset, Mr. Howard is charged with two counts.  Count 1

2    charges tampering.  The government must prove that -- to

3    convict Mr. Howard the government must prove beyond a

4    reasonable doubt that he tampered or attempted to tamper with

5    property or real property or moved, manipulated or set in

6    motion any of the parts thereof except when such property is

7    under one's lawful control or possession.

8            The government would also otherwise have to prove that

9    this offense occurred within the boundaries of the National

10   Park System.  The parties have stipulated both as to Count 1

11   and Count 2, that the Defendants's actions in the matter which

12   occurred on/or about August 15, 2022, occurred within the

13   waters subject to the jurisdiction of the United States located

14   within the boundaries of the National Park System, Sleeping

15   Bear Dunes National Lakeshore, which includes navigable waters

16   and areas within their ordinary reach.  The actions at issue

17   occurred in Benzie County in the Southern Division of the

18   Western District of Michigan.  So that element has been met

19   with respect to both Counts 1 and 2.

20           Two, Count 2 requires further the government to prove

21   beyond a reasonable doubt that Mr. Howard destroyed, injured,

22   defaced or damaged property or real property.

23           Some preliminary observations which have been -- some

24   of which have been made by Ms. Biksacky and some of which have

25   been acknowledged about Mr. Valentine.

1          The Sleeping Bear Dunes National Lakeshore does not

2     belong to any one person or any one group of people.  Not to

3     kayakers, not to beach goers, not to fishermen.  It doesn't

4     belong only to the residents of Lake Township or Benzie County

5     or even the State of Michigan.  The Sleeping Bear Dunes

6     National Lakeshore belongs to all Americans, and no one person

7     or group of people can decide what is best for a national park

8     for the rest of us.

9          As Americans we have entrusted the National Park

10    Service with managing and preserving our national parks.  One

11    of the most important duties that we entrust them with is to

12    preserve these beautiful places in their natural state for

13    future generations of Americans to experience and enjoy and

14    fall in love with.

15         There are lots of things that you cannot do in a

16    national park.  So -- and I have seen those in both my time as

17    a lawyer and in my time here as a Magistrate Judge.  I have

18    control over the courts.  We call it the CVB, or civil

19    violation bureau docket.  In our district it's made up largely

20    of tickets written in the national parks, national forests in

21    the Lower Peninsula in our district.

22         So for example, Petoskey stones.  You know, Sleeping

23    Bear Dunes, the beach, lots of Petoskey stones.  You can't pick

24    up and remove a Petoskey stone.  Now, I am sure that there are

25    people who have never gone to Sleeping Bear Dunes without

1   having a Petoskey stone in their pocket when they left.  That,

2   of course, does not make that conduct legal.  It's illegal

3   every single time they do it, but they simply haven't yet been

4   caught doing it.

5       Wild flowers.  I mean, there is all kinds of

6   spectacular wild flowers in our national forests.  You can't

7   pick those.  You can't cut wood in our national forests without

8   a permit.  And a situation which is analogous to this

9   situation, Mr. Howard, which I have seen for myself, is when

10  guys hunt in the national forests, and you know, sometimes

11  they'll say, gosh, that's an awful long way back to my blind

12  and an even further way back to the truck if I am dragging a

13  deer, and if I just cut out a little brush right here or knock

14  down a couple of saplings I can get my truck right back there

15  and then save myself a lot of trouble.  That's a crime.  They

16  can't do that.  But you know, they don't know and they do it

17  and sometimes they get caught and sometimes they end up in this

18  courtroom.

19      So when I review the evidence in the case I find that

20  your actions were intended to and in fact did divert the flow

21  of the Platte River into Platte Bay.  In your own words, and as

22  captured on body cam video, you told Officer Bahm -- Bahm.

23  Probably mispronouncing his name -- that you were adding to

24  what was there, in other words, the cut that was already there.

25      And let me back up to say the government has produced

no evidence that Mr. Howard cut the initial channel from the
river into the lake, but there is no question in my mind that
somebody did that with a shovel.  Now, could it have been
Mr. Howard?  It could have been Mr. Howard.  It could have been
somebody else, but the government has certainly not offered
evidence that it was Mr. Howard.  But the idea one of the
witnesses testified that some kids dug that with their hands is
ridiculous.  They didn't.  Somebody cut that initial channel
with a shovel.  Even Mr. Howard himself said, I am not even
sure -- I wasn't even sure I could cut it with a shovel.  So
the idea that a bunch of kids with plastic beach toys did it is
ridiculous.  Somebody cut that on purpose, and as I said, I am
not finding that that was Mr. Howard.

Mr. Howard, though, says that he was there adding to
what had already been done.  Officer Bahm saw him with the
shovel, saw him actually shoveling sand, and I am not sure of
the directions.  Even now it's confusing to me, because I think
when you look out in the bay you should be looking west, but on
the side of the river away from the main land Mr. Howard said,
I didn't open that up.  As I said, I don't believe that there
is evidence that he did.

Officer Bahm also, however, saw him adding rocks to
the wing dam, which was diverting and channelling water towards
that new opening.  Mr. Howard admitted that he came down to the
beach that afternoon with the very intention of digging the

trench.  He told Officer Bahm, I did what I did.  I was just trying to enhance it, the new channel, to move rocks and sand to make the water go that way, in other words, out the new channel and into Lake Michigan.

Other witnesses.  Zachary Hatfield saw Mr. Howard digging in the trench with the shovel, digging sand and rocks. Maybe egging would be the word I'd use kids.  There apparently were kids there.  We've heard from -- we heard from numerous witnesses there were kids egging kids on to get them to dig more and widen the channel, which I believe to have been originally cut with a shovel.

Ms. S., the young lady who was on the cross country team, testified that Mr. Howard told her that he was trying to make a gap big enough so that he could get his boat through it and that he could go out into the bay to fish for coho.

Ms. Nelson testified that she saw Mr. Howard moving rocks that he used the shovel in part to move rocks.

Kirk Walby testified that he saw Mr. Howard carrying rocks from the shoreline out towards Lake Michigan and extending the wing dam I'll call it that was extending from the beach back towards the shore right by the cut, so channelling water into the cut, and one of the -- one of the photographs or perhaps one of the videos illustrated that very condition.  I could see the water.  I could see the channel with the water coming through it, and I could see a rock wall, if you will,

1    that's probably an exaggeration, or rocks in a wing shape

2    channelling water right through this.

3         Mr. Walby testified that Mr. Howard said, we're

4    helping the flow of the current go into Lake Michigan.  Talked

5    about how he had brought his boat down earlier and had a very

6    hard time getting it back upstream to the take out, and after

7    Officer Bahm walked away said to -- Mr. Howard said to

8    Mr. Walby, I dodged a ticket right there, which is certainly

9    some acknowledgment that he knew what he was doing was wrong.

10   I think that would be Exhibit A maybe.  Was A a video,

11   Mr. Valentine?

12        MR. VALENTINE:  No.  I think it would be either

13   Exhibit H --

14        THE COURT:  H.  It's an H.  Thank you.  Exhibit H is

15   the exhibit I am referring to that shows the narrow cut.

16   Obviously, the video was taken shortly after it was dug with

17   the rocks sticking into the river clearly intended to divert

18   the flow out the cut.

19        All right.  So let's look, then, at the two counts.

20   Count 1, tampering.  The government would have to prove that

21   Mr. Howard tampered with property or real property or moved it.

22        I mean, the testimony is undisputed that Mr. Howard

23   moved both sand with the shovel and rocks with the shovel and

24   with his hands, and there is plenty of evidence on both of

25   those issues.  So I find the government has met its burden of

1      proving by clear and convincing evidence Count 1.

2              Count 2, that Mr. Howard destroyed, injured, defaced

3      or damaged property or real property.  So I don't know, can you

4      damage a river?  I think yes, right?  I mean, the answer is

5      clearly yes.  You can pollute a river.  You could dam up a

6      river.  You could divert a river, you know, into your soybean

7      field thereby depriving your neighbors of water, and I think

8      that what Mr. Howard did in this case was in part responsible

9      for damaging the Platte River.

10             Now, for him and for other fishermen -- fishermen and

11     other boaters perhaps who wanted to go out into Lake Michigan

12     from that boat launch it is certainly preferable for -- to them

13     to have this deeper, closer cut to get out into the lake, but I

14     am not sure, at all sure that would be true for kayakers.  That

15     would be a lovely stretch, and I have to confess I have kayaked

16     the Platte River from the bridge and the canoe rental place all

17     the way to Lake Michigan.  And you know, that stretch along the

18     beach there is beautiful.  You've got the beach and you know,

19     the park up to your right.  You have got the lake off to your

20     left, and so you know, cutting the tail off the river I think

21     is damage to the river.

22             And you know, there is probably other ecological

23     consequences that I am not competent to opine on, like the

24     plants and animals that were living in the original river bed

25     and what happened to them after the water was diverted and that

area dried up.  You know, maybe some of them moved.  I don't
know.  But maybe some of them didn't make it either.  So I
think we could find damage in that respect.

          Now, Mr. Howard, in defense of his actions, says a
couple things.  One, I didn't know it was illegal.  You know,
unfortunately, Mr. Howard, ignorance of the law is no defense
to violating it.  And as I said, there are lots of things that
you can't do in a national forest, and I talked about a couple
of them.

          Mr. Valentine argued and -- Mr. Howard testified and
Mr. Valentine argued that his actions did not in any meaningful
way alter the outcome.  So I thought about that and I tried to
come up with an analogy.  Unfortunately, the analogies I came
up with I think are -- I wish I could have come up with more
mundane analogies but here they are.

          Analogy No. 1.  There is a civil disturbance downtown
let's say following some police activity of some kind, and
people gather as they do sometimes in downtown Grand Rapids and
they protest.  One of the protestors throws a Molotov cocktail
on an unoccupied parked car.  It bursts into flames.  A second
protester comes by, throws a Molotov cocktail onto the same
car.  The second guy gets caught and he is charged, you know,
with attempted damage of property over $1000 or whatever it is,
a felony.  Would we hear him to say that car was burning
anyway.  My Molotov cocktail didn't change a thing.  That car

was doomed in any event.  You shouldn't convict me.  Of course

not.  The action itself is wrong and it's illegal.

So you know, that argument I think doesn't -- and I

won't even get to my second analogy.  We'll just leave it at

that one.

So I believe that, Mr. Howard, your actions did, in

fact, damage the river and thus fall under the prohibitions in

the statute which forms the basis for Count 2, that the

government has proved that beyond a reasonable doubt, and that

you are guilty of that offense.

And I would say this, Mr. Howard.  You love that

river.  That's clear to me.  So you know, in the future, I

mean, protect, preserve, because, you know, your kids, your

grandkids, their grandkids, they should all be able to

experience Sleeping Bear Dunes National Lakeshore, and the

Platte River to the extent it falls within it, in their natural

unspoiled unaltered states.

And you know, the changes to the -- to the dredging

resulted from public, right, comment, from studies, presumably

studies by the National Forest Service, National Park Service.

There was an opportunity for public comment.  The government

admits that the comments were, you know, 50/50.  It clearly

wasn't an unanimous or overwhelming support for ending

dredging, but at the end of the day, we, the people of the

United States of America who own that park and invest that

1    service with the solemn and so important duty of protecting and

2    preserving that national resource, they said, we're going to

3    end dredging, and that's the answer unless, you know, a group

4    of -- a person or a group wants to follow the procedures to try

5    to get that decision changed lawfully, but we cannot take the

6    law into our own hands and do what we want.

7          MR. VALENTINE:  Your Honor, I am -- I am going to --

8    going to interrupt you for what I think is a pretty important

9    thing before you.

10         THE COURT:  Go ahead.

11         MR. VALENTINE:  Before you leave the bench, and that

12   is that as to Count 1, the standard that you said that the

13   government had met was clear and convincing evidence, and I am

14   wondering whether --

15         THE COURT:  Yeah.  I am dead wrong if I said that.  I

16   said -- I am dead wrong if I said that.  It is proof beyond a

17   reasonable doubt on both counts.

18         MR. VALENTINE:  Yeah.  I know.

19         THE COURT:  Thank you, Mr. Valentine.

20         MR. VALENTINE:  That's okay.

21         THE COURT:  It's all we need is a record that I

22   misspeak and we end up doing this again.  The government has

23   met its burden on both Counts 1 and 2 of proving violations

24   beyond a reasonable doubt.

25         MR. VALENTINE:  We don't ever want to get to a hearing

1    under the Bail Reform Act, Your Honor, where you might want to

2    use that standard.  Thank you.

3          THE COURT:  You are most welcome.  Thank you,

4    Mr. Valentine.  Appreciate it.

5          All right.  That's it.  Ms. Biksacky, anything else

6    from the United States?

7          MS. BIKSACKY:  No, Your Honor.  Nothing with respect

8    to this phase.  I would note that I anticipate extensive

9    restitution arguments and briefing from Defense counsel, and it

10   may be helpful to talk through timelines for that briefing and

11   sentencing.  I just want to make sure both parties have an

12   ample opportunity to prepare for that as well as to respond to

13   any arguments raised in the initial briefing.

14         THE COURT:  Like, I would think a monthish.  I mean, I

15   have to look at my calendar.  I know I am going to be

16   unavailable for some weeks here coming up.  So why don't you

17   and Mr. Valentine talk.  See if there is a date that makes

18   sense to both sides and then check with Ms. Webb.

19         MR. VALENTINE:  One question.  Is there a referral to

20   probation on this?  It's a Class B misdemeanor.

21         THE COURT:  I don't think so, Mr. Valentine.

22         MR. VALENTINE:  All right.

23         THE COURT:  We talked about that in chambers.  You

24   know, out of an abundance of caution we'll probably ask that

25   they run a criminal background check on Mr. Howard, and we'll

1    find out whatever we find out from that.  If something in there

2    causes me concern maybe I'd ask for more, but as of right now I

3    don't intend to ask for a presentence report to be prepared.

4    So I'll rely on the parties.  Submit sentencing memoranda.

5    Tell me whatever you think I need to know.

6            MR. VALENTINE:  Okay.

7            MS. BIKSACKY:  That makes sense, Your Honor,

8    especially given your familiarity with the facts, the

9    government believes it could sufficiently address those issues

10   in its sentencing memoranda.

11           THE COURT:  All right.

12           MS. BIKSACKY:  I do not know the answer to this

13   question so I am raising it, but I may be wrong.  I know

14   sometimes after jury trials there are discussions about rights

15   to appeal, but that often also is discussed at the sentencing

16   proceedings.  I am not sure whether there needs to be any

17   notification in a bench trial?

18           THE COURT:  I don't know.

19           THE CLERK:  At sentencing.

20           THE COURT:  At sentencing.

21           MS. BIKSACKY:  Yes.  Okay.

22           THE COURT:  We'll cover that at sentencing.  Thank

23   you, Ms. Carpenter.  All right.  We'll see you all in a month

24   or so.

25           MR. VALENTINE:  Thank you, Judge Kent.

1          MS. BIKSACKY:  We will be in touch after we discuss

2    dates.

3          THE CLERK:  All right.

4          (Proceeding concluded, 3:13 p.m.)

INDEX

Government Witnesses:                                    Page

LOGAN bahm

  Direct Examination by Ms. Biksacky            6
  Cross Examination by Mr. Valentine            27

ZACHARY HATFIELD

  Direct Examination by Ms. Biksacky           34
  Cross Examination by Mr. Valentine           42

L.S.

  Direct Examination by Ms. Biksacky           43
  Cross Examination by Mr. Valentine           48

JAMIE NELSON

  Direct Examination by Ms. Biksacky           49
  Cross Examination by Mr. Valentine           54

CARRIE ALLGAIER

  Direct Examination by Ms. Biksacky           54

KIRK WALBY

  Direct Examination by Ms. Biksacky           60
  Cross Examination by Mr. Valentine           65

SCOTT DEKKERS

  Direct Examination by Ms. Biksacky           67
  Cross Examination by Mr. Valentine           78

Defendant's Witnesses:                                  Page

AMY ROCHE

  Direct Examination by Mr. Valentine          84
  Cross Examination by Ms. Biksacky            88

LAURA CALLEJA

  Direct Examination by Mr. Valentine          91
  Cross Examination by Ms. Biksacky           103

ANDREW HOWARD

Direct Examination by Mr. Valentine          105
Cross Examination by Ms. Biksacky            119
Redirect Examination by Mr. Valentine        130

Closing Statement by Ms. Biksacky            132
Closing Statement by Mr. Valentine           140
Rebuttal Argument by Ms. Biksacky            146
Verdict                                      149

Exhibits:                                    Admitted

Government's Exhibit 1                          4
  (Photograph, Platte River & Boat Launch)
Government's Exhibit 2A                         4
  (Video, Body Cam)
Government's Exhibit 2B                         4
  (Video, Body Cam)
Government's Exhibit 2C                         4
  (Video, Body Cam)
Government's Exhibit 2D                         4
  (Video, Body Cam)
Government's Exhibit 2E                         4
  (Video, Body Cam)
Government's Exhibit 2F                         4
  (Video, Body Cam)
Government's Exhibit 2G                         4
  (Video, Body Cam)
Government's Exhibit 2I                         4
  (Video, Body Cam)
Government's Exhibit 2J                         4
  (Video, Body Cam)
Government's Exhibit 2K                         4
  (Video, Body Cam)
Government's Exhibit 2L                         4
  (Photograph, Defendant at River)
Government's Exhibit 3                          4
  (Photograph, Balm Observation Point)
Government's Exhibit 4                          4
  (Photograph, Coast Guard)
Government's Exhibit 5                          4
  (Photograph, Coast Guard)
Government's Exhibit 6                          4
  (Photograph, Coast Guard)
Government's Exhibit 7                          4
  (Photograph, Coast Guard)
Government's Exhibit 8                          4
  (Photograph, Coast Guard)

| | | |
|---|---|---|
| 1 | Government's Exhibit 9 | 4 |
| | (Photograph, Cross Country Team Locations) | |
| 2 | Government's Exhibit 10 | 4 |
| | (Photograph, Athlete talking to Defendant) | |
| 3 | Government's Exhibit 11 | 4 |
| | (Photograph, Athlete talking to Defendant) | |
| 4 | Government's Exhibit 12 | 4 |
| | (Photograph, Cross County Team Photo) | |
| 5 | Government's Exhibit 13 | 4 |
| | (Photograph, Cross County Team Photo) | |
| 6 | Government's Exhibit 14 | 4 |
| | (Photograph by Nelson of Defendant) | |
| 7 | Government's Exhibit 15 | 4 |
| | (Photograph, August 17, 2022) | |
| 8 | Government's Exhibit 16 | 4 |
| | (Photograph, New Channel) | |
| 9 | Government's Exhibit 17 | 4 |
| | (Photograph, Previous Channel) | |
| 10 | Government's Exhibit 18 | 4 |
| | (Photograph, August 18, 2022) | |
| 11 | Defendant's Exhibit A | 4 |
| | (Photographs, 11 total) | |
| 12 | Defendant's Exhibit B | 4 |
| | (Not Identified) | |
| 13 | Defendant's Exhibit C | 4 |
| | (Not Identified) | |
| 14 | Defendant's Exhibit D | 4 |
| | (Not Identified) | |
| 15 | Defendant's Exhibit E | 4 |
| | (Google Earth Pro Image 2) | |
| 16 | Defendant's Exhibit F | 4 |
| | (Not Identified) | |
| 17 | Defendant's Exhibit G | 4 |
| | (Not Identified) | |
| 18 | Defendant's Exhibit H | 4 |
| | (Video by Calleja) | |
| 19 | Defendant's Exhibit I | 4 |
| | (Not Identified) | |
| 20 | Defendant's Exhibit J | 4 |
| | (Not Identified) | |
| 21 | Defendant's Exhibit K | 4 |
| | (Not Identified) | |
| 22 | Defendant's Exhibit L | 4 |
| | (Not Identified) | |
| 23 | Defendant's Exhibit M | 4 |
| | (Photograph of Trench) | |
| 24 | Defendant's Exhibit N | 4 |
| | (Photograph of Trench, larger) | |
| 25 | Defendant's Exhibit O | 4 |
| | (Photograph of Trench) | |

```
 1      Defendant's Exhibit Q                          4
          (Not Identified)
 2      Defendant's Exhibit R                          4
          (Not Identified)
 3      Defendant's Exhibit S                          4
          (Photographs, Receipt and Shovels)
 4      Defendant's Exhibit T                          4
          (Video by Calleja)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE


        I, Paul G. Brandell, Official Court Reporter for the

United States District Court for the Western District of

Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of the

proceedings had in the within entitled and numbered cause on

the date hereinbefore set forth; and I do further certify that

the foregoing transcript has been prepared by me or under my

direction.



                        /s/ Paul G. Brandell

                        Paul G. Brandell, CSR-4552, RPR, CRR

                        U.S. District Court Reporter

                        399 Federal Building

                        Grand Rapids, Michigan  49503