UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                         No. 1:23-mj-00230

               v.                            Hon. Ray Kent
                                           United States Magistrate Judge

ANDREW BLAIR HOWARD,

               Defendant.

_____/

## **GOVERNMENT'S SENTENCING AND RESTITUTION MEMORANDUM**

On August 15, 2022, the defendant used a shovel to dig part of a trench/channel in the Platte River in Sleeping Bear Dunes National Lakeshore and stacked large rocks on a dam to divert the river's natural water flow toward the channel. Following a bench trial before this Court, Mr. Howard was convicted of tampering (Count 1) and vandalism (Count 2) in violation of 36 C.F.R. § 2.31(a). Pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, the victims (in this case, government agencies) are entitled to mandatory restitution. In advance of Mr. Howard's sentencing scheduled for April 17, 2024, the United States respectfully submits this memorandum and related exhibits addressing sentencing and restitution issues and to provide the Court with a detailed accounting of the total loss incurred by the victims because of Mr. Howard's criminal conduct.

## I.    **Statutory Maximum Sentence**

The sentencing guidelines do not apply to any count of conviction that is a Class B misdemeanor, such as here. The court may impose any sentence authorized by

statute.  The statutory maximum sentence that the Court can impose for violation of

36 C.F.R. § 2.31 is the following:

Imprisonment: Not more than 6 months [*See* 36 C.F.R. § 1.3(a) (citing to penalties contained in 18 U.S.C. § 1865(a))];

Fine: Not more than $5,000  [18 U.S.C. § 3571(b)(6)];

Probation: Not more than 5 years  [18 U.S.C. § 3561(c)(2)];

Mandatory Special Assessment: $10  [18 U.S.C. §§ 3013];

Restitution: Mandatory [18 U.S.C. §3663A]; and

Cost of Proceedings: "all cost of the proceedings."  [*See* 18 U.S.C. § 1865(a); 36 CFR § 1.3].

## II.    Sentencing Factors Under 3553(a)

Title 18 U.S.C. § 3553(a) creates a list of factors that must be considered when

imposing a sentence in a federal case.  Some of the factors this Court must consider

include: the nature and circumstances of the offense, § 3553(a)(1);  the history and

characteristics of the defendant, *id*.;  the need for the sentence to reflect the

seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need

for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid

unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct, § 3553(a)(6).

The government does not seek any term of imprisonment for Mr. Howard.  The

government submits that the Section 3553(a) factors weigh in favor of a probationary

term, which would adequately reflect the seriousness of his offense.  The government

further asks the Court, as a condition of any probationary term, that he be banned

from entering onto any National Park Service ("NPS") property for the duration of that term.

As the Court heard at trial, Mr. Howard is an avid fisherman who frequents the Platte River (his "home river"), including during the Coho Salmon "run" each fall. Such a restriction on Mr. Howard's activities on the Platte River in Sleeping Bear Dunes would take into consideration the nature of Mr. Howard's offense and promote respect for the law within our National Parks. The government is not seeking imposition of a fine considering its request for mandatory restitution and cost of proceedings, as outlined below.

## III.   Restitution and Costs of Proceedings

### A.   Background

The Sleeping Bear Dunes National Lakeshore is a U.S. National Lakeshore managed by the National Park Service. "The National Park Service's mission is to preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations." (Exhibit A, Julie Christian Summary at ¶ 5). The Platte River area, which runs through the National Lakeshore before emptying into Lake Michigan, is home to protected wetlands, coastal dunes, plants, and wildlife. Several endangered animal species and threatened plant species make the Platte River area their home, including the piping plover,[1] a small migratory bird that nests along the sand and

---

[1] Sleeping Bear Dunes is home to 30 percent and upwards of 50 percent of the breeding population of piping plovers. *See* Sleeping Bear Dunes National Lakeshore website, *available at* https://www.nps.gov/slbe/learn/nature/pipingplover.htm.

3

shore of Lake Michigan, and Pitcher's thistle, a native thistle that grows along the sand dunes of Lake Michigan. (*Id.* at ¶ 2).


*Piping Plover*


*Pitcher's thistle*

Although NPS and the State of Michigan previously undertook dredging efforts beginning in the 1960's, a subsequent NPS analysis demonstrated the continued intervention into the river flow was causing ecological harm and was counter to underlying goals and policies of the NPS. Beginning around 2016, the NPS prepared the Platte River Mouth Restoration and Access Plan and associated Environmental Assessment (EA). After careful analysis, NPS announced that it would decline to allow dredging to restore natural functions to the ecosystem in a manner sensitive to the National Lakeshore's natural resources and the needs of the visiting public. NPS understood that, depending on water levels and other conditions, this change might make it more difficult for some boats to access Platte Bay in Lake Michigan.

On August 15, 2022, Mr. Howard was in search of more favorable fishing access after his boat became stuck along the Platte River earlier in the day. He purchased a shovel and used it to dig part of a trench/channel in the Platte River within Sleeping Bear Dunes National Lakeshore. At trial, Mr. Howard discussed his desire to access

the Platte Bay from the nearby boat launch like he used to when the government previously dredged the area.  As a long-time local homeowner and fisherman, Mr. Howard acted with full knowledge of the decision made by the NPS years before to discontinue dredging of the Platte River.  In addition to digging, Mr. Howard added and stacked large rocks as a dam to divert the river's natural water flow toward the channel.  Although the full extent of Mr. Howard's participation cannot be calculated, he was observed by onlookers for an extended period actively digging in the area with a shovel and dislodging large stones from the riverbed and stacking them to extend and enhance the dam.

 

*Gov't Trial Ex. 14*                                             *Gov't Trial Ex. 10*

After NPS was alerted to the disturbance, it dispatched a Ranger who intervened and interviewed Mr. Howard.  The evidence at trial showed that Mr. Howard was the last person to participate in the Platte River diversion actively and substantially.  The result was an unauthorized diversion of the river as it emptied into Lake Michigan.  The diversion resulted in destruction to wetlands and wildlife, and losses—some immeasurable—to the public and the National Park Service.

The following aerial photograph on the left, taken in May of 2022, shows the

natural flow of the Platte River running parallel to Lake Michigan. The photograph on the right shows the same area approximately 3 days after Mr. Howard's actions, with the channel emptying directly into Lake Michigan.



*May 2022 (Pre-Diversion)*          *August 18, 2022 (Post-Diversion)*

Prior to determining whether and what repair efforts to undertake, NPS undertook an individualized analysis of the river and adjacent resources to determine necessary steps to take to understand the full impact of the damage caused by the illegal dredging and the potential further damage that would be caused by taking steps to remediate the harm.  As a result of Mr. Howard's actions, the National Park Service expended significant resources assessing both the ecological damage and ecological impact of repair by deploying NPS personnel and Coast Guard resources to evaluate the impact on the resources of the National Lakeshore, including on the river, adjoining habitats, and affected wildlife. (Exhibit A, Christian Statement, ¶ 2-3).  The NPS's Natural Resources Division oversaw the assessment; the Natural

Resource Division is overseen by Julie Christian, the Chief of the National Resource Division. (Exhibit A, Christian Statement). Natural Resources Division staff performed field assessments and consulted with specialists from other National Park Service units (hydrologists, wetland biologists, fisheries biologists, remote sensing specialists) and the State of Michigan Department of Environment, Great Lakes, and Energy. (*Id.* at ¶ 1).

Sleeping Bear Dunes sits on the shores of Lake Michigan and is a relatively small National Lakeshore; NPS relies on the United States Coast Guard to assist it with any necessary aerial operations in the area. Following the diversion of the Platte River, NPS assessed that it was necessary to quickly gain access to overhead images so that it could assess and respond to the damage. On August 18, 2023, NPS requested Coast Guard resources to obtain imagery necessary to assess the impact and damage to the Platte River system. (Exhibit F, Statement of John P. Akers ¶ 5). Other means of obtaining imagery, such as using a drone, was not an option due to Department of Interior rules regarding drone flights and a lack of a certified Unmanned Aircraft System pilot. (*Id.* ¶¶ 3-5.) Additionally, NPS can obtain satellite imagery from geographic information system (GIS) and requested such; however, GIS imagery is not immediately available in real-time due to limited satellites and weather patterns. (*Id.*) Therefore, a Coast Guard flight was the quickest and most effective means of obtaining the images. (*Id.*) The Coast Guard accepted the mission and conducted a helicopter flight to obtain photos, which assisted NPS staff in creating its response to the diversion.

NPS staff focused its study on two primary areas of damage: the original mouth of the river (downstream of the diversion), which was damaged by the diversion and rock dam, and upstream of the river near Loon Lake.   (Exhibit A, Christian Statement, ¶ 1).  NPS staff chose to focus on these areas because NPS staff observed decreased or complete cessation of water levels within weeks following the diversion. (*Id.* at ¶ 1, 3).  NPS staff assessments of these areas included assessment of impacts to wetland vegetation, aquatic wildlife and fish, water levels, river geomorphology, and federally-listed species and associated habitat, including the endangered piping plover and threatened Pitcher's thistle.  (*Id.* at ¶ 2).

Due to the significant decrease in—and the partial absence of—water levels caused by the illegal diversion, as well as changes to the flow and speed of the river, NPS staff observed wetland vegetation drying and, subsequently, dying within and along the river as well as tracks from aquatic invertebrates migrating down to current water levels.  (*Id.*).   NPS staff also documented changes to the channel at the diversion, including downcutting (deepening) along the diversion channel over short term, buildup of a sediment bar just offshore, and the slow migration of the new mouth of the river to the east.  (*Id.* at ¶ 3).  NPS officials also observed that the flow rate of the river increased substantially, which can be a barrier to passage of types of fish and other organisms that are weaker swimmers.  (*Id.*).  For the portion of the river downstream of the diversion, NPS staff documented the channel becoming disconnected from the river and from the lake, followed by the slow dewatering until portions dried out completely.  (*Id.*).  Below are some photographs NPS staff took

when documenting these changes.  The photographs were taken upstream from the unauthorized diversion showing wetlands that were dewatered due to the drop in water level.  The photographs show several species of plants and algae that would normally be under the waterline or have their root systems under the waterline that dried out and subsequently died.

 

*August 24, 2022*                                   *September 21, 2022*

NPS staff also documented absence of fish once the area was disconnected from the river and the lake.  (*Id.*).  Overall, the change in water levels caused by the diversion drained wetlands considerably, negatively impacting many plants and aquatic invertebrates in the process.  (*Id.* at ¶ 2).

Given the volume and power of water moving through the diversion, and after careful consideration of impacts to affected ecosystems and wildlife, NPS concluded that attempts to block the diversion and reconnect to the original channel would have involved substantial disturbance to the area and impacts similar to those assessed within the Environmental Assessment of the Platte River Mouth Restoration and

Access Plan.[2]  (*Id.* at ¶ 4).   Among other concerns, NPS was concerned that the presence of the necessary equipment and people required for the work, coupled with the disturbance of earth, would substantially disturb fragile ecosystems, including the habitat of the endangered piping plover. As a result of this analysis and findings, NPS did not pursue major remediation, and NPS did not repair the river breach, though NPS continues to monitor and assess the damage and situation.  (*Id.*).   NPS anticipates that over time the river mouth will return to its natural state.

### B.  Mandatory Victim Restitution Act (MVRA)

### a.  Statutory Elements under the MVRA

A victim is entitled to restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, if the loss "stemmed directly and proximately" from a defendant's criminal offense.  *See United States v. Kratt*, 579 F.3d 558, 565 (6th Cir. 2009).  "Specifically, restitution is mandatory—regardless of a defendant's financial situation—when a defendant is convicted of a crime of violence, an offense against property, or an offense related to tampering with consumer products."  *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016) (quoting *United States v. Vandeberg,* 201 F.3d 805, 812 (6th Cir. 2000)); 18 U.S.C. § 3663A(c).  "The MVRA mandates restitution in cases like this where "an identifiable victim or victims has suffered a ... pecuniary loss."  18 U.S.C. § 3663A(c)(1)(A)(ii)-(c)(1)(B).  The government bears the burden of demonstrating the amount of loss sustained by the victim while

---

[2] Environmental Assessment of the Platte River Mouth Restoration and Access Plan is *available at* https://parkplanning.nps.gov/projectHome.cfm?parkID=165&projectID=60589.

demonstration of the financial resources of the defendant is on the defendant.  18 U.S.C. § 3664(e).  "[T]he court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(e).

### b. Burden of Proof and Evidence of Loss

"[A] sentencing judge's inquiry is 'broad in scope,' and it is 'largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) (*quoting United States v. Tucker*, 404 U.S. 443, 446 (1972)).  "Sentencing hearings may include evidence otherwise inadmissible at trial so long as the evidence is reliable." *Graham-Wright*, 715 F.3d at 601 (*citing Roberts v. United States,* 445 U.S. 552, 556 (1980)). Evidence of a victim's loss for restitution purposes need only meet a preponderance of the evidence standard if contested by defendant.  18 U.S.C. § 3664(e).

### C. Analysis

#### a. Defendant's Offense of Conviction is an Offense Against Property.

Congress proscribed penalties for violations of National Park regulations in Title 18 U.S.C. § 1865 (*see, e.g.,* 54 U.S.C.§ 100751; 36 C.F.R. § 1.3(a)).  At trial, the Court found Mr. Howard tampered with and vandalized property of the National Park Service in violation of 36 C.F.R. § 2.31(a)(2) because he both tampered with and moved, manipulated, or set in motion the property of the Platte River and 36 C.F.R. § 2.31(a)(3) because he injured, defaced, or damaged the property.  Although Mr. Howard was charged and convicted of separate violations, the facts of this case are

11

similar to *United States v. Phillips*, 367 F.3d 846, 849 (9th Cir. 2004)).  In *Phillips*, the defendant was charged with violations of the Clean Water Act for his illegal dredging of a river which caused pollution; the 9th Circuit held that imposition of mandatory restitution for an offense against property was appropriate.  Similarly, here, to be convicted of the offense, the Court was required to find that the Mr. Howard tampered with and damaged NPS property; therefore, the Court is required to impose restitution pursuant to 18 U.S.C. § 3663A.

### b.  NPS and the Coast Guard Are Victims Entitled to Restitution.

Similarly, the National Park Service and the United States Coast Guard are victims entitled to restitution.  As an initial matter, "a government agency can be a victim to whom restitution is owed, regardless of whether it has a possessory interest in the affected property."  *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016) (*quoting United States v. Phillips*, 367 F.3d 846, 849 (9th Cir. 2004)).  In *Sawyer*, the Environmental Protection Agency ("EPA") expended employee time and funds for cleanup of contaminated property using its statutory authority.  Although it did not own the property, the 6th Circuit held that the EPA was a victim who suffered a loss directly from defendant's conduct and awarded restitution both for internal costs of oversight and external costs it paid to contractors for cleanup.  *Id.* at 292-295. Similarly in *Phillips*, the defendant was convicted of violating and conspiring to violate the Clean Water Act.  The Court held that "[w]hen the government loses money as the direct result of an offense, it is as entitled to restitution as any other victim."  *Phillips*. 367 F.3d at 849 (9th Cir. 2004).  Here, like in *Sawyer* and *Phillips*,

NPS and the U.S. Coast Guard are requesting restitution for costs incurred directly and proximately by Mr. Howard's actions in diverting the flow of the river. Specifically, NPS incurred costs during its response assessing damage and evaluating how and whether to respond to the damage.  Likewise, the Coast Guard incurred losses in connection with the helicopter flight it conducted to obtain aerial views of the area for NPS.

        c. **The Defendant's Conduct Directly and Proximately Caused the Government's Harm; the Harm was Foreseeable; Defendant Need Not Be the Sole Cause of the Government's Harm.**

As noted above, after discovering the damage, NPS undertook an individualized analysis of the river and adjacent resources to understand the full impact of the damage caused by the illegal dredging and the potential further damage that would be caused by taking steps to remediate the harm.  NPS deployed personnel and Coast Guard resources to evaluate the impact on the resources of the National Lakeshore, including on the river, adjoining habitats, and affected wildlife. (Exhibit A, Christian Statement, ¶ 2).

"The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010) (quoting *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009)).  Both conditions are met here.  But for Mr. Howard's unlawful dredging of the river, NPS would not have had to undertake efforts to assess and remediate the damage and the Coast Guard would not have been required to aid and conduct a flyover to obtain the necessary imagery.  The harm was also foreseeable to Mr.

Howard.  Mr. Howard is an avid fisherman and long-time homeowner in the area.  At trial, he described the Platte River as his "home river" and discussed his knowledge of the prior dredging in that location and the government's decision to not continue dredging the river.  Mr. Howard actively participated in the dredging by buying a shovel and spending several hours—the last hours anyone dredged before Rangers intervened—furthering the efforts to dredge the river and create the channel.  Mr. Howard's own words show that he intended to cause the very harm that was the direct cause of the government's losses.  This Court noted in its bench ruling at trial that Mr. Howard intended to, and did in fact, divert the Platte River.

The government anticipates that Mr. Howard will argue that other individuals, including children playing at the beach, were also partly responsible for the diversion of the river.  Notably, imposition of restitution does not require the government to prove that the river diversion was solely caused by a defendant's actions or any specific amount of damage attributable to the defendant.  It is immaterial whether other people, in addition to the defendant, also contributed to the diversion, and this argument has been squarely rejected by the Sixth Circuit. *United States v. Church*, 731 F.3d 530, 537–38 (6th Cir. 2013); *see also United States v. Buchanan*, 2023 WL 5352223, Case No. Nos. 22-3301/3697 (6th Cir. August 21, 2023) (finding that defendant, who was one of many looters who broke into and caused damage to defendant's business, responsible for the full loss and noting that district courts are authorized to impose "full liability on any defendant" as long as his conduct was a material cause of the loss.).  As the Sixth Circuit explained in *Church*, § 3663A

authorizes the imposition of full liability on any defendant who the district court finds "contributed to the loss" and "we know of no case in which the court struck down a restitution order that imposed full restitution on a defendant who . . . clearly did contribute to the victim's loss, even if to an indeterminate extent." *Church*, 731 F.3d at 537. That is because the "government is obligated to prove—by a preponderance of the evidence—the total amount of the victim's (or third party's) losses, not the total amount of losses that result solely from the defendant's conduct. *Id*. at 538.

Here, it is clear that the NPS and Coast Guard's damages were a direct and proximate result of Mr. Howard's actions. Further, Mr. Howard participated materially in the diversion. In its bench ruling after conclusion of the trial, the Court concluded that Mr. Howard intended to and diverted the Platte River. Numerous eyewitnesses and body camera video demonstrated that he worked diligently digging and stacking rocks with a new shovel that he purchased for the express purpose of enhancing, or opening up, the channel to Lake Michigan. Mr. Howard stacked stones to dam the existing channel to prevent water from flowing on its natural course. Importantly, Mr. Howard was the last main actor to work on the dredging prior to discovery by investigators. Mr. Howard intended—and was eager—to join and expand on the dredging. He intended the result for the dredging to be successful so that he could navigate his boat to Lake Michigan and catch more Coho Salmon out in Platte Bay like he did that morning. Therefore, it was reasonably foreseeable when he took those actions that it would result in the diversion of the river and subsequent environmental investigation into the diversion. No reasonable person could have

taken the actions Mr. Howard did and not expected the Platte River (and by extension the National Park Service) to suffer significant property damage as a result of his actions.  Further, it is reasonable to expect that when something of this magnitude occurs, the NPS, whose mission it is to preserve unimpaired the natural resources of the country, would respond with an environmental investigation of the diversion prior to undertaking any further efforts at remediation and would need to confirm that the environmental cost of remediation efforts would not outweigh the benefit of remediation.  Like the courts in *Church* and *Buchanan*, this Court should impose the full cost of restitution on Mr. Howard.

**C.    The Government is Entitled to Restitution for Harm Defendant Caused to the NPS and the Coast Guard.**

The "purpose of the MVRA is essentially compensatory: to restore a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury." *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012) (internal quotations and citation omitted.).  Cost of employee wages incurred by government victims to design and oversee an appropriate mitigation or cleanup plan of the damage defendant caused are appropriately recoverable as restitution.  *See United States v. Sawyer*, at 857, 862–64 (*quoting United States v. Phillips*, 367 F.3d 846, 864 (9th Cir. 2004) (awarding site investigation costs that were a direct and foreseeable result' of the Government's mitigation of the damage [the defendant] caused.").  Similarly, costs the government expends on lost employee time remedying the damage directly and proximately caused by defendant may also be recovered.  *United States v. Clausen*, 949 F.3d 1076, 1081 (8th Cir. 2020) (holding that district court appropriately

16

awarded $19,619.45  in restitution for repair of government helicopter damaged by defendant's gunfire, which award included time for government man hours spent on repair.); *United States v. Wilfong*, 551 F.3d 1182, 1186 (10th Cir. 2008), cert. denied, 556 U.S. 1215 ("awarding restitution to [the government] for lost employee work time, valued at the employees' wages, is not economically equivalent to compensating for lost profits or income.").

The U.S. Coast Guard (USCG) and NPS both had costs they expended in this matter.  The cost for the USCG is directly associated with the expenses for operating a helicopter to conduct an overflight and obtain images of the damage to the Platte River system.  The total cost for the Platte River diversion overflight was $40,992.41, which includes direct costs, support costs, general and administrative costs, depreciation, and cost of capital.  (Exhibit G, Litts Declaration, ¶ 8). The inter-government rate (the rate charged to other federal agencies) for the flight is $31,790.52. (*Id.* at ¶ 9). However, the loss amount to the USCG for restitution purposes that the government is seeking is limited to direct costs and support costs of $21,161.16 for two hours of USCG support.  This cost was calculated by multiplying the hourly direct cost of $8,565.23 by the two hours required for the mission, for a total of $17,130.46, which includes costs for fuel, labor, maintenance, etc.  (*Id.* ¶ 7, 9). Further, the support costs, which represents the hourly costs of ground support for the mission, is $2,015.35; multiplied for the two hours required by the mission is $4,030.70, for a total cost of $21,161.16. (*Id.*). To calculate these figures, the government has removed per hour costs related to general and administrative

expenses, depreciation, and costs of capital.

| Cost | Restitution Amount |
|---|---|
| Direct Flight Costs | $17,130.46 |
| Support Flight Costs | $4,030.70 |
| TOTAL | $21,161.16 |

With respect to NPS costs, NPS personnel involved in the environmental investigation included hydrologist, wetland biologists, fisheries biologists, and remote sensing specialists. (Exhibit B, Hydrologist Hours; Exhibit C, Hydrologist Travel; Exhibit D, Natural Resource Personnel Cost; Exhibit E, Christian Activity Time Log).[3]   The total cost for NPS personnel for their work in assessing the environmental impact is $12,868.29.

| Cost | Restitution Amount |
|---|---|
| Hydrologist | $4,108.72 |
| Natural Resource Personnel | $8,759.57 |
| TOTAL | $12,868.29 |

**D. Cost of the Proceedings**

Title 18 U.S.C. § 1865 provides that a person in violation of a National Park Regulation **shall** be "adjudged to pay all cost of the proceedings." (emphasis added). While the statute does not define specific costs, under 28 U.S.C. § 1920 (3), taxed costs may include "fees and expenses of . . . witnesses." Title 28 U.S. Code § 1821 outlines the costs available for witnesses, which may include costs such a (1) mileage or travel on common carrier, (2) toll charge or parking fees, (3) subsistence meals when

---

[3] Exhibits for B, D and E contain salary and hourly rate information for various employees. For purposes of public filing, that information has been redacted from these exhibits.  The government will provide the unredacted versions of the exhibits to the Court and defense counsel.

traveling away from home, and (4) all other normal travel expenses within and outside the district.

The government submits as taxed costs the travel expenses of the two National Park District Rangers who attended the hearing and provided testimony at trial regarding Mr. Howard's activity.  Scott Deckers, Platte River District Ranger, who traveled from Sleeping Bear Dunes National Lakeshore, provided $521.18 in costs related to travel to attend and provide testimony at the trial.  Park District Ranger Bahm, who flew to the trial from Yellowstone National Park, where he was stationed, provided $1,591.89 in expenses, including his flight costs.  (Exhibit I, Dekkers Travel Expenses; Exhibit J, Bahm Travel Expenses).  As both Rangers Bahm and Dekkers are NPS employees, their travel expenses comport with 28 U.S.C. § 1821 because the statute requires taxation of costs at substantially similar costs allowed recovered by federal employees.

The government also submits taxed costs for the travel expenses for the various fact witnesses called at trial.  The witnesses and costs are as follows and the documents are attached as Exhibit K.  These costs include costs such as mileage reimbursement and hotel accommodations near the courthouse, where needed.  The U.S. Department of Justice is responsible for all fees and allowances of witnesses. 28 C.F.R. § 21.7.

| Cost | Restitution Amount |
|------|--------------------|
| Bahm Travel Expenses | $1,591.89 |
| Dekkers Travel Expenses | $521.18 |
| Fact Witnesses Travel Expenses | $1,834.64 |
| TOTAL | $3,947.71 |

The total cost of the proceeding for travel expenses for all witnesses is $3,947.71.

## IV.  Conclusion

The government is entitled to restitution to victims for recoverable losses associated with Mr. Howard's conduct (18 U.S.C. § 3663A) and the costs of proceedings (18 U.S.C. § 1865) as follows:

| Party | Recoverable Losses 18 U.S.C. § 3663A | Cost of Proceedings | Justification |
|---|---|---|---|
| National Park Service | $12,868.29 | | Natural Resource / hydrologist expenses |
| U.S. Coast Guard | $21,161.16 | | Two hours direct cost of USCG helicopter operation |
| National Park Service[4] | | $2,113.07 | Rangers Bahm and Dekkers trial travel expenses |
| U.S. Department of Justice | | $1,834.64 | Trial travel expenses for fact witnesses |
| **TOTALS** | **$34,029.45** | **$3,947.71** | |

The government therefore seeks $34,029.45 in recoverable restitution and $3,947.71 in recoverable costs of proceedings (totaling $37,977.16 from these distinct categories.)  Combined with the restitution and cost of proceedings, the government further seeks a probationary sentence with a term of probation that he be banned from entering onto any NPS property, including Sleeping Bear Dunes National Lakeshore, for the duration of any probation term.

---

[4] Because restitution and costs of proceedings are legally distinct, they have been separated on this table.  The total award to the NPS for cost of the proceedings under 18 U.S.C. § 1865 and restitution under 18 U.S.C. § 3663A is $14,981.36.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: March 27, 2024                    /s/ Lauren F. Biksacky
                                         LAUREN F. BIKSACKY
                                         MEAGAN JOHNSON
                                         Assistant United States Attorneys
                                         P.O. Box 208
                                         Grand Rapids, MI 49501-0208
                                         (616) 456-2404