# EXHIBIT B

# Chapter 2.   Coast Guard Budget Authority and Structure

## 2.1  Federal Agency Authority to Spend Funds

Federal agencies obtain their authority to "spend" Federal funds via a statute called an appropriation.  Appropriations, as a type of budget authority, permits an agency to incur obligations and expenditures.  Congress usually enacts appropriations in annual **appropriations acts** and other laws.  An appropriation may make funds available from the General Fund, special funds, or trust funds, or it may authorize the spending of offsetting collections, which are credited to expenditure accounts (including revolving funds).

By contrast, **authorization acts** usually precede appropriation acts, setting a limit by Congress on itself as to what it may later appropriate for a given purpose.  Authorization acts generally do not make any funds available to an agency.  It is not unusual for Congress to skip this preliminary authorization step.

Authorization acts are the primary source of permanent enabling legislation for agency missions and functions.  Appropriations are needed to execute authorized missions and functions.

See the *Financial Resource Management Manual-Procedures (FRMM-P)*, COMDTINST M7100.4 (series), Chapter 2 (Coast Guard Budget Authority and Structure) for responsibilities and procedures detailing the Coast Guard's authority to spend funds.

## 2.2  Coast Guard Budget Authority

Coast Guard budget authority comes from a wide variety of statutes.  The most common authorities for funding the Coast Guard's programs and missions are:

1.  The annual DHS appropriations act;

2.  Supplemental appropriations;

3.  Continuing resolutions; and

4.  Revolving funds, special funds, and trust funds.

In addition to these, the Coast Guard is authorized by law to collect monies for goods and services, fines, and fees.  For some of these collections, Coast Guard has Budget Authority referred to as **Offsetting Receipts and Collections.** This permits the Coast Guard to obligate and expend some of the proceeds authorized by law as offsetting receipts and collections.  Various statutes authorize the Coast Guard to safeguard and seize property, including cash, in the course of conducting operations.  Authority to establish and use nonappropriated funds (NAFs) may be authorized by law, or by agency sanction, policy, and regulation.

In the absence of appropriations (per Office of Management and Budget (OMB), Circular A-11, *Preparation, Submission, and Execution of the Budget*):

1.  Federal officers may <u>not</u> incur any obligations that cannot lawfully be funded from prior appropriations unless such obligations are otherwise authorized by law.

COMDTINST M7100.3F

2. Federal officers may incur obligations as necessary for orderly termination of an agency's functions, but funds may <u>not</u> be disbursed.

## 2.2.1 <u>Regular Appropriations</u>

Regular appropriations provide funding for:

1. Operations & Support (O&S).

2. Procurement, Construction, and Improvement (PC&I).

3. Research & Development (R&D).

4. Alteration of Bridges (AB).

5. Retired Pay (RP).

6. Oil Spill Liability Trust Fund (OSLTF).  Amounts are derived from the OSLTF for the O&S, PC&I, and R&D appropriation.  The President may apportion up to $50 million per fiscal year from the OSLTF.

7. Boat Safety (BS).  Amounts for Boat Safety are transferred to the Coast Guard from the Sport Fish Restoration and Boating Trust Fund through the Department of Treasury Governmentwide Accounting system.

These appropriations are described in the Subsections that follow.

## 2.2.1.1 *Operations & Support (O&S)*

The O&S appropriation provides for the operation and maintenance of all authorized Coast Guard programs and facilities not otherwise specifically provided for in other appropriations or funds.  Unless otherwise directed by Congress in the appropriations language, O&S is typically an annual appropriation that is available for obligations for one fiscal year.

### 2.2.1.1.1  Reserve Training (RT)

Effective FY 2019, RT is a PPA within the O&S appropriation that provides for the operation, recruiting, training, administration, and management of the Coast Guard Reserve Program.

The Director of the Coast Guard Reserve is the official within the Coast Guard who, subject to the authority, direction, and control of the Secretary of Homeland Security and the Commandant, is responsible for preparation, justification, and execution of the personnel, operation and maintenance, and construction budgets for the Coast Guard Reserve. As such, the Director of the Coast Guard Reserve is the director and functional manager of appropriations made for the Coast Guard Reserve in those areas.

Per 14 USC 309, the Director of the Coast Guard Reserve shall submit to the Secretary of Homeland Security and the Secretary of Defense an annual report on the state of the Coast Guard Reserve and the ability of the Coast Guard Reserve to meet its missions. The report shall be prepared in conjunction with the Commandant and may be submitted in classified and unclassified versions.

**2.2.1.1.2  Environmental Compliance and Restoration (EC&R)**

Effective FY 2019 EC&R is no longer a standalone appropriation but a part of O&S. EC&R provides for environmental compliance and restoration of contamination from hazardous substances and pollutants at all current and former Coast Guard facilities. It provides for identification, investigation, and cleanup, and also physical changes to Coast Guard buildings and structures, in order to comply with Federal, State, and local environmental laws and regulations. Prior to fiscal year 2012, EC&R funds were available until expended (no-year funds). However, recent appropriation language states that EC&R funds are to remain available for five years.

## 2.2.1.2  *Procurement, Construction, and Improvement (PC&I)*

The PC&I appropriation provides for the acquisition, construction, rebuilding, and improvement of vessels, aircraft, shore facilities, aids to navigation (ATON) systems and facilities, and command, control, Command, Control Communications, Computers and Information Technology (C4IT) systems and related equipment.  PC&I funds are normally available for obligation as follows:

1. Acquisition, repair, renovation, and improvement of vessels:  typically five fiscal years.

2. Acquisition, repair, renovation, rebuilding, and improvement of shore facilities and ATON:  typically five fiscal years.

3. Acquisition, repair, renovation, and improvement of new aircraft and increases in aircraft capability:  typically five fiscal years, but can be three fiscal years.

4. Acquisition, construction, replacement, or improvement of capital equipment related to the above categories or for other specific purposes:  typically five fiscal years.

5. Personnel and administrative expenses:  typically one fiscal year.

## 2.2.1.3  *Research & Development (R&D)*

The R&D appropriation provides funding for applied scientific research and development.  This includes funds for pay, allowances, and related personnel support costs, as well as the maintenance, rehabilitation, lease, and operation of related facilities and equipment.  Prior to Fiscal Year 2012, R&D funds were typically available until expended (no-year funds). In Fiscal Years 2012 and 2013 R&D funds were appropriated to remain available for five years. In Fiscal Years 2014 through 2016, R&D funds were appropriated to remain available for three years.

## 2.2.1.4  *Alteration of Bridges (AB)*

Pursuant to the Truman-Hobbs Act (54 Stat. 497, 33 USC 511-523) governing bridge alterations, and in accordance with the Coast Guard Authorization Act of 1996, permanent authority exists in 49 USC 104(e) to transfer funds from the Federal-Aid Highways discretionary bridge program to the Coast Guard to finance alteration of obstructive highway bridges.

The AB appropriation provides for the Government's share of altering or removing railroads and publicly owned bridges that obstruct navigable waterways in the United States. The administrative costs associated with this appropriation are funded under the O&S appropriation. AB funds are normally available until expended (no-year funds).

COMDTINST M7100.3F

### 2.2.1.5  *Retired Pay (RP)*

The RP appropriation provides for the pay of former military members of the Coast Guard, the Coast Guard Reserve.  It also funds survivor annuity payments under the Retired Serviceman's Family Protection Plan and the Survivor Benefit Plan (SBP), as well as medical benefits for retirees and their dependents. RP is an annual appropriation and generally remains available until expended. In other words, these funds are known as no-year funds as opposed to most annual appropriations that expire at the end of one year.

RP is also designated as a mandatory appropriation not subject to 31 U.S.C. § 1341 the Antideficiency Act.  RP may make obligations in excess of available budget authority as this appropriation supports statutory entitlement programs.  However, obligations made in excess of available budgetary authority may only be liquidated once new appropriations are enacted.

### 2.2.1.6  *Oil Spill Liability Trust Fund (OSLTF)*

Title 1 of the Oil Pollution Act (OPA) of 1990 (33 USC 2701 et. seq.) includes authorization language governing the uses of the OSLTF.  Title 6 (33 USC 2752) includes special provisions authorizing permanent definite and permanent indefinite appropriations for specific purposes, as well as a requirement that all other OSLTF funds be subject to annual appropriations.

The Energy Policy Act of 2005, PL 109-58, reinstated a five-cent per barrel tax on oil received at a U.S. refinery or petroleum product entering U.S. ports, to be deposited into the OSLTF to be used to finance oil pollution prevention, response, and enforcement activities of various Federal agencies.

#### 2.2.1.6.1  OSLTF Spending

The Coast Guard uses the OSLTF for:

1. Operation & Support – Congress may appropriate not more than $25 million dollars from the OSLTF for operations and support of the Coast Guard.  This annual appropriation is available for administrative, operation, and personnel costs and other expenses necessary and incidental to carry out OPA 90 with respect to prevention, removal, and enforcement.

2. Oil spill response (Emergency Fund) – A permanent definite (no-year) appropriation of $50 million per year (not all of which may be apportioned by OMB for any given year), administered by the National Pollution Funds Center (NPFC), for immediate response to oil spills and substantial threats of such spills by Coast Guard and Environmental Protection Agency (EPA) Federal On-Scene Coordinators (FOSCs) in accordance with the National Contingency Plan (40 CFR 300).  To the extent that $50 million is inadequate, the Coast Guard may obtain an additional advance of up to $100 million, unless otherwise provided by law.

3. Oil spill claims (Claims Fund) – A permanent indefinite warrant authority extended to the Coast Guard National Pollution Funds Center to pay all valid claims for oil spill response costs and damages authorized by OPA to injured parties resulting from oil spills.

**Note:**  Recent annual appropriation acts have provided funds derived from the OSLTF for R&D expenses. These funds are available for R&D administrative, operation, and personnel costs and other expenses necessary to carry out the purposes of Section 1012(a)(5) of the Oil Pollution Act of 1990.

### 2.2.1.6.2  OSLTF Receipts

Two categories of receipts are deposited back into the OSLTF:

1. Cost recovery from liable responsible parties for the costs of Federal response to oil spills and for claims paid from the OSLTF for oil spill response costs and damages.

2. Certain civil and criminal fines and penalties, including administrative and judicial fines or penalties for violations of Sections 309 and 311 of the Clean Water Act, penalties under the Deepwater Port Act of 1974, and penalties under Section 207 of the Trans-Alaska Pipeline Authorization Act.  Clean Water Act administrative fines and penalties may be collected by the Coast Guard or the EPA, since both agencies have enforcement authority under the Clean Water Act.  Judicial fines or penalties are collected by the Department of Justice or local U.S. attorneys.

### 2.2.1.7  *Boat Safety (BS)*

There are appropriations and transfers from the Sport Fish Restoration and Boating Trust Fund to carry out the provisions of Title 16 of the U.S. Code (USC) Chapter 10B–Fish Restoration and Management Projects.  This provision of 16 USC includes funding for a boat safety account.  The Boat Safety account is also governed by 46 USC Chapter 131–Recreational Boating Safety, which provides the use of funding for the development and implementation of a coordinated national recreational boating safety program.  Current provisions of the law provide for the transfer of highway trust fund revenue derived from the motorboat fuel tax, and certain other taxes, to the Sport Fish Restoration and Boating Trust Fund.  Congress authorizes appropriations and transfers from this fund for Coast Guard and State recreational boating safety assistance, and other programs specified by law.  The Boat Safety funds are available until expended (no-year funds).

## 2.2.2  Supplemental Appropriations

Supplemental appropriations are legislatively funded adjustments to the Coast Guard budget authority.  These appropriations are provided in various statutes and are outside the normal annual budgeting process in order to address funding needs that are often emergent in nature.  Examples of supplemental funding are annual pay increases, Operation Desert Shield/Storm, the Midwest floods of 1993, and Hurricane Sandy.

## 2.2.3  Continuing Resolutions

Continuing resolutions are stopgap legislation enacted to continue operations whenever Congress and the President have not completed action on appropriations acts by the beginning of the fiscal year.  A continuing resolution generally covers a short period of time (i.e., one to three weeks).  Several continuing resolutions may be needed at the beginning of the fiscal year before the regular appropriations are enacted.  However, continuing resolutions have, on occasion, provided budget or spending authority and limitations for an entire fiscal year.

## 2.2.4  Operating with No Appropriations

Occasionally a fiscal year will begin with neither a regular appropriation nor a continuing resolution in place.  In the absence of appropriations (per OMB Circular A-11):

COMDTINST M7100.3F

1. Federal officers may <u>not</u> incur any obligations that cannot lawfully be funded from prior appropriations unless such obligations are otherwise authorized by law.

2. Federal officers may incur obligations as necessary for orderly termination of an agency's functions, but funds may <u>not</u> be disbursed.

Chapter 6 (Continuing Operations without Appropriations) provides specific instructions and policies for continuing operations without appropriations.

## 2.2.5  Revolving Funds

Specific provisions of law for self-financing operations authorize revolving funds.  Funds are obtained by charging customers for services or materials furnished.  The income from such operations is available in its entirety for meeting authorized expenses.

Once capitalized, annual appropriations are not normally made for revolving funds (they are meant to be self-sufficient), though an appropriation may be made to increase the total capital structure, if necessary.

### 2.2.5.1  *Supply Fund (SF)*

The Coast Guard Supply Fund is authorized by 14 USC 941.  It finances the procurement of uniform clothing, subsistence provisions, general stores, technical material, and fuel for specified facilities.  The fund is normally financed by reimbursements from the sale of goods, unless otherwise provided for by statute or an appropriation.

### 2.2.5.2  *Yard Fund (YF)*

The Coast Guard is authorized to finance industrial activities with a revolving fund by 14 USC 939.  The Coast Guard used this authority to create the Yard Fund, which finances the industrial operations of the Coast Guard Yard.  The Yard provides services such as construction, repairs, and alteration of vessels and boats; and fabrication of buoys and other special items for the Coast Guard and other Government agencies (OGAs).  The Government customers pay the Yard for these services from their respective appropriations.  The charges to the customer by the Yard are based upon recovery of its total industrial cost because the statute requires that amounts in excess of the actual cost be returned to the customers.

## 2.2.6  General Gift Fund

The Coast Guard General Gift Fund is authorized by 10 USC 2601 and is maintained to account for gifts, devises, and bequests.  The Coast Guard uses the money in the Gift Fund as specified by the donor in the devise or bequest.  This fund is financed by gifts, bequests, and proceeds from interest and dividends.  The fund is not financed by Congressional appropriations.

## 2.2.7  Sales, Fees, Fines, and Other Collections

The Coast Guard is authorized by law to collect monies for goods and services that it provides and specific fines collected and recovery of expenses.  Sources include:

1. Goods and services provided to Coast Guard personnel (e.g., sale of meals at Coast Guard dining facilities (CGDFs));

2. Goods and services provided to other agencies (e.g., issues of electronic parts from the SFLC to a DOD command);

3. User fees from goods and services provided to the public (e.g., Marine Safety User Fees);

4. Fines and judgments collected (e.g., boating safety violations);

5. Miscellaneous fees collected (e.g., FOIA requests);

6. Recovery of Federal funds used to clean up oil spills;

7. Sales of excess property, including military housing and lighthouses; and

8. Collections for the repair or replacement of CG property damaged or destroyed by a private person.

Funds collected may only be used as authorized by law – they cannot be automatically used to fund the operations and maintenance (O&M) of Coast Guard units.

Units that receive or collect funds must safeguard them in accordance with established procedures, and ensure that they are only used for purposes provided by law.

**Note:**  Safeguarding collections means placing under lock and key in a secure location with limited access and, if cash or check, deposit into Coast Guard/U.S. Government Treasury accounts as soon as possible.

Establishing detailed policies and procedures for all types of funds collected by the Coast Guard (i.e., user fees, fines and penalties, etc.) is not included in this Manual.  For detailed policy see References in Section 7.9 (Financial Policy for Revenue and Accounts Receivable) of this Manual.

## 2.2.8  Reimbursable Activities

1. Interagency Agreements (IAA):  Reimbursable activities describe those activities wherein the Coast Guard acts as a seller (provider) of goods or services and is entitled to reimbursement of all or part of the costs of its performance.  The annual budget submitted to Congress develops costs and funds required for programs to be carried out through appropriations made directly to the Coast Guard. However, to ensure that the budget presents a complete picture of the Coast Guard's operations and to ensure there is sufficient and anticipated reimbursable authority apportioned, the estimated costs of the reimbursable activities are included in the OMB and Congressional Stage budgets.

2. User Fees:  The Coast Guard has specific legislated authority to be reimbursed for costs related to the collection of user fees and the annual costs of providing vessel documentation services to recreational vessel owners.  Reimbursement of these costs related to collections are credited to the Appropriation from which originally expended.

## 2.2.9  Imprest Funds

An imprest fund is a fixed cash fund in the form of currency, coin, or Government check.  The fund is advanced to a duly authorized cashier for cash disbursement when other methods of

COMDTINST M7100.3F

payment are not feasible (e.g., cash purchase of fuel at a foreign port).  See *U.S. Coast Guard Certifying and Disbursing Manual*, COMDTINST M7210.1 (series).

## 2.2.10  Nonappropriated Funds (NAFs)

NAFs are typically used for morale, well-being, and recreation (MWR) programs, and also by the Coast Guard Exchange System (CGES).  Policies and procedures governing NAFs may be found in *Coast Guard Morale, Well-Being, and Recreation Manual*, COMDTINST M1710.13 (series), and *Coast Guard Nonappropriated Fund Instrumentalities (NAFI) Manual*, COMDTINST M7010.5 (series).

A portion of nonappropriated MWR funds, known as Extraordinary Expense Funds (XXFs), are set aside annually into the Coast Guard Trust Fund Operating Account to provide a nominal allocation to flag officers and other members of senior leadership to be used to further the welfare of the Coast Guard family.  If funds are available, a portion of the XXF funds may also be budgeted for other Commandant-approved uses, such as flag officer change of command, flowers for Arlington funerals, and other centrally funded activities for the benefit of the Coast Guard family.  Questions regarding the use of these funds should be referred to Commandant (CG-81).

## 2.2.11  Cash and Property Recovered or Seized

Coast Guard units sometimes recover or seize property, including cash, in the course of conducting operations.  All cash and property thus obtained must be safeguarded and used only for the purposes authorized by law.  Policies and procedures for handling such property are specified in *U.S. Coast Guard Personal Property Management Manual* (PPMM), COMDTINST M4500.5 (series), and also in the directives governing the activity being conducted at the time that the property is recovered or seized.

## 2.2.12  Other Budget Authority

The basic forms of budget authority provided by federal law include appropriations, borrowing authority, contract authority, and authority to obligate and expend offsetting receipts and collections.

### 2.2.12.1  *Overview*

The Department of Homeland Security (DHS) receives the majority of its funding through the regular annual discretionary DHS appropriations act; however, a significant portion of its resources are obtained through other budget authority. These other funding mechanisms include fees, resources from the Treasury Forfeiture Fund (TFF), and National Intelligence Program funding. In addition, pursuant to 21 USC 173(b)(8), the Secretary of DHS is required to submit drug control budgets to the Office of National Drug Control Policy (ONDCP) for those DHS components that expend budgetary resources on counterdrug activities. This is referred to as the "drug control" budget and a description of that process is also included in this Subsection of policy.

The largest of these other sources is fees. For example, at DHS, approximately 97 percent of the U.S. Citizenship and Immigration Service's (USCIS) budget is fee-funded. While the USCIS

budget is an anomaly within the Department, U.S. Customs and Border Protection (CBP), Transportation Security Administration, National Protection and Programs Directorate (NPPD), and U.S. Immigration and Customs Enforcement (ICE) also are resourced partially through the collection of fees.

Another source of funding is the TFF administered by the Treasury Executive Office for Asset Forfeiture (TEOAF). The TFF is the receipt account for deposit of nontax forfeitures (TFF is comprised of forfeited cash, proceeds from the sale of forfeited property and amounts remitted in lieu of forfeiture) made pursuant to laws enforced or administered by participating Treasury and DHS agencies (CBP, ICE, Coast Guard, and USSS). The availability of funds from the TFF varies from year to year based on the amount of forfeited funds recovered and priorities set by TEOAF. The TFF is available to reimburse participating agencies' costs of seizure and forfeiture of assets and other law enforcement-related expenses.

Policy covered in this Section includes;

1. DHS Fee Proposal Framework
2. Treasury Asset Forfeiture Fund
3. National Intelligence Program
4. Office of National Drug Control Policy

### 2.2.12.2  *Purpose*

The purpose of this Section is to provide guidance to the Coast Guard concerning other budget authorities that includes user fees, Treasury Asset Forfeiture Fund, National Intelligence Program, and Office of National Drug Control Policy.

### 2.2.12.3  *Scope*

All Coast Guard units that execute budget authority are subject to the provisions of this policy.

### 2.2.12.4  *Modifications*

It may be necessary to periodically update this policy to reflect changes in life cycle events, as well as changes in laws, regulations, accounting standards, DHS-specific guidance, or management objectives. Program managers shall review and oversee the policy implementation changes in local desk guides or procedures, as appropriate.

### 2.2.12.5  *Definitions*

**appropriation** – A provision of law authorizing the expenditure of funds for a given purpose. Usually, but not always, an appropriation provides budget authority. An authorization by act of Congress to incur obligations for specified purposes and to make disbursements from the U.S. Treasury Department.

**budget authority** - Authority provided by law to enter into obligations, which result in immediate or future outlays involving Government funds. The basic forms of budget authority are appropriations, contract authority, and borrowing power.

COMDTINST M7100.3F

**budget execution** - The process by which the financial resources made available to an agency are directed and controlled toward achieving the purposes and objectives for which the resources were approved.

**Budget Justification** - The documents that an agency submits to the appropriations committees in support of its budget request. OMB prescribes justification materials, which typically explain changes between the current appropriation and the amounts requested for the next fiscal year.

**expenditure** - A payment made to liquidate an obligation.

**obligations** - The legal requirement to pay orders placed, contracts awarded, services received, and similar transactions. Any act that legally binds the Government to make payment creates an obligation.

**program, project, or activity (PPA)** - An element within a budget account. For annually appropriated accounts, the Office of Management and Budget (OMB) and agencies identify PPAs by reference to committee reports and budget justifications; for permanent appropriations, OMB and agencies identify PPAs by the program and financing schedules that the President provides in the "Detailed Budget Estimates" in the budget submission for the relevant fiscal year. Program activity structures are intended to provide a meaningful representation of the operations financed by a specific budget account—usually by project, activity, or organization.

**Resource Allocation Decision** - The Secretary's formal approval of component RAPs at the close of the Program Review. The RAD is issued after the Program Review Board deliberates on the RAP. RADs will set resource allocation guidance for components for the Future Years Homeland Security Program and become the basis for the budget submission to OMB.

**Resource Allocation Plan** - DHS components annually develop proposed programs consistent with the Integrated Planning Guidance. These programs, expressed in the RAP, reflect systematic allocation of resources required to achieve missions, objectives, and priorities, and potential alternative methods of accomplishing them. Resource requirements reflected in RAPs are translated into time-phased funding requirements. RAPs must account for long-term requirements and resources including human capital, construction and investments, operating and maintenance, and potential disposal or termination costs, and program performance goals. RAPs are submitted to PA&E in late March and initiate the annual Program Review.

**Super Surplus** - The Super Surplus Fund is available for obligations or expenditures in connection with law enforcement activities of any Federal agency or of a Department of the Treasury law enforcement organization.

**User fee -** A fee assessed to users for goods or services provided by the Federal Government. User fees generally apply to federal programs or activities that provide special benefits to identifiable recipients above and beyond what is normally available to the public. User fees normally are related to the cost of the goods or services provided. Once collected, they must be deposited into the general fund of the Treasury, unless the agency has specific authority to deposit the fees into a special fund of the Treasury. An agency may not obligate against fees collected without specific statutory authority.

**zero-based budget** - A budget technique that attempts to analyze budget requests without an implicit commitment to sustaining past levels of funding. Under this system, programs and activities are organized and budgeted in a detailed plan that focuses review, evaluation, and analysis on all proposed operations rather than on increases above current levels of operations, as in incremental budgeting. Programs and activities are analyzed in terms of successively

increasing levels of performance and funding, starting from zero, and then evaluated and ranked in priority order. The purpose is to determine the level, if any, at which each program or activity should be conducted.

### 2.2.12.6 *Authorities*

1. The Public Law 101-576, *Chief Financial Officers Act of 1990*.
   https://www.congress.gov/bill/101st-congress/house-bill/5687/text

2. Public Law 109-469, *ONDCP Reauthorization Act of 2006*.
   https://www.congress.gov/109/plaws/publ469/PLAW-109publ469.pdf

3. Title 21, U.S. Code Section 1703, "Appointment and duties of Director and Deputy Directors".
   https://www.law.cornell.edu/uscode/text/21/1703

4. Title 31 U.S. Code Section 902, "Authority and functions of agency Chief Financial Officers".
   https://www.law.cornell.edu/uscode/text/31/902

5. Title 31, U.S. Code, Section 9703, "Department of the Treasury Forfeiture Fund".
   https://www.law.cornell.edu/uscode/text/31/9705

6. Government Accountability Office, *A Glossary of Terms Used in the Federal Budget Process* (GAO-05-734SP) (September 2005).
   http://www.gao.gov/new.items/d05734sp.pdf

7. Office of Management and Budget (OMB), Circular A-19, *Legislative Coordination and Clearance*.
   https://www.whitehouse.gov/omb/information-for-agencies/circulars/

8. Office of Management and Budget (OMB), Circular A-25, *User Charges*.
   https://www.whitehouse.gov/omb/information-for-agencies/circulars/

9. Department of Homeland Security, Chief Financial Officer, *Financial Management Policy Manual* (FMPM), Section 2.4, "Budget Execution".
   http://cfo-policy.dhs.gov/FMPM%20Table%20of%20Contents%20for%20PDFs/Section%202.4%20Budget%20Execution.pdf

### 2.2.12.7 *Responsibilities*

The following are the offices and their respective responsibilities for other budget authority.

#### 2.2.12.7.1 DHS Budget Director

1. Coordinates, reviews, and approves the proposal with DHS counsel, budget, finance, policy legislative affairs, operational programs, public affairs, and industry engagement offices.

2. Prioritizes all DHS fee proposals department-wide.

3. Submits proposals to OMB and the necessary Congressional committees; DHS Budget Director will act as the liaison between the component, OMB, and Congressional committees to respond to any questions or arrange for required meetings.

COMDTINST M7100.3F

4. Provides final resolution on the proposal to the component.

5. Ensures the proposals are reviewed and cleared by the Office of General Counsel, Office of Policy, and Office of the Chief Information Officer (OCIO) for information technology-related requests.

6. Officially submits material to TEOAF and providing copies of final submissions to the Components.

7. Maintains a list of proposals submitted to DHS Office of the Chief Financial Officer (OCFO) as part of the TEOAF Super Surplus process.

### 2.2.12.7.2 DHS Budget Division

Modifies all Congressional Justification table templates to ensure column headers do not inappropriately use the word "request".

### 2.2.12.7.3 Department of Homeland Security (DHS)

Distributes guidance on the process and priorities for Super Surplus funding to the Components.

### 2.2.12.7.4 DHS OCFO

Compiles all components' requests for Super Surplus funding into a consolidated package.

### 2.2.12.7.5 CFO, in coordination with the Office of Policy (PLCY)

Seeks guidance from the Office of the Secretary concerning specific DHS-wide priorities that should be considered in component submissions.

### 2.2.12.7.6 Steering Committee

1. Reviews, vets, and ranks Super Surplus proposals to ensure that the proposals are aligned with, and are grouped by, secretarial and departmental priorities.

2. Develops the criteria and assessment instrument used to review, vet, and rank Super Surplus proposals.

3 Provides the CFO Council with its recommended consolidated and prioritized package of Super Surplus proposals.

### 2.2.12.7.7 CFO Council

Provides its recommendations and, if necessary, identifying any outstanding issues that need to be taken to the Deputy Secretary for final resolution.

### 2.2.12.7.8 Office of the Chief Financial Officer (OCFO)

1. Submits the consolidated and prioritized package to OMB for review before submission to TEOAF.

2. Adjusts the proposals to the funding guidelines in the Super Surplus Plan and clearing the revised packet through DHS Clearance.

3. Ensures the revised packet of proposals conforms to articulated departmental priorities and operational need.

### 2.2.12.7.9  Treasury Executive Office for Asset Forfeiture (TEOAF)

Calculates the funds available for the Super Surplus and developing a Super Surplus Plan commensurate with the available funding.

### 2.2.12.7.10  DHS OCFO Budget Division

Distributes additional guidance and templates for specific drug budget deliverables to the relevant components.

## 2.2.12.8  *Policy*

### 2.2.12.8.1  DHS Fee Proposal Framework

Much of the DHS mission is accomplished with collections from user fees. DHS's Fiscal Year (FY) 2015 budget includes approximately $9 billion in user fee collections to fund agency programs. There exists considerable variation across the Components relating to the authorities for user fees and the development and budgeting of user fees. With appropriate authorities, user fees may offer opportunities to leverage funding beyond that which Congress provides through the discretionary annual appropriations process to support critical Departmental operations.

For additional guidance on user fees policy, see Chapter 7, Section 7.9.5.5 (User Fees) of this Manual.

This framework is intended to allow components latitude in operations and recognizes the variations in authorities for user fee while also providing structure and guidance in future user fee efforts. The framework provides guidance to developing fee proposals while promoting information sharing Department-wide. It is a Department-wide attempt to establish governance policies for user fees.

Components should adopt the following standards in the development of fee proposals:

1. *Applicability*. This framework applies to any user fee proposals that will result in new or changes to existing fees.

2. *Timing of Proposals*. User fee proposals, including proposals to establish a new fee and revise or update an existing fee, should be submitted to DHS once the proposal is clearly defined and approved by the component head and, where feasible, at the same time as the Resource Allocation Plan (RAP) submission. Fee proposals must be in accordance with the requirements in OMB Circular A-19. The items in the checklist found in Section 5 (Fee Proposal Checklist) below should be submitted to the DHS OCFO Budget Division and Program Analysis and Evaluation (PA&E) as part of the RAP submission. This will allow for consideration with all the other new initiatives.

3. *Legislative Jurisdiction*.

   a. In order to have the best chance of success for adoption, fee proposals that require legislative action should fully consider legislative jurisdiction and should include, in coordination with the component's office of congressional relations, the development

COMDTINST M7100.3F

of an enactment strategy. When necessary, component and DHS resources should be engaged as part of this strategy in order to optimize the potential for success.

b. When necessary, if legislative changes are part of the proposal, legislative language must be approved by the component's chief counsel office, coordinated with the component's office of congressional relations, and included with the fee proposal.

4. *Funding strategies*. When the authority exists to use fee revenue, user fees may allow DHS to increase performance or capacity, which is beneficial to DHS components, other federal agencies, the private sector, and the public at large. In many cases, specific user fees have their own budget submission requirements and Treasury Account Fund Symbols. Office of Management and Budget (OMB), Circular A-25, *User Charges* provides general policy on determining the amount of user charges to assess.

5. *Budget Presentation of Fees*. DHS develops justifications for most, but not all, of the Department's fee programs. Standard exhibits and templates must be used to ensure that there is consistency as to what information about the fee programs is included in Congressional Justifications.

The following Subsections detail policy for DHS Fee Proposal Framework.

1. Timing of Proposals

a. *Purpose*. The purpose of this Section is to discuss the timing of when a component within DHS should submit a proposal to adjust its fees. User fee proposals should be submitted to DHS once the proposal is clearly defined and approved by the component head and at the same time as the RAP submission. The attached checklist details the information that must be included in the packet that is submitted to the DHS Budget Division and DHS PA&E as part of the RAP submission. This will allow for consideration with all the other new initiatives.

b. *Background*. Any component within DHS that has user fees must conform to the requirements of the Chief Financial Officers Act of 1990 (CFO Act). Section 205 of the CFO Act, specifically 31 U.S.C. 902(a)(8), requires each agency's Chief Financial Officer to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." If, after completing a review, the Component recommends adjusting user fees, the appropriate official must provide this information to the DHS Office of the Chief Financial Officer (OCFO) and the Office of General Counsel in sufficient time to introduce this adjustment into the federal budgeting process.

c. *Discussion*. Components need to sufficiently plan to incorporate the impact of establishing a new fee or adjusting existing fees into the budget formulation process. The component must estimate when a new fee or fee adjustment is likely to occur, including any administrative and regulatory time required. Budget projections based on a current operating plan (or spending plan) also must be available for the time period. If the biennial period is FY 2018/2019, the component normally will use FY 2018 as the base for a 3-year budget projection. However, based on the particular fee program being analyzed, a zero-based budget for the 2-year biennium may be appropriate instead of using the year before the biennium as a base. The intent is to

inform DHS that a fee adjustment or establishment is being considered for its program. In some instances, the component may be required to show how much additional fee revenue is needed.

The component should utilize its existing processes to conduct fee reviews in order to determine how much additional revenue is needed or to what extent fees will change as a result of a biennial review. If the component is denied the request to propose a fee adjustment, its next request should reflect this decision. For example, if the adjustment is a critical need, but is denied in the FY 2018-2022 Resource Allocation Decision (RAD), the component should resubmit its request in the subsequent budget cycle.

The nature of a biennial fee review is to identify trends in anticipated workloads, costs to handle those workloads, and the anticipated necessary fee levels. Due to this nature, if a component is conducting a fee review, according to the requirements discussed in OMB Circular A-25, the fee review should be planned such that the review will be complete and the fee adjustment will be vetted with DHS, OMB, and Congress (as necessary) in time for DHS to publicize the fee adjustment (e.g., through a notice of proposed rulemaking) on the same day as the President's Budget is delivered to Congress. This will allow adequate time for public comment (if required) and implementation planning so that the new fee schedule will be in place on the first day of the appropriate fiscal year.

Fee proposals that require new or modified statutory authority should be submitted along with other DHS legislative proposals. Components should not include funds associated with new or modified fee proposals in their RAPs, OMB Submissions, or Congressional Justifications until statutory changes have been enacted into law.

2. Legislative Jurisdiction

   a. *Purpose*. The purpose of this Section is to establish a DHS-wide governance policy for user fee proposals that provides component latitude, Department-wide guidance, and promotes information sharing. Specifically this discussion will focus on providing DHS with an outline that may be used for implementing Department-wide policy for drafting user fee proposals. The discussion will only focus on legislative jurisdiction and legislative language aspects.

   b. *Background*. Currently, user fee proposals are developed mostly within respective DHS components. DHS has not established Department-wide user fee proposal guidance and thus, there is little information sharing across the Department regarding such proposals. Each DHS component has developed its own unique process to draft, prioritize, and implement user fee proposals.

   c. *Discussion*. In establishing Department-wide user fee proposal guidance, DHS can better leverage opportunities to attain the necessary fee resources to achieve important aspects of the DHS mission. Increased commonality and information sharing across the Department can help to fully integrate and prioritize user fee proposals consistent with the budget formulation process.

   Legislative jurisdiction and legislative language are components of any DHS user fee proposal policy. Department-wide guidance in these areas is intended to provide components with sufficient latitude to promote a cohesive budget formulation process for both discretionary and mandatory resources.

COMDTINST M7100.3F

DHS policy regarding legislative jurisdiction and legislative language is that:

1) Components are responsible for maintaining a detailed knowledge of existing user fee authorizations.

2) When possible, components should fully utilize existing fee authorizations to establish or maintain user fees.

3) When current authorizations are insufficient, components are responsible for identifying integrated internal teams to develop new or revised fee authorities. Subject matter experts from component counsel, budget, finance, policy legislative affairs, congressional relations, operational programs, public affairs, and industry engagement offices should be considered for team membership.

4) Components are responsible for full coordination and approval of each proposal within the component and submission to DHS.

5) At a minimum the proposal should include:

   (1) legislative language that is necessary to impose a new fee or to alter an existing fee;

   (2) Congressional committee(s) that are required (if applicable) to take action regarding the proposed legislation;

   (3) integration into the budget formulation process as required.

6) DHS Budget Director is responsible for coordination, review, and approval of the proposal with DHS counsel, budget, finance, policy legislative affairs, operational programs, public affairs, and industry engagement offices.

7) DHS Budget Director is responsible for Department-wide prioritization of all DHS fee proposals.

8) DHS Budget Director is responsible for proposal submission to OMB.

9) DHS Budget Director is responsible for proposal submission to the necessary Congressional committees.

10) DHS Budget Director will act as the liaison between the component, OMB, and Congressional committees to respond to any questions or arrange for required meetings.

11) DHS Budget Director will provide final resolution on the proposal to the component.

3. Funding Strategies

   a. *Funding Sources*. The main source of funding that allows DHS to finance federal programs or activities is funding from annual and other appropriations. However, funding may be authorized in the form of user fees, user charges, or excise taxes. User fees recover part or all of the costs of these programs and activities – the cost of providing a benefit that is beyond what is normally available to or consumed by the general public – from the identifiable users/beneficiaries of those programs and activities. Since user fees represent a charge for a service provided by the government or for a benefit from a government program, payers expect and deserve a well-defined correlation between the fees imposed and the cost of providing the services or

benefits, and they have expectations about the quality of the related services or benefits.

Statutes dictate whether the user fee collections may be dedicated to a specific program or, alternatively, whether they must be deposited into the General Fund of the Treasury where the collections remain available to fund general Government expenditures. Where the governing statute is silent on the disposition of fee collections, they must be deposited as miscellaneous receipts into the general fund (see 31 U.S.C. 3302(b)).

User fees are collected either directly by DHS Components or by an outside party, such as a Department of Treasury lockbox service provider, and then are deposited in the appropriate Treasury account.

b. *Use of Funding*. User fee operating plans include estimated collections and allocate these amounts to fund eligible expenses as defined by the fee's statutory authorities on use of the funding.

4. Budget Presentation of Fees

a. *Purpose*. The purpose of this Section is to establish a DHS-wide governance policy for presenting user fees in budget documentation, such as Congressional Justifications. This Section focuses on what information should be included in budget documentation. In addition, this Section presents the factors that should be considered whether Congressional Justifications should be developed for individual fee programs.

b. *Background*. DHS develops Congressional Justifications for most of the Department's fee programs. However, there are some significant fee programs for which DHS does not develop Congressional Justifications, such as the Merchandise Processing Fee.

c. *Discussion*. At a minimum, the Congressional Justifications should include the following information for all fee programs:

1) *Statutory authority*. The legislative language authorizing the fee along with a plain language description of what the legislative language authorizes.

2) *Uses*. A description of what the statute authorizes in terms of activities and expenditures.

3) *Change mechanism*. A discussion of how changes can be made to the fee program. If changes can be made through a regulatory process, the Congressional Justifications should provide details of the time frames and necessary stages associated with the regulatory process. If changes can be made only through the statutory process, provide the names of the congressional committees that would have jurisdiction over such legislation.

4) *Previous changes*. A discussion of the last time that changes were made to the fee program and how that change was attained.

5) *Recovery rate*. The Congressional Justification should include a discussion of whether or not the fee is designed to recover the full cost of the program services provided and whether or not those fees that are designed to achieve full-cost recovery actually are achieving it. Additionally, for those fee programs that are not

COMDTINST M7100.3F

achieving full-cost recovery, an estimate should be provided of the actual recovery rate.

Congressional Justifications should be developed for all discretionary fee programs. Congressional Justifications also should be developed for all mandatory fee programs that generate more than $10 million in revenue annually. In addition, components should consider developing Congressional Justifications for mandatory fee programs that generate less than $10 million in revenue where the program could be considered of particular interest or priority to the congressional appropriations committees.

For mandatory fees or other fees over which the appropriations committees have no jurisdiction, Congressional Justifications should avoid the terminology "Budget Request." The word "request" implies that the committee has jurisdiction in setting fee levels and is misleading and inaccurate. Use of the term "request" in mandatory fee budget documents has caused displeasure with members of the appropriations committee staffs in the past. Budget documents should use the terminology "Budget Estimate" in lieu of "Budget Request." The DHS Budget Division will modify all Congressional Justification table templates to ensure that column headers do not inappropriately use the word "request."

5. Fee Proposal Checklist

   a. At a minimum, any fee proposal should include the following information and provide answers to the following questions:

      1) Name of Fee

      2) Administration or DHS objective that fee supports

      3) Existing or proposed fee rate

      4) Proposed change (if any)

      5) Background on who currently is charged the fee and discussion of any proposed changes

      6) Are there any other DHS Fees charged to the same industry segment? (Have you done an economic impact analysis that factors in other fees assessed against the same user population?)

      7) What is the duration of the fee?

      8) What congressional committee will have (or has) jurisdiction?

      9) What is the problem/challenge that you are trying to address?

      10) What is the proposed legislation (if applicable)?

      11) What is your strategy for gaining support on behalf of the fee proposal?

      12) Has there been any OMB, congressional, or public feedback/support on the possibility of this fee increase?

      13) Coordination, if any, with other Executive Branch departments for free implementation matters (e.g., collection and reimbursement mechanisms)

      14) Contact person for further information

15) Nominating official

## 2.2.12.8.2 Treasury Asset Forfeiture Fund

The TEOAF oversees the TFF (See 31 U.S.C. § 9703), which is the receipt account for the deposit of nontax forfeitures made pursuant to laws enforced or administered by Department of the Treasury and DHS law enforcement agencies. The TFF was established in 1992 as the successor to what was then the Customs Forfeiture Fund. The TFF participating agencies are:

1. Internal Revenue Service Criminal Investigations Division (IRS-CI), U.S. Department of the Treasury;

2. ICE, DHS;

3. CBP, DHS;

4. U.S. Secret Service, DHS; and

5. Coast Guard, DHS.

The TFF is a special fund. Special funds are federal fund collections that are earmarked by law for a specific purpose. These funds can be allocated and used without the enactment of an annual appropriation by Congress. Expenses of the TFF are set in a relative priority so that unavoidable costs, known as mandatory expenses, are met first.

The enabling legislation for TFF (Title 31 U.S.C. § 9703) defines those purposes for which Treasury forfeiture revenue may be used. In addition to the agencies listed above, the funds can be allocated to other law enforcement entities that do not have forfeiture authority, such as the Financial Crimes Enforcement Network, Federal Law Enforcement Training Center (FLETC), and the Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau.

The statutory authority requires that available funding is used to meet mandatory expenses of the TFF, including:

1. Storing and maintaining seized and forfeited assets. Investigative expenses incurred in pursuing a seizure.

2. Certain costs of local police agencies incurred in joint law enforcement operations.

3. Following deposits of forfeited cash, proceeds from forfeited property sales, and amounts remitted in lieu of forfeiture, funds may be paid to:

    a. reimburse participating agencies' costs of seizure and forfeiture of assets;

    b. pay expenses to include costs of investigation and satisfaction of liens;

    c. pay for training, promote cooperation among Federal, state, and local law enforcement agencies;

    d. reimburse expenses related to expenses of sale/destruction of contraband;

    e. pay informant awards and expert services;

    f. reimburse persons for costs incurred in their cooperation; and

    g. serve as a source of funding for international asset sharing.

The following Subsections detail policy for Treasury Asset Forfeiture Fund.

COMDTINST M7100.3F

1. Super Surplus Fund

   After mandatory expenses are accounted for, the remaining unobligated balance can be distributed through the Super Surplus process. Unlike the mandatory funding that is strictly designed to support forfeiture-related law enforcement activities, the Super Surplus Fund is available for obligations or expenditures in connection with law enforcement activities of any Federal agency or of a Department of the Treasury law enforcement organization.

   a. Components that wish to submit proposals for Super Surplus funding through the TFF must submit a package, including all of their proposals for the following fiscal year, no later than mid-April to DHS OCFO. DHS OCFO compiles all components' requests into a consolidated package that will be cleared internally and through OMB before submission to TEOAF on or before early June.

   b. Although the authority governing the use of Super Surplus funds is very broad, making Super Surplus funds available for obligations or expenditures in connection with law enforcement activities of any Federal agency, as a matter of policy, Treasury tends to support proposals that are likely to provide a return on investment to the fund. Super Surplus funds cannot be requested for programmatic activities or equipment appropriated by Congress.

   c. Other components (other than those identified in Section 3.2 of this Policy) may submit requests, as long as they fund law enforcement activities of U.S. Federal law enforcement agencies, have a law enforcement agency or component designated as fiscal agent, and address TEOAF and DHS priorities.

      1) Components may work together to develop joint proposals.

      2) Components requesting Super Surplus funding should work with the appropriate DHS Budget Division Desk Officer to ensure that proposals address TEOAF and DHS priorities.

2. Super Surplus Funding Proposal Process

   The DHS process for preparing, reviewing, and submitting Super Surplus funding proposals is as follows:

   a. DHS distributes guidance on the process and priorities for Super Surplus funding to the Components. As part of preparing the guidance, the CFO, in coordination with the Office of Policy (PLCY), will seek guidance from the Office of the Secretary concerning specific DHS-wide priorities that should be considered in component submissions.

   b. The components send this information to the program offices along with submission deadlines and other elements that the component may require.

   c. Each component compiles its proposals into a prioritized submission that reflects the strategic and tactical priorities of the component, as well as DHS as a whole. Components are responsible for ensuring that proposals undergo a thorough internal clearance process including clearance from component headquarters budget, legal, policy, and information technology staff.

   d. The Component forwards the approved submission to the DHS CFO at least 6 weeks before the submission due date to TEOAF, with a written indication (email is

acceptable) that the Component's senior leadership (Chief of Staff or higher) has cleared the submission. This should be received by DHS OCFO no later than mid-April based on the Request for Proposals sent by OCFO Budget Division.

e. By late April, a Steering Committee made up of personnel from OCFO, PLCY, and relevant DHS Components will be convened to review, vet, and rank Super Surplus proposals to ensure that the proposals are aligned with, and are grouped by, secretarial and departmental priorities; this maximizes the impact of any funding received.

f. DHS Budget Director is responsible for ensuring that the proposals are reviewed and cleared by the Office of General Counsel, Office of Policy, and Office of the Chief Information Officer (OCIO) for information technology-related requests.

g. The Steering Committee develops the criteria and assessment instrument used to review, vet, and rank Super Surplus proposals.

h. By early May, the Steering Committee provides the CFO Council with its recommended consolidated and prioritized package of Super Surplus proposals and is prepared to discuss the methodology behind the recommendations.

i. By late May, the CFO Council, guided by a strategic priorities framework and any other applicable integrated planning guidance, provides its recommendations and, if necessary, identifies any outstanding issues that need to be taken to the Deputy Secretary for final resolution.

j. By early June, OCFO submits the consolidated and prioritized package to OMB for review before submission to TEOAF.

k. By late June, the DHS Budget Division officially submits the material to TEOAF and provides copies of final submissions to the Components.

l. The DHS Budget Division maintains a list of proposals submitted to DHS OCFO as part of the TEOAF Super Surplus process, and Components provide updates as needs, priorities, and costs change.

m. At the end of the fiscal year, TEOAF calculates the funds available for the Super Surplus and develops a Super Surplus Plan commensurate with the available funding.

n. DHS OCFO works with the Components to adjust the proposals to the funding guidelines in the Super Surplus Plan and clears the revised packet through DHS Clearance.

o. DHS OCFO works with Components and the CFO Council, as needed, to ensure that the revised packet of proposals conforms to articulated departmental priorities and operational need.

p. Once approved, the revised Super Surplus proposals are transmitted to OMB and then to the House and Senate Appropriations Committees for approval. Congressional approval often comes in March/April.

3. Timeline for Submission of Super Surplus Proposals to Congressional Appropriations Committees:

COMDTINST M7100.3F

**Table 2.1  Submission of Super Surplus Proposals to Congressional Appropriations Timeline**

| Month | Process Step |
|---|---|
| Mid-February | DHS CFO sends guidance to Components for Super Surplus proposals |
| Mid-March | Formal call for Super Surplus proposals from Components to their program offices |
| Early April | Super Surplus proposals due to Components from program offices |
| Mid-April | Super Surplus proposals due to DHS Budget Director from Components |
| Late April | DHS Budget Director convenes a Steering Committee made up of personnel from OCFO, PLCY, and relevant DHS Components to review, vet, and rank Super Surplus proposals |
| Early May | The Steering Committee provides the CFO Council with its recommended consolidated and prioritized package of Super Surplus proposals |
| Late May | The CFO Council provides its recommendations and, if necessary, identifies any outstanding issues that need to be taken to the Deputy Secretary for final resolution |
| Early-June | DHS Budget Director transmits consolidated package of proposals to OMB for clearance |
| Late June | Consolidated package of proposals submitted to TEOAF by DHS |
| September 30 | Once the fiscal year is over, TEOAF calculates the funds available for the Super Surplus and develops a Super Surplus Plan |
| Late Fall-Early Spring | DHS Budget Director works with Components and CFO Council to adjust the proposals to the funding guidelines in the Super Surplus Plan<br>The Budget Director puts the revised packet of proposals into DHS Clearance for final review and clearance<br>Once the revised packet of proposals is cleared, the Budget Director sends it to OMB for clearance<br>Once cleared by OMB, the Budget Director transmits the packet of proposals to the House and Senate Appropriations Committees for approval<br>Congressional approval of the Super Surplus proposals often comes in March-April |

### 2.2.12.8.3  National Intelligence Program

The U.S. intelligence budget has two major components: the National Intelligence Program (NIP) and the Military Intelligence Program. The NIP includes all programs, projects, and activities of the intelligence community as well as any other intelligence community-related programs designated jointly by the Director of National Intelligence (DNI) and the head of a department or agency, or the DNI and the President. The NIP provides authority to spend intelligence program funds for activities in several Federal departments, including DHS's Office of Intelligence and Analysis (I&A), Coast Guard, and OCIO.

The majority of I&A's budget and a small part of the Coast Guard and OCIO budgets are authorized to be funded in the NIP. As the Department's Chief Intelligence Officer, the Under Secretary for I&A works with the Office of the Director of National Intelligence (ODNI) to develop its annual NIP budget request. ODNI budget execution reporting requirements are described in FMPM 2.4, *Budget Execution*. See Chapter 5, Subsection 5.6.19.1.3 (Reprogramming of National Intelligence Program (NIP) Funding) of this Manual for guidance related to reprogramming requests of funding for the NIP.

### 2.2.12.8.4  Office of National Drug Control Policy

ONDCP advises the President on drug-control issues, coordinates drug-control activities and related funding across the Federal Government, and produces the annual National Drug Control Strategy, which outlines Administration efforts to reduce illicit drug use, manufacturing, and trafficking; drug-related crime and violence; and drug-related health consequences.

Pursuant to 21 U.S.C. § 1703, each fiscal year, the head of each department, agency, or program of the Federal Government with responsibilities under the National Drug Control Program Strategy shall transmit to the Director of National Drug Control Policy a proposed drug control budget request. The Secretary of DHS shall ensure timely development and submission of proposed drug control budget requests for those components who expend budget resources on counter-drug activities. The DHS Components that participate in this process are CBP, the Federal Emergency Management Agency (FEMA), FLETC, ICE, and Coast Guard.
Under the authority of the ONDCP Reauthorization Act of 2006, ONDCP produced three budget circulars (similar to OMB Circulars). The following three budget circulars include:

1. *Budget Formulation*. Provides instructions in preparing drug control budget proposals for submission, certification, and inclusion in the National Drug Control Budget.

2. *Budget Execution*. This circular contains procedures for reprogramming requests, transfers, and the guidance for submission of the Annual Financial Plan.

   See Chapter 5, Subsection 5.6.19.1.2 (Reprogramming of National Drug Control Policy (NDCP) Funding) in this Manual for guidance related to reprogramming of National Drug Control Policy funding.

3. *Drug Control Accounting and Performance*. Agencies are required to conduct an annual detailed accounting of all funds expended for National Drug Control Activities. The report is authenticated by the DHS Office of Inspector General (OIG) if the component's total drug budget exceeds $50 million. If the Drug Budget is less than $50 million, this falls under the unreasonable burden exception and the component produces the Accounting and Performance report directly.

The following Subsections detail policy for Office of National Drug Control Policy.

1. Content of Drug Control Budget Requests

   Each year around June, the ONDCP Director sends a letter to the DHS Secretary stating ONDCP's priorities for the DHS Components as it relates to the drug budget. The DHS OCFO Budget Division will distribute additional guidance and templates for specific drug budget deliverables to the relevant components.

   Components then will begin drafting their drug control budget requests. These shall include all requests for funds for any drug control activity undertaken, including demand reduction,

COMDTINST M7100.3F

supply reduction, and any drug law enforcement activities. If an activity has both drug control and nondrug control purposes or applications, the program shall estimate by a documented calculation the total funds requested for that activity that would be used for drug control, and shall set forth in its request the basis and method for making the estimate.

Component drug budgets shall include a narrative summary and a table displaying detailed funding and personnel resources. The narrative program summary is a high-level overview of the agency's mission and a description of the agency's approach to counter-drug activities. Components shall populate a Resource Summary table that mirrors the 3-year budget profile of the Department's OMB submissions. The table details drug resources by function displayed for both appropriations and programs, projects, or activities. The table also should list the total amount of full-time equivalents dedicated to counter-drug activities.

After the submission of the Fall Drug Budget, the ONDCP Director will issue a letter to the DHS Secretary certifying the Department's Drug Budget for the coming President's Budget Submission.

2. Deliverables and Timeline

The following table displays the deliverable, timeline, and a brief description of the deliverable. Note that additional information regarding budget execution deliverables can be found in Department of Homeland Security, *Financial Management Policy Manual* (FMPM) Section 2.4 (Budget Execution).

**Table 2.2 Deliverable Timeline**

| Deliverable Name | Timeline | Description |
| --- | --- | --- |
| Summer Budget Submission | Due prior to the OMB Budget Submission | ONDCP reviews the requested topline funding levels and performance to determine if the request addresses the National Drug Control Strategy and the annual funding guidance. |
| Fall Budget Certification | With the OMB Budget Submission | Components submit funding levels and performance goals for counter-drug activities. ONDCP analyzes the submission and issues Fall Budget Certification Letter to the DHS Secretary. |
| Accounting and Performance Summary Reporting | Due around February 1st each year | Handled by OIG (with the exception of FEMA and FLETC because they are under the $50 million unreasonable burden threshold). |
| Budget and Performance Summary | Late December/Early January | The Budget Summary presents resources and performance as part of the National Drug Control Strategy. |
| Financial/Execution Plan | 45 days after enactment | A comparison of the request to enacted levels as it relates to the Drug Submission. |
| Reprogramming/Transfer Notification | Prior to Congressional Notification | ONDCP must approve reprogramming/transfers in excess of |

| Deliverable Name | Timeline | Description |
|---|---|---|
| | | $1,000,000 that are included as part of the Drug Budget methodology |

## 2.3  Subappropriation Accounts

Subappropriation accounts break down appropriations, apportionments, or allotments into smaller accounts and functional categories that serve as tools for funds control, and for assigning responsibilities for funds management.  Subappropriation accounts for specific appropriations, earmarks, and allowance fund codes are subdivisions of budget authority used to assign responsibility for obligations and expenditures.

### 2.3.1  Apportionment

Funding is provided to an agency through an appropriation or fund account.  The Coast Guard then must receive an apportionment from OMB before it can "spend" funds (i.e., incur obligations).  Apportionments typically divide the funds available for obligation by time periods (usually quarters for O&S) or lump sum for PC&I.

#### 2.3.1.1  *Allotments and Suballotments*

Allotments or suballotments are formal subdivisions of budget authority made by DHS or the Coast Guard, which allows authorized officials to incur obligations not to exceed a specified amount.

Each appropriation (or project for PC&I), revolving fund, trust fund, and special fund must be allocated to a single allotment or suballotment (i.e., a formal subdivision of budget authority).  For direct appropriations and special funds, Coast Guard issues suballotments to Deputy Commandants, Assistant Commandants, or Directors of Headquarters-managed programs, projects, or activities (PPAs) in accordance with the approved Financial Management Operation Plan (FMOP), not to exceed the amounts apportioned by OMB.

#### 2.3.1.2  *Program, Project, or Activity Category (PPA)*

A PPA is a major category within an appropriation.  The Government Accountability Office has defined a PPA as an element within a budget account.  For annually appropriated accounts, the Office of Management and Budget (OMB) and agencies identify PPAs by reference to committee reports and budget justifications; for permanent appropriations, OMB and agencies identify PPAs by the program and financing schedules that the President provides in the "Detailed Budget Estimates" in the budget submission for the relevant fiscal year.  Program activity structures are intended to provide a meaningful representation of the operations financed by a specific budget account—usually by project, activity, or organization.  Examples of a PPA would be Military Pay and Allowances PPA in the Operations & Support or National Security Cutter PPA in the Procurement, Construction and Improvement (PC&I) appropriation.

COMDTINST M7100.3F

### 2.3.1.3  *Allowance Fund Control Code (AFC)*

AFCs represent the next sub-division of funding below the sub-allotment level for O&S. AFCs represent administrative operating targets for specified purposes. PPAs are subdivided into one or more AFCs.

### 2.3.1.4  *Administrative Target Unit (ATU)*

ATUs consist of logistics and service center commands, districts, areas, Headquarters staffs, and Headquarters units that are authorized to receive funding authority. An ATU receives a funding allocation from an AFC.

### 2.3.1.5  *Target (Funding)*

Targets are amounts established at each level of funds distribution for the obligation of funds within program areas or projects.

### 2.3.1.6  *Project Targets (PTs)*

PTs represent the planned obligation ceilings for project-oriented efforts in the PC&I, AB, and R&D appropriations, in EC&R (a PPA within the O&S appropriation), and in some of the project-oriented special funds.  The appropriation manager normally issues project targets to the Headquarters staffs, areas, logistics and service center commands, districts, and Headquarters units for administration at their respective levels.

### 2.3.1.7  *Program Element (PE)*

A program element represents a source of funds under the command or oversight of an ATU. PEs are used to fund a particular unit or effort. Allowance managers or ATU budget officers are authorized to distribute this funding.

## 2.4  Operations & Support (O&S) Allowance Fund Control Codes

The O&S allowance fund control codes (AFCs) are described in the Subsections that follow.  For more detailed explanations of how to use the O&S AFCs refer to the *Financial Resource Management Manual - Procedures (FRMM-P)*, COMDTINST M7100.4 (series), Chapter 2, Appendices 2-1 through 2-20.

### 2.4.1  **AFC-01 Military Pay**

AFC-01 is a parent term that refers to the combination of AFC-10, AFC-11, and AFC-12.  AFC-01 includes compensation, subsistence rations, and entitlements for active duty members, cadets. Specifically, AFC-10 is used for all payroll expenses such as basic pay, basic housing allowance, and basic subsistence allowances.  AFC-11 is used for non-payroll direct expenditure expenses to include Auxiliary orders meal reimbursement, basic daily food allowance (BDFA), and recruit uniform issue.  AFC-12 is used for other non-payroll expenses such as galley contracts, leased housing, and transit benefits.

### 2.4.2  **AFC-08 Civilian Pay**

Compensation, benefits, and costs associated with civilian salaried employees, Permanent Change of Station (PCS), and reimbursable positions in the Coast Guard.

### 2.4.3  **AFC-20 and AFC 21 Permanent Change of Station (PCS)**

Travel and transportation expenses incident to PCS orders for military personnel and their dependents. AFC-20 is used for advances and tax payments associated with PCS moves.  AFC-21 includes the remainder of PCS costs, and non-standard travel for decedent affairs, dependent students, early return of dependents, and environmental morale leave.

### 2.4.4  **AFC-30 Operating and Maintenance**

General unit-level operating and maintenance (O&M) expenses, including ordnance.

Travel, per diem, and tuition for formal training intended for field execution of training that is not approved nor funded through the class convening schedule for Coast Guard class "A" and "C" resident and exportable training courses.

### 2.4.5  *AFC-34 Training and Recruiting Centers*

General operating and maintenance expenses associated with the following training and recruiting centers:

1.  Aviation Technical Training Center (ATTC), Elizabeth City, NC;

2.  Aviation Training Center (ATC), Mobile, AL;

3.  Coast Guard Academy, New London, CT;

4.  Coast Guard Institute, Oklahoma City, OK;

5.  Coast Guard Recruiting Command (CGRC), Arlington, VA;

6.  Container Inspection Training and Assistance Team (CITAT), Oklahoma City, OK;

7.  FORCECOM, Norfolk, VA;

8.  Leadership Development Center, New London, CT;

9.  Maritime Law Enforcement (MLE) Academy, Charleston, SC;

10. Personnel Service Center (PSC), Arlington, VA;

11. Special Missions Training Center (SMTC), Camp LeJeune, NC;

12. Training Center (TRACEN) Cape May, Cape May, NJ;

13. TRACEN Petaluma, Petaluma, CA;

14. TRACEN Yorktown, Yorktown, VA; and

15. Training Quota Management Center (TQC), Chesapeake, VA.

This allowance fund control code allows the Coast Guard to segregate operating and maintenance expenses specific to the training and recruiting centers, and facilitates accurate reporting of that information.  AFC-34 funds support the operating and maintenance expenses for

COMDTINST M7100.3F

Coast Guard training and recruiting centers in the same way AFC-30 supports other units.  Also, because AFC-34 funds are a subdivision of PPA #3 (Program Project and Activity) for Training and Recruiting, AFC-34 funds may be used for tuition, formal training, and other costs without reprogramming actions.

## 2.4.6  AFC-36 Central Accounts

General Coast Guard accounts for centralized bill payment that is managed at Headquarters.  Accounts include Ammunition (AMMO), Buoys, Enterprise Communication/Network Services, enterprise Cyber network defenses, GSA (Rent and Security), Medals, Postal charges, Standard Workstations (SWS), and certain depot-level maintenance of IT systems—not specifically provided for by AFC-42 or other AFCs, Industrial Recapitalizations, and Working Capital Funds.  Each account has a direct manager, but the overall management of AFC-36 is performed by Commandant (CG-83).

## 2.4.7  AFC-40 Other Activities

Funds for operating projects or expenses approved by Commandant (CG-8). AFC-40 is also commonly used to centrally hold funds that are not restricted in use at a PPA level until they are distributed.  A common example of unrestricted funding is Overseas Contingency Operations (OCO) funding.

## 2.4.8  AFC-41 Aeronautical Engineering

Depot-level maintenance expenses incurred in support of the Aviation Logistics Support Program.

## 2.4.9  AFC-42 Command, Control, Communications, and Electronics Engineering

Depot-level maintenance expenses incurred in support of standard electronics Command, Control Communications, Computers and Information Technology (C4IT) systems. General expenses related to inventory, repair, alteration, modification, services directly related to depot-level maintenance of support of Command, Control Communications, Computers and Information Technology (C4IT). These general expenses cannot significantly add to the underlying assets capacity or capability.

## 2.4.10  AFC-43 Civil Engineering

Depot-level maintenance expenses incurred in support of the Shore Infrastructure Logistics Center (SILC).  General expenses related to the maintenance of real property (land, buildings, and structures) to preserve and maintain capability.  Costs include nonrecurring major maintenance and repairs, alterations, code compliance, demolition, direct project support cost (i.e., travel, engineering design services, permits, inspections, etc.), and minor improvements within the minor construction authority.

## 2.4.11  AFC-45 Naval Engineering

Depot-level maintenance expenses incurred in support of the Naval Engineering Logistics Support Program.

## 2.4.12  AFC-56 Training

Formal training performed as a temporary assignment duty (TAD) for civilian, military personnel, reserve members, and auxiliarists.

**Note:**  For reserve members, AFC-56 (later refunded through the Reserve Training (RT) to O&S refund process) is used for the costs of anticipated Class A and C School training quotas in support of Reserve Component readiness as well as to address training costs for personnel filling military and civilian Full Time Support (FTS) positions.

## 2.4.13  AFC-57 Health, Safety, and Work-Life

General expenses to support health care for military members and their dependents.

## 2.4.14  AFC-75 Reimbursable/Refund Program

A "contra" reimbursable account administered by the Office of Resource Management (CG-83) in conjunction with an associated AFC-80 parent account facilitates reimbursement for approved reimbursable activity which can occur outside of dedicated AFC-80 accounts (i.e., AFC-01, 08, 30, etc.). This account ensures the associated obligation and subsequent expenditure is captured within the parent AFC-80 reimbursement account and provides accounts receivable notification for a valid Uncollected Order Amount (UCO). (A contra account provides a more detailed presentation of an account balance. For example, "accumulated depreciation" is a contra account for fixed assets and highlights the depreciation that reduces the book value of such assets. The account and its related contra account are combined to show the net balance of the fixed asset.)

## 2.4.15  AFC-77 Reimbursable Execution Account

This reimbursable budget authority account is managed by Commandant (CG-83).  This account collects an administrative fee charged for processing reimbursable agreements.

## 2.4.16  AFC-80 Reimbursements

This general account is used for establishing and identifying reimbursable agreements and reimbursements from user fees for services to the public.  A purpose of AFC-80 is to accept and expend funds in the Coast Guard accounting system for reimbursable work for other Government agencies and non-Government entities in accordance with specific legislative authority.  The account is also used to manage user fee transactions in the Coast Guard's accounting system both for budget execution and for reimbursement for allowable expenses associated with providing services to the public and in accordance with specific legislative authority.  AFC-80 is managed and controlled by Commandant (CG-83).

### 2.4.16.1  *AFC-80 Reimbursable CERCLA Accounts*

The Coast Guard and the EPA are parties to a Memorandum of Understanding (MOU) that provides the Coast Guard with access to funding from the Hazardous Substance Superfund, the

COMDTINST M7100.3F

trust fund established under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 USC 9604).  Each fiscal year one or more interagency agreements (IAAs) transfer CERCLA funds from the EPA to the Coast Guard.  The Coast Guard establishes AFC-80 reimbursable accounts to enable spending of the funds and then bills EPA for reimbursement of expenditures against the accounts.

### 2.4.16.2  *Incident-Specific Funds*

The Coast Guard uses CERCLA AFC-80 incident-specific funds for Coast Guard Federal On-Scene Coordinators (FOSCs) to respond to hazardous-substance incidents in the Coastal Zone (including costs for contractors) and for National Strike Force (NSF) operations nationwide in support of specifically designated hazardous substance incidents.  Procedures for the use of these funds are set by the NPFC.  Guidance for the use of incident-specific CERCLA funds can be found in the National Pollution Funds Center User Reference Guide, located at http://www.dcms.uscg.mil/directives and in the National Contingency Plan (40 CFR 300), located at http://www.access.gpo.gov/nara/cfr/waisidx_02/40cfr300_02.html.

### 2.4.16.3  *Management and Support Funds*

AFC-88 is the management and support (M&S) account, also known as the ongoing activities account, used to support the Coast Guard's capability to respond to external hazardous substance releases, not EC&R actions for internal Coast Guard pollution issues.  These funds are limited in application, and some procedures for their use are different from the procedures for standard Coast Guard O&S funds.  Procedures for the use of these funds are set by the National Pollution Funds Center.

The Coast Guard's M&S funds are used for the personnel, functions, activities, training, and equipment/property purchases needed to build or maintain the Coast Guard's hazardous substance response capability.  There are two cost centers responsible for these funds:

1. Commandant (CG-MER) – Office of Environmental Response Policy; and

2. National Pollution Funds Center (NPFC) CF-2.

In addition, there are six designated ATU users for these funds:

1. Sector District Response Advisory Teams (DRATs);

2. National Strike Force (Atlantic, Pacific, Gulf);

3. Training Center Yorktown;

4. Commandant (CG-113) HSWL (medical);

5. National Response Center; and

6. Coast Guard Academy.

## 2.5  Reserve Training (RT) Allowance Fund Control Codes

The RT AFCs are established as follows:

1. AFC-90  Reserve Training Program – provides funding for recruiting, training, administration, and management of the reserve component. This includes compensation, commuted rations, and entitlements for all Reserve inactive duty and active duty including: active duty for operational Support-Reserve component (ADOS-RC); Reserve initial active duty training (IADT) (i.e.  Reserve Officer Candidate Indoctrination (ROCI) program, Direct Entry Petty Officer Training (DEPOT) program and Selected Reserve (SELRES) Boot Camp attendance), and pay/travel requirements for Class A and C School attendance.

2. AFC-91 Full Time Support (FTS) Military Pay Reserve Training (RT) Personnel – used for compensation, subsistence rations, entitlements, and special and incentive pay for Reserve Training Full Time Support (FTS) active duty in the Operations & Support (O&S) appropriation.

3. AFC-92 Civilian Pay for Full Time Support (FTS) Reserve Training (RT) Personnel – used for compensation, benefits, and costs associated with RT civilian pay in the RT PPA within the O&S appropriation.

4. AFC-94  Reserve Reimbursable Program – used for all reimbursable programs to the Coast Guard Reserve, to include the Selective Service System, DOD, and other agencies.

5. AFC-97 Reserve Training to Operations and Support (RT to O&S) – used to refund certain other program costs charged to AFC-20, AFC-30, AFC-56, and AFC-57. Such adjustments between/within appropriations are administered through the Coast Guard Refund Program under the authority of 31 USC 1534. (For Headquarters use only.)

For a more detailed explanation of how to use the RT AFCs refer to *Financial Resource Management Manual - Procedures (FRMM-P)*, COMDTINST M7100.4 (series), Chapter 2, Appendix 2-18 through 2-20.

## 2.6  Retired Pay (RP) Allowance Fund Control Codes

The RP AFCs are established as follows:

1. AFC-72  Retired Pay – provides compensation and entitlements for Coast Guard military retirees and their survivors.

2. AFC-73  Retired Medical – used for medical expenses to support health care for Coast Guard retired members and their dependents.

## 2.7  Coast Guard Supply Fund

Authorized by 14 USC 941, the Supply Fund finances the procurement of uniform clothing, subsistence provisions, O&M stores, technical material, and fuel for specified facilities. Items authorized for supply fund stockage are consumable low-cost commodities having a high demand.  The fund is reimbursed by charging customers for inventory sold, and the income from these sales is then used to repurchase inventory and to meet authorized fund expenses. Subsistence provisions, supply account 82 (see below), may be reimbursed per 37 USC 1011(d) for meals sold below cost at Coast Guard dining facilities.  The Supply Fund may be increased

COMDTINST M7100.3F

by the value of usable materials transferred in from other Coast Guard accounts.  In addition, the Supply Fund may be increased by appropriations or transfers approved by Congress.

Supply Fund accounts are summarized in the following table:

**Table 2.3  Supply Fund Accounts**

| Supply Account | Sub-Appropriation Short Code | Inventory Type |
|---|---|---|
| 81.00xx | XU6 | Clothing and accessories |
| 82.00xx | XS6 | Subsistence provisions |
| 83.01xx | XG6 | General inventory |
| 83.03xx | XE6 | Electronics inventory |
| 83.04xx | XB6 | Buoy appendages inventory |
| 85.00xx | XF6 | Fuel inventory |

Supply account (SA) 81.00:  Clothing and Accessories.  This inventory consists of fabric, uniform items, and accessories (both OGA and commercial) for sale to eligible uniform patrons. Members of other branches of the Armed Services may purchase common clothing items subject to inventory availability.

SA 82.00:  Subsistence Provisions.  This inventory supplies authorized CGDFs throughout the Coast Guard.  However, it does not support contracted (A-76) dining facilities.  Inventory management and general stocking criteria is found in *Coast Guard Food Service Manual*, COMDTINST M4061.5 (series).

SA 83.00:  Operations and Maintenance.  This inventory is broken into subaccounts:

1.  SA 83.01:  General Inventory.  Hull, mechanical, and electrical inventory, general parts, paint, lube oil, tools, and general supplies.

2.  SA 83.03:  Electronics Inventory.  Electronics parts and materials to support the Management Information of Combined Allowance (MICA).

3.  SA 83.04:  Buoy Appendages and Parts.  Supplies and parts to support buoys and related ATON.

4.  SA 85.00:  Fuel Inventory.  This consists of fuel purchased for selected shore facilities (i.e., Kodiak fuel farm).

### 2.7.1  <u>Authorities</u>

1.  14 USC Subtitle I, Chapter 9, Section 941, Coast Guard Supply Fund. http://uscode.house.gov/

2.  37 USC 1011, Mess operation: reimbursement of expenses. https://www.gpo.gov/fdsys/search/pagedetails.action?collectionCode=USCODE&searchPath=Title+2&granuleId=USCODE-2011-title37-chap19-sec1011&packageId=USCODE-2011-

COMDTINST M7100.3F

title37&oldPath=Title+37%2FChapter+19%2FSec.+1011&fromPageDetails=true&colla
pse=true

3. Federal Accounting Standards Advisory Board, Statement of Federal Financial
   Accounting Standards (SFFAS) No. 3, *Accounting for Inventory and Related Property*,
   October 1993.
   http://files.fasab.gov/pdffiles/2016_fasab_handbook.pdf

4. *Coast Guard Food Service Manual*, COMDTINST M4061.5 (series).
   http://www.dcms.uscg.mil/directives

5. *Coast Guard Uniform Supply Operations Manual*, COMDTINST M4121.4 (series).
   http://www.dcms.uscg.mil/directives

6. *Supply Policy and Procedures Manual (SPPM)*, COMDTINST M4400.19 (series).
   http://www.dcms.uscg.mil/directives

7. *Energy Management Policy*, COMDTINST M4100.2 (series).
   http://www.dcms.uscg.mil/directives

## 2.7.2  Responsibilities

The Subsections that follow list the offices and their respective responsibilities for Supply Fund
accounting.

### 2.7.2.1  *Assistant Commandant for Resources (CG-8)/CFO*

Commandant (CG-8)/CFO:

1. Establishes policy on executing financial management within the Supply Fund.

2. Monitors controls over Supply Fund operations and verifies that corrective actions are
   initiated and completed whenever process or reporting errors are noted.

3. Reviews and approves material transfers-in to the Supply Fund.

4. Coordinates at the budget formulation and budget execution stages the respective budgets
   of the Supply Fund and the appropriation accounts from which the Supply Fund derives
   its annual income, as provided in Subsection 5.5.12 (Formulating and Establishing the
   Financial Management Operation Plan (FMOP)) of this Manual.

### 2.7.2.2  *Office of Resource Management (CG-83)*

Commandant (CG-83) is designated the Coast Guard Supply Fund officer and is responsible for
financial and inventory management of the Supply Fund.

### 2.7.2.3  *Budget Execution Division (CG-831)*

Commandant (CG-831) is designated the Coast Guard Supply Fund management officer, and is
responsible for:

1. Developing and implementing Supply Fund financial management and reporting policy
   and procedures.

COMDTINST M7100.3F

2. Establishing and reviewing Capital Authorization (CA) levels.

3. Gathering and analyzing financial and logistics data to oversee fund performance, and recommending logistics improvements to Commandant (CG-44).

4. Implementing financial controls to ensure that obligations and inventories do not exceed Supply Fund CA levels.

5. Providing guidance and oversight as necessary.

6. Delegating authority and responsibility for local management of supply accounts (SAs), when appropriate.

7. Financial systems and CFO oversight of FINCEN operations.

### 2.7.2.4  *Office of Military Personnel (CG-122)*

Commandant (CG-122) is the designated program manager for the Supply Fund Account 81.00 (Clothing and Accessories), and is responsible for:

1. Developing and implementing clothing (uniforms) policy and procedures.

2. Ensuring that standard operating procedures (SOPs) exist for daily operations, internal control, budgeting, procurement, inventory, sales, and storage.

### 2.7.2.5  *Office of Work-Life (CG-111)*

Commandant (CG-111) is the designated program manager for the Supply Fund Account 82.00 (Subsistence Provisions), and is responsible for:

1. Issuing instructions regarding subsistence policy and procedures.

2. Administering Supply Fund Account 82.00 on a service-wide basis.

3. Delegating authority and responsibility for management of dining facilities to area and district commanders, logistics and service center commands, and commanding officers (COs) of Headquarters units.

### 2.7.2.6  *Finance Center (FINCEN)*

FINCEN is responsible for general accounting and reporting for the Supply Fund.  It is also responsible for:

1. Establishing and promulgating accounting procedures for the Supply Fund.

2. Maintaining accounting records in accordance with *Information and Life Cycle Management Manual*, COMDTINST M5212.12 (series), and submitting accounting and financial reports for all units within the Coast Guard.

3. Providing financial statements to the Supply Fund manager that reflects the service-wide status of the Supply Fund.

4. Providing reconciliation reports to Supply Fund activities on a monthly basis.

### 2.7.2.7  *Office of Energy Management (CG-46)*

Commandant (CG-46) is the designated program manager for Supply Fund Account 85.00 (Fuel Inventory), and is responsible for:

1. Issuing instructions regarding fuel inventory policy and procedures.

2. Administering Supply Fund Account 85.00 on a service-wide basis.

3. Delegating authority and responsibility for the management of fuel inventory distribution activities to area and district commanders, logistics and service center commands, and commanding officers (COs) of Headquarters units.

### 2.7.2.8  *Activities or Units with SA 81, SA 83, or SA 85 Accounts*

Activities or units with SA 81, SA 83, or SA 85 accounts are responsible for:

1. Establishing and maintaining a local Supply Fund program.

2. Identifying a Supply Fund manager.

3. Safeguarding Supply Fund inventory.

4. Ensuring that the CA is used effectively, is not breached, and is returned after unit analysis determines that an excess exists.

5. Stocking only inventory items that meet prescribed customer demand.

6. Maintaining accounting and inventory records and providing reports and financial statements in accordance with established policies and guidelines.

7. Reconciling accounting records against inventory records and making appropriate adjustments.

8. Reconciling local financial records with FINCEN accounting records and reporting all material unreconciled balances on a monthly basis.

9. Identifying and removing excess, obsolete, or unserviceable (EOU) inventory from the Supply Fund.

10. Reporting EOU inventory to the Supply Fund manager on a quarterly basis.

11. Maintaining a listing of inventory on hand as of 30 September for recordkeeping and audit purposes.  At a minimum, the listing shall contain National Stock Number (NSN), quantity on hand, unit price, and total value.

12. Reviewing and reconciling undelivered orders, accounts payable, accounts receivable, price variance, and surcharge accounts monthly.

13. Reviewing surcharge rates annually and requesting approval from Commandant (CG-831) to update.

14. Providing performance measurement data as requested by the Supply Fund manager in Commandant (CG-831).

## 2.8  PC&I Project Identification System

COMDTINST M7100.3F

Each PC&I project is assigned a four-digit identification number which relates to the appropriate PC&I program area (budget activity).  The following table defines the meaning of each digit in the identification number:

**Table 2.4  Explanation of PC&I Product Identification Numbers**

| Budget Activity Number | Fiscal Year (Note 1) | Project Number (Note 2) | Major Category |
|---|---|---|---|
| 1 | X | XX | Vessels |
| 2 | X | XX | Aircraft |
| 3 | X | XX | Shore Facilities and Aids to Navigation |
| 4 | X | XX | Other Acquisition including Equipment |
| 5 | X | XX | Integrated Deepwater System **(Note 3)** |
| 6 | X | XX | Reimbursable |

**Note 1:**  The second digit indicates the last fiscal year in which funds can be obligated.

**Note 2:**  The third and fourth digits indicate the specific project serial number.

**Note 3:**  Budget Activity Number 5 (Integrated Deepwater System) is no longer authorized.  The Coast Guard's Integrated Deepwater System (IDS) was only used for FY2002-FY2011 appropriations.  IDS assets are now included as part of Coast Guard's current recapitalization investment portfolio, managed by Commandant (CG-9).

## 2.9  Transfers

A transfer is the shifting of budgetary resources from one budget account (appropriation) to another.  The basic rule with respect to transfers per 31 USC 1532 is:  Transfer is prohibited without statutory authority.  Two exceptions to this rule are refunds and reimbursements.  These are addressed in the Subsections that follow.

### 2.9.1  Refunds

The Government Accountability Office (GAO) and OMB identify refund transactions as bookkeeping adjustments to correct errors such as overpayments and incorrect disbursements, and to fund common services provided by one appropriation to another.

### 2.9.2  Reimbursements

Reimbursement transactions are repayments for commodities or services provided by one agency or appropriation to another, and authorized by law to be credited directly to specific appropriation and fund accounts.

## 2.10  The Investment Board

The purpose of the Investment Board (IB) is to provide Commandants (CG-09) and (CG-8) with sound and reliable information on matters relating to resource allocation. The IB looks at a wide variety of issues, from budget-year priorities to current-year targets and projected deficiencies in a given appropriation, and makes recommendations to Commandant (CG-09).

### 2.10.1  The Resource Group

The primary role of the Resource Group is to act as an advisory body to the IB concerning the prioritization of all investment, divestment, and research alternatives. In doing so, the Resource Group must make significant contributions to Coast Guard planning. The Resource Group shall provide the following deliverables to the IB:

1. Prioritization list of all investment, divestment, and research alternatives;

2. Recommended Proposed Reduction List with the prioritized alternatives; and

3. Validated Agency Capital Plan.

## 2.11  The Budget Review Board

The executive officer (XO)/deputy director of a Headquarters unit, under the direction of the unit commanding officer, supervises and coordinates the budgetary program of the unit, ensures the efficient management and use of unit funds, and makes recommendations to the unit commanding officer when program adjustments are necessary to ensure effective use of those funds. This individual shall serve as chairperson of the Budget Review Board.

### 2.11.1  Headquarters Unit – Financial Management Staff

Organization of Headquarters units varies widely; however, Headquarters units fall under one of the following Resource Management Offices (RMOs): Commandants (CG-81), (CG-DCO), and (CG-DCMS); PACAREA; and LANTAREA. Each should have a designated financial management staff. This staff is responsible for coordinating with Headquarters unit COs in all aspects of the Headquarters unit's financial budget process, including the issuance of funding targets to subordinate Headquarters units and staffs, and developing financial guidance that aligns with Headquarters unit missions, requirements, and directives to foster good stewardship over the funds provided. RMOs are also responsible for coordinating with Headquarters unit COs to ensure financial management duties and responsibilities are clearly outlined in Headquarters unit directives.

### 2.11.2  Field Unit – Commanding Officers

As the end user of funding provided to the administrative operating target at an area (administrative target unit (ATU)), logistics center command, service center command, or district unit, the individual unit commanding officer is responsible for the efficient and economical expenditure of available funds to carry out the unit's mission. The unit commanding officer must ensure that the unit's funds are used only for the purposes for which they were provided and in accordance with established laws, rules, and regulations; and ensure adherence to obligation lifecycle management policies and procedures.

COMDTINST M7100.3F

### 2.11.3  Field Unit – Executive Officers

The executive officer, deputy commander, or executive petty officer (under the direction of the officer-in-charge) supervises and coordinates the budgetary program of the unit, ensures the efficient management and use of unit funds, and makes recommendations to the unit commanding officer or officer-in-charge when program adjustments are necessary to ensure effective use of those funds.

### 2.11.4  Field Unit – Financial Managers

Like Headquarters units, field units are also aligned under one of the following RMOs: Commandants (CG-81), (CG-DCO), and (CG-DCMS); PACAREA; and LANTAREA.  RMOs are responsible for coordinating overarching guidance to field units, and shall coordinate with field unit COs to designate personnel to administer field unit funding and to ensure financial management duties are clearly outlined in field unit directives. Designated financial managers of field unit funding will be responsible for coordinating all aspects of the field unit's budget process, including the issuance of field unit funding targets to subordinate staff, and developing directives and other guidance to foster good stewardship over the funds provided. These financial management duties and responsibilities shall be clearly outlined in field unit directives.

In order to enhance the effective use of funds (i.e., AFC-30, AFC-34, AFC-36, and others) distributed down to the unit level and allow unit commanding officers more flexibility to manage recurring expenses, funds are passed to the lowest level bearing both the operational and funding responsibility. Therefore, in general, all funds should be programmed to the unit level whenever possible for efficient and effective management.