No. 1:23-mj-00230-RJJ
_____

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANDREW BLAIR HOWARD,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Western District of Michigan from
Case No.1:23-00230-RSK, a matter before
U.S. Magistrate Judge Raymond S. Kent
_____

**DEFENDANT ANDREW BLAIR HOWARD'S
BRIEF ON APPEAL**

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

Anthony J. Valentine
Attorney at Law
Attorney for Defendant-Appellant
    Andrew Blair Howard
Ste. 227, 29 Pearl Street, N.W.
Grand Rapids, MI 49503
(616) 288-5410
*tonyvalentinelaw@gmail.com*

# TABLE OF CONTENTS

Table of Contents ..........................................................................................................ii

Table of Authorities ......................................................................................................iii

Statement in Support of Oral Argument ......................................................................v

Statement of Subject Matter and Appellate Jurisdiction ...........................................1

Statement of Issue Presented for Review .................................................................. 2

Standard of Review ..................................................................................................... 3

Statement of the Case ................................................................................................ 4

Argument .....................................................................................................................17

    A.  Ordering restitution based upon a "but for" analysis was inappropriate..................18

    B.  Ordering restitution based upon a "direct and proximate cause" analysis was equally inappropriate...........................................................................................19

Relief ......................................................................................................................... 23

Certificate of Compliance ...........................................................................................24

Certificate of Service ..................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993) ...........................................................18

*Farwell v. Un*, 902 F.2d 282 (4th Cir. 1990).............................................................18

*Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69 (3d Cir. 1996)....................................18

Gall v. United States, 21 F.3d 107 (6th Cir. 1994)......................................................... 13

*In re McNulty*, 597 F.3d 344 (6th Cir. 2010)..............................................................19

*Robers v. United States*, 572 U.S. 639, 645, 134 S. Ct. 1854, 188 L. Ed. 2d 885 (2014)........18

 United States v. Betts, 99 F.4th 1048 (7th Cir. 2024)............................................... 17

*United States v. Buchanan*, No. 22-3301, 2023 U.S. App. LEXIS 22104, at *27
    (6th Cir. Aug. 21,2023).........................................................................................19

*United States v. Clark*, 787 F.3d 451 (7th Cir. 2015)..................................................17

*United States v. Church*, 731 F.3d 530 (6th Cir. 2013)...............................................19

*United States v. Donaby*, 349 F.3d 1046 (7th Cir. 2003)..........................................18

*United States v. Elson*, 577 F.3d 713 (6th Cir. 2009) ................................................3

*United States v. Ellis*, 938 F.3d 757 (6th Cir. 2019).................................................17

*United States v. Goodrich*, 12 F.4th 219 (2d Cir. 2021)............................................17

*United States v. Johnson*, 440 F.3d 832 (6th Cir. 2006) ...........................................3

*United States v. Marlatt*, 24 F.3d 1005 (7th Cir. 1994).............................................18

*United States v. Phillips*, 367 F.3d 846  (9th Cir. 2004)........................................20,21

*United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004)...........................................18

*United States v. Salcedo-Lopez*, 907 F.2d 97 (9th Cir. 1990) ..................................21

*United States v. Sawyer*, 825 F.3d 287 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 386,
    196 L.Ed. 2d 304 (2016) ..............................................................................3,20,21

*United States v. Seignious*, 757 F.3d 155 (4ᵗʰ Cir. 2014) ..........................................................3

*United States v. Stone*, 866 F.3d 219 (4th Cir. 2017) ...............................................................3

*United States v. W. Indies Transp., Inc.*, 127 F.3d 299 (3d Cir. 1997)....................................21

*United States v. Wilcoxon*, No. 5:19-po-00195-LLK, 2022 U.S. Dist. LEXIS 68452, at *7
    (W.D.  Ky. Apr. 12, 2022)..................................................................................................13


## Statutes

18 U.S.C. § 3231.......................................................................................................................1
18 U.S.C. § 3402.......................................................................................................................1
18 U.S.C. § 3556.....................................................................................................................17
18 U.S.C. § 3563 ................................................................................................................. *passim*
18 U.S.C. § 3663A.............................................................................................................. *passim*
18 U.S.C. § 3664(e).................................................................................................................18

## Regulations

36 C.F.R. 231(a)(2)....................................................................................................................4
36 C.F.R. 231(a)(3) ...................................................................................................................4

## Rules

Fed. R.Crim. P. Rule 58(g)(2)(B)................................................................................................ 1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant Andrew Blair Howard respectfully requests oral argument as he believes it could significantly aid the decisional process in this case.

"Oral argument is the absolutely indispensable ingredient of appellate advocacy. . . . [O]ften my whole notion of what a case is about crystallizes at oral argument." Robert L. Stern, Supreme Court Practice, p. 671 (2002), quoting Brennan in Harvard Law School Occasional Pamphlet No. 9, 22-23 (1967). The core of the adversary process is oral argument, a tradition which provides a "hedge against misdiagnosis and misperformance in the brief, the one last chance of locating a postern missed in the advance survey." Merritt, Judges on Judging: The Decision-Making Process in Federal Courts of Appeal, 51Ohio St. L. J. 1385, 1386-1387 (1991).

## STATEMENT IN SUPPORT OF APPELLATE JURISDICTION

The district court had original jurisdiction of these offenses against the laws of the United States.  18 U.S.C. § 3231.

An appeal of right lies in this Court because this is the district in which "the offense was committed."  18 U.S.C. § 3402.

This appeal is timely taken for the reason that in a criminal case before a magistrate judge, the defendant's notice of appeal must be filed in the district court within fourteen days after the entry of the judgment.  Rule 58(g)(2)(B) of the Federal Rules of Criminal Procedure permits a defendant to appeal a magistrate judge's judgment of conviction or sentence to a district judge within fourteen days of its entry.

The Judgment[1] (ECF No. 30) was entered on June 28, 2024, and the defendant filed his Notice of Appeal (ECF No. 34) on July 11, 2024.

---

[1]On July 8, 2024 the Court entered again the Judgment (ECF No. 33) entered June 28, 2024 (ECF No. 30), restricting access to the personal identifying information in the Judgment entered June 28, 2024.

1

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

Did the trial court properly order restitution under 18 U.S.C. § 3563(b)(2) in the absence

"but for" or "reasonably foreseeable" causation for the harm the government claimed it

suffered?

## STANDARD OF REVIEW

Restitution orders are subject to a bifurcated standard of review. *United States v. Sawyer*, 825 F.3d 287, 291 (6th Cir.), *cert. denied*, 137 S. Ct. 386, 196 L.Ed. 2d 304 (2016). "'Whether a restitution order is permitted under the law is subject to *de novo* review . . . whereas "the amount of restitution ordered is reviewed under the abuse of discretion standard." *Id*. at 291-92 (quoting *United States v. Elson*, 577 F.3d 713, 720 (6th Cir. 2009) and *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

Restitution orders involve examining the court's record as a whole and are fact-intensive inquiries:

> The determination of whether the district court committed error in its calculation of restitution is a fact-intensive inquiry. See [*United States v.*] *Seignious*, 757 F.3d [155] at 163 [4[th] Cir. 2014] (noting that a district court's view of the evidence must only be "plausible in light of the record viewed in its entirety") . . .

*United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017).

## STATEMENT OF THE CASE

Andrew Blair Howard was charged in a Class B Misdemeanor Information (ECF No. 1) with Tampering (Count 1) and Vandalism (Count 2) occurring on August 15, 2022 in waters subject to the jurisdiction of the United States located within the Sleeping Bear Dunes National Lakeshore in violation of 36 C.F.R. §§ 2.31(a)(2) and (a)(3).  Those regulations prohibit tampering or attempting to tamper with property or real property or moving, manipulating or setting in motion any parts thereof, (§ 2.31(a)(2)), as well as prohibiting the destroying, defacing or damaging of property or real property (§ 2.31(a)(3)) within the National Park System.  As will be discussed below, Mr. Howard used a shovel to dig in the Platte River and moved rocks in the river and in a pre-existing channel that had been previously cut by others directing the flow of the river into Lake Michigan.[2]

The trial court found Mr. Howard guilty of both charges  (ECF No. 15, PageID.209) and ordered the parties to submit restitution and sentencing memoranda.  (ECF No. 18, PageID.50)

The trial court conducted its Sentence Hearing on June 25, 2024, and sentenced Mr. Howard to a term of sixty (60) months probation, banning him from entering any National Park Service properties for the duration of his probation and, of relevance to this appeal, restitution in the amount of $22,472.22. (ECF No. 33, PageID.546-51)   (Costs were imposed in the amount of $3,947.71.  (Id.)  Neither the inclusion of costs nor their amount is disputed by Mr. Howard.)

The government submitted its Sentencing and Restitution Memorandum. (ECF No. 20)

---

[2]The trial of this matter lasted less than one day. (Trial Transcript, ECF No. 19) The parties submitted sentencing memoranda. (ECF No.s 20, 21, 22, 24, 25 and 27)   A Sentence Hearing was held June 25, 2024.  (Sentence Hearing Transcript, ECF No. 36)

The government argued that restitution was due it under Mandatory Victims Restitution Act, (MVRA) 18 U.S.C. § 3663A,  because Mr. Howard had harmed the National Park Service and the United States Coast Guard.  (ECF No. 20. PageID.233)

The theory of Mr. Howard's liability for restitution to the Park Service was that government expenses should be awarded for the Park Service's designing and overseeing a mitigation and clean-up plan, although the testimony at trial was that a decision was made by the National Park Service *not* to restore the channel in any way.  (ECF No. 19 Page ID.123) Those expenses were claimed for the time period from August 17, 2022 to January 23, 2023. (ECF No. 20-1, PageID.247-49)

Helicopter expenses were claimed for flying the helicopter over the site on August 18, 2022.  (Exhibit G to Government Memo, ECF No. 20-1, PageID.255)   That occurred three days after the offense.  That claim for restitution for helicopter costs was based upon appellate authority ordering restitution for the expense of *repairing* a helicopter that a defendant had damaged with gunfire.  (ECF No. 20, PageID.233-34)

The defendant responded.  (ECF No. 22, PageID.323)  What might appear to be a one-sided recitation of the facts from the trial testimony is in reality an excellent summation of one important thing in this appeal, that is, when Andy Howard appeared at the mouth of the Platte River in the late afternoon on August 15, 2022, the Platte River had already been diverted to Lake Michigan.

National Park Law Enforcement Officer Logan Bahm was the first witness called by the government.  Officer Bahm testified to observing the existence of "wing dams" prior to his interaction with Mr. Howard.

> Q And in that conversation you said that you knew he didn't
> build the dams. That they were there before. To be clear,
> what did you see him doing with respect to those dams?

5

> A There were several wing dams in the area prior to this
> interaction. However, Mr. Howard was seen adding rocks to them
> and I had not seen any diversions or structures divert flow out
> towards a new river mouth like I had that day.

(ECF No. 19, PageID.69)[3]

Officer Bahm's testimony above is silent, as is silent the testimony of each of the

remaining witnesses called at trial, as to how Mr. Howard's *conduct* contributed to the

channel's opening to the lake.  In fact, the channel's initial creation, again, without the

participation of Mr. Howard, according to Officer Bahm, expanded and enlarged over the

following days:

> Q And generally, between August 15th and August 18th, I don't
> need specific measurements, but generally what happened to that
> diversion?
>
> A The diversion grew in width, and more -- it seemed more
> water had started flowing out in that direction.

(ECF No. 19, PageID.75)

The conclusion that the conduct of Mr. Howard did not contribute to the channel's

enlargement is born out by the *number* of rocks that he was observed moving.

> Q Well, maybe we can talk about it a little different way.
> How long did you see Mr. Howard putting specific activity --
> putting rocks onto what has been referred to now as wing dams?
>
> A While in the position I returned to the observation
> location for several minutes as well as -- as I approached and
> the body camera footage that was seen.
>
> Q Would it be fair to say a handful of rocks, half dozen?
> A I would say that.

(ECF No. 19, PageID.80)   A half dozen rocks.

---

[3]ECF No. 19 is the transcript of the trial of this matter that occurred on February 7,
2024.

Similarly, and consistent with Andy Howard's lack of involvement in contributing to the channel's expansion, is his brief involvement after the channel's opening by shoveling  - "five minutes of shoveling activity."

> Q About five minutes there are attempted shovels and then
> there were completed shovels? I didn't understand.
>
> A At least five minutes of shoveling activity.

(ECF No. 19, PageID.31)

The government's next witness was Zachary Hatfield.  Witness Hatfield testified that he observed Andy Howard digging in the channel towards Lake Michigan.  (ECF No. 19, PageID.39-40)   Importantly, from a time-stamped photograph, the witness established that digging occurred at approximately 6:11 and 6:12 p.m.

> Q Government's Exhibit 12 and 13 were taken at approximately
> 6:11 and 6:12 p.m. Does that sound about right to you?
>
> A Yes. It does.

(ECF No. 19, PageID.41)

Witness L.S. testified that Mr. Howard was having children assist him in digging the channel at the beach - as many as ten of them.  (ECF No. 19, PageID.48)   Her testimony is substantially undermined by stipulated photographic evidence to the contrary.

> Q And how many -- how many would you say you see in that
> picture; about five; fair statement?
>
> A Yes.
>
> Q You don't see them digging or moving any rocks, do you?
> A No.

(ECF No. 19, PageID.48)

Next, Witness Jamie Nelson testified that *he* did *not see* the five to ten children digging at the beach that had been described by the previous witness.  (ECF No. 18, PageID.54)

Witness Carrie Allgaier testified to the activity of Andy Howard that can be best

described as sporadic in wading and from time to time "feeling around for rocks" over less than

an hour's time.

> Q And approximately how long did you observe the man digging
> with the shovel?
> A I don't know exactly. I was probably there with my kids
> for maybe a little less than an hour in that exact spot, and he
> was just kind of wading in that area.

(ECF No. 19, PageID.57)

> Q Was he wading in the area or digging with his shovel the
> entire time that you were at the river?
>
> A When I was in that spot it was kind of on and off. It
> wasn't vigorous constant digging or anything. It was more just
> wading and kind of feeling around for rocks it seemed like what
> he was doing.

(ECF No. 19, PageID.57)

Witness Kirk Walby observed Andy Howard moving rocks for "[p]robably a half hour,

maybe a little more."  (ECF No. 19, PageID.65)

Officer Scott Dekkers placed into perspective the existence of rock dams before August

15, 2022.

> Q Now, it's not a fair impression that rock dams are new or
> of relatively recent creation in that stretch of the river, is
> it?
>
> A The National Park Service was aware that there is rock
> formations in that river. They moved over time.

(ECF No. 19, PageID.80)

> Q Look roughly under that box that says Google Earth Pro
> Image 2. Look down there about an inch and-a-half on the
> bottom edge of that box. Do you see in that photograph what
> appear to be dark, and I am going to suggest, rock dams
> protruding into the long channel that flows down into the end
> of that stretch of river?

A Yes. I see a formation.

Q Pardon me. You see a formation?

A A formation of something. A dark line.

Q Okay. It wouldn't be inconsistent with what are the rock
dams that have been described earlier, would it?

A No. Not inconsistent.

(ECF No. 19, PageID.81)

The defense called witness Amy Roche.  Ms. Roche testified that in the mid-afternoon,

she saw digging with "toy shovels like children's shovels" but did not see any of the shovels

that she refers to as "adult tools".  (ECF No. 19, PageID.86)   She described the digging as

"vigorous" and done predominantly by ten to twenty children and teenagers.  (ECF No. 19,

PageID.86)

Ms. Roche testified that she was at the beach between 1:00 p.m. and 3:00 p.m. and

between those times and at the time of her leaving had no knowledge of what happened to

what is described as the "trench".  (ECF No.19, PageID.89)

Witness Laura Calleja testified that she saw children digging - chanting and working as

a team.  (ECF No. 19, PageID.96)   Ms. Calleja testified that as a consequence of that, the

following happened:

Q Did anything happen? What happened? What resulted from
that?

A The -- the river was diverted. It was very fun for the
beach goers because as people were approaching the water was
rushing so much people were bringing their floaties up, kids
were kind of rafting down. It was a toy to them. And when it
was time for us to leave, it was very difficult to even walk in
that current because, you know, we had to get to that other
side to go to the parking lot. So it was -- honestly, it was
an amazing thing that it happened as quickly as it did.

(ECF No. 19, PageID.97)

Significantly, Ms. Calleja did not see Andy Howard during that time.

Q We'll get to that one in a second. I think I might not
have asked you earlier. At any point in time you didn't see
Mr. Howard by that trench?

A No, sir.

(ECF No. 19, PageID.100)

The final witness to testify at trial was Andy Howard.  Mr. Howard, having purchased

two shovels in Frankfort, Michigan, arrived at the beach between 5:00 and 5:30 pm.

Q All right. Did you see on Exhibit S, page 1, any time
noted at the time you purchased the shovels at the hardware
store?

A 4:23 p.m.

Q And that's from the first page of Exhibit S?

A Yes.

Q All right. And so you got back to the -- you got back to
the Platte River there, and what did you do next? Excuse me.
How long a drive is it from Frankfort -- let me finish,
please -- from Frankfort hardware store in Frankfort to the
Platte River?

A Approximately 30 minutes.

Q Okay. So what time did you get back there as best you
recall?

A Five to five-thirty.

(ECF No. 19, PageID.113)

Andy Howard's reaction to a channel having opened to Lake Michigan can be best

described from his testimony describing when he arrived and what he saw. 113-14

Q All right. And when you got back there, what did you do?

10

A I took one of the shovels and I hiked down along the river with the thought in mind that I would try to move some hazardous rocks as I have done for many years without ever being questioned, sometimes for hours at a time, moving rocks and improving the passage of the boat. And so when I walked down there and saw the new river diversion where they used to drudge it I was in shock and I was also elated. I was actually ready to sing the hallelujah chorus and dance around because I could not believe -- it was like a miracle of God that this river opened up from when I left at noon and come back here. It's blasting and wide open right exactly where all of us fishermen would have preferred it be for the last five years. There have been plenty of conversation about different ways we could go down and try to open it and a lot of different strategies came up over a five year period, but it was really something to see without knowing how it even happened. I just -- it just -- it just felt miraculous.

(ECF No. 19, PageID.113-14)

Q Let's focus a little more now on what you did when you got there. What did you do when you got down to that lake with -- down to that channel with your new shovel?

A Well, when I went down there, instead of working on the old branch of the river I crossed over to where the new branch was and I was digging in the sand. There would be new rocks that would appear out of the sand because the river was like white water. I could hardly stand up it was rushing so hard. And so it was revealing new rocks, so I was taking those rocks, moving them to the side. But I felt the power of the water. If I would stick my shovel in the sand where I was shown at the new bank, it was like a glacier melting.
There was two feet deep of sand walls that were just falling in due to the current. So me sticking my shovel in was of, like, no consequence to the outcome. Had I done absolutely nothing, had I gotten back into my car, the outcome of this river diversion would not have changed. My actions did not impact the outcome of the diversion of that river in one respect. And I told the ranger, I did not move one grain of sand before that new river diversion opened up. I had absolutely zero to do with the opening of the new branch of the river, otherwise, I wouldn't be sitting here today if I would have done it. I would have pled guilty and accepted my rightful punishment.

(ECF No.19, PageID.115-160)

Of further note, Mr. Howard responded to the application of the Mandatory Victims Restoration Act[4]

The trial court ordered further briefing.  (ECF No. 23)

In its Government's Reply Brief (ECF No. 24) the government added a new theory to its restitution claims - alternatively, that a probation statute - 18 U.S.C. § 3563(b)(2) - "provides that court with authority to require a defendant to 'make restitution to a victim of the offense . . . (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A).'" (ECF No. 24, PageID.356)   Additionally, the government replied to Mr. Howard's argument that losses to the government paid the National Park Service and Coast Guard were a foreseeable result of his efforts.  (ECF No. 24, PageID.360) The government argued that the defendant need not be the sole cause of the harm for which the government seeks restitution and that Howard's contemporaneous statement that he had "dodged a ticket there" was evidence of his knowledge that he knew his actions were wrong.[5]  (Id.)

Mr. Howard filed his sur-reply (ECF No. 25, PageID.473)   He argued again that restitution should not be ordered under the MVRA, one again discussing foreseeablity and causation limitations.  Mr. Howard also addressed the "without the limitations" language contained in the MVRA.  He stated that the probation restitution statute, 18 U.S.C. § 3563(b)(2) also imposed limitations of forseeability and causation were the trial court to

---

[4]Mr. Howard argued that the Act did not apply in this case for the reasons that the offenses of conviction were not property offenses under Title 18 of the United States code and furthermore that the government had not shown that it was "directly and proximately harmed," and that the expenses were reasonably forseeable under analysis, "but for" or otherwise. (ECF No. ECF No. 22, PageID.335-38)

[5]Mr. Howard explained at sentencing that his statement about dodging a ticket was that upon his arrival and presence at the channel - *opened to Lake Michigan by others* - could be misinterpreted as having dug that channel to the lake.  (ECF No. 36, Page ID.571)

impose restitution under that statute and citing Sixth Circuit authority.[6]  (ECF No. 25,

PageID.480-84)

Finally, Mr. Howard stated that if restitution were to be ordered, something he believed

inappropriate, under the "but for", "directly and proximately caused", and "reasonably

foreseeable" standards that he had discussed, it would also be an opportunity for the trial court

to identify the minimal role, if any, that Howard played in the diversion of the Platte River.[7]

At sentencing in the matter, Andy Howard offered the following statement:

> THE DEFENDANT:  There is even water handy.
> First of all, I would like to thank you for the
> opportunity to speak on my defense.
> Your Honor, some of the comments you made in the court
> transcription, page 158, line 1, Mr. Howard, your actions did,
> in fact, damage the river.  Remember the river was dredged in
> that same location using massive equipment for 48 years.  You
> yourself enjoyed kayaking the Platte River and said you took
> the long ride down the beach and enjoyed it.
> On transcript page 153, line 7 through 11, you said, I
> don't believe that the river could have been dredged by hand or
> plastic shovels.  A real shovel was involved.  When my best
> witnesses, Laura Collegia and Amy Roche, witnessed 15 teenagers
> dredging the river with photographic and video evidence.
> I was curious, do you believe I was involved in any

---

[6]The authority that was cited is an appeal in which the Sixth Circuit reviewed restitution under the probation statute that the government raised, citing the proximate cause standards contained in the MVRA.  One district court in this Circuit has determined The "limitation of section 3663(a) or 3663A(c)(1)(A)," *18 U.S.C. § 3563(b)(2), refers to the list of specific offenses covered by the VWPA at section 3663(a)(1)(A) (not the definition of "victim" at 18 U.S.C. § 3663(a)(2)) and to the list of specific offenses covered by the MVRA at section 3663A(c)(1)(A) (not the definition of "victim" at 18 U.S.C. § 3663A(a)(2)). See Gall v. United States, 21 F.3d 107 (1994)*.
United States v. Wilcoxon, No. 5:19-po-00195-LLK, 2022 U.S. Dist. LEXIS 68452, at *7 (W.D. Ky. Apr. 12, 2022) (italics added)

[7]"Were restitution to be ordered in this matter as a condition of probation, something the Defendant believes would be inappropriate under the "but for", "directly and proximately caused" and "reasonably forsseble" standards discussed above, it would be the opportunity for the Court to identify the minimal role, if any, that the Defendant played in the diversion of the Platte River to Lake Michigan and apportion his restitution accordingly."  (ECF No. 25, PageID.484)

way in diverting the river prior to 5:30 p.m. on August 15th?

THE COURT:  Mr. Howard, we are not -- I am not going to get into a question and answer session with you.  You are happy to tell me whatever you want to tell me.

THE DEFENDANT:  Okay.

THE COURT:  And I will listen.

THE [DEFENDANT]:  I accept responsibility for any of my actions in life but not for something I didn't do.  My best efforts could not have stopped the new diversion of the river when I arrived.  If my intent was to force the flow of the river back to the old river bed with my shovel and moving rocks, I could not have reversed the 20-foot wide raging current that I -- that was occurring when I came down. I wanted to run through to just really confirm the timeline of what occurred from our photo evidence in the court case.  On Exhibit M that we presented on 2:27 p.m., we have the water just beginning to flow through the original trench that was dug.  On Exhibit L at 2:51 p.m., we have rock wing damns, huge rock wing damns, and you can see in the background the girl inner tubing down the new trench the river approximately six to eight feet wide.  On Exhibit P at 3:08 p.m., we have multiple children, teenagers, digging with their hands just as witnesses testified, working on the new diversion of the river.  And note the width of the flow and the power of the current in such a short timeline from 2:27 to 3:08.

Exhibit G, 4:03 p.m., the diverted river with kids digging as witnessed by Laura and Amy, again, with the rock damns.  And Laura and Amy are even in the picture.  Laura was with her daughter and friend from 9:00 a.m. throughout the entire day.

Exhibit N is 4:11 p.m.  Again, I wanted to note the width and the amount of current.

And then Exhibit S -- pardon me, Exhibit O, is a kind of another picture of the newly diverted river with the level of current.  All of this occurring before any witness said that I was even present.

And there even was I felt a misunderstanding in the case of the Frankfurt hardware receipt at 4:23 p.m., which I produced under the direction of my attorney, of an alibi of

where I was at when I left the river at noon to clean my fish, and 4:23 with the drive time from Frankfurt back to the river would put me back there at around the 5:30 timeline, which was what was confirmed by several witnesses.
Not one witness said I was present during the initial diversion of the river.  Rock wing damns were already present before Andrew Howard arrived.  My actions after 5:30 p.m. were of no significance to the river outcome.  I should not be paying for helicopter photos or environmental studies or be banned from the park for something I didn't do.
From the court transcript governor witness Officer Balm.  Witness seen me digging at 6:20 p.m.

THE COURT:  All right, Mr. Howard, these arguments I am sure will all be made to the Sixth Circuit Court of Appeals in Cincinnati and you are welcome to do that.  We are not going to rehash the whole trial here -

THE DEFENDANT:  Okay.

THE COURT:  -- and argue about your conviction.  If there is anything you wish to say to me on the issue of your sentencing, happy to listen.  Otherwise, we are going to move on.

THE DEFENDANT:  Okay.  I'd like to give one example of what I felt would be a comparative act, example to my actions. I think it could be compared to someone saying they are going to buy a knife and kill someone and leave the location and buy a knife and come back five hours later to find the person I was going to kill laying on the ground stabbed to death.  Then law enforcement arrives and sees me standing over the dead body with a knife accusing me of the murder, when the man I came upon was already dead.  My actions were of no consequence and would not have changed the outcome.

So my request to you in sentencing would be to listen to my perspective of the amount of damage or involvement that I had.  My statements of what I was going to do looked terrible. My being down there with a shovel was terrible.  And I read your comments in the transcript through three times, and I felt I was pretty impressed actually with the balanced thoughts that you had on both sides of the issue, but I felt that the level of penalty -- even though, yes, I was digging in the new trench, I think the level of penalty that the government is seeking is too heavy for the amount of damage that occurred from my arrival.

15

If I thought I was committing a crime, I wouldn't have
been there in broad daylight standing out there.  Some of the
witnesses said I was very relaxed, and I felt that in the
transcript that there -- that you may have misinterpreted me
saying I really dodged a ticket.  My comment to the witness
that I really dodged a ticket, it was Kurt Walbey, wasn't that
I got away with a crime.  It was that I was fortunate.  I was
actually thanking God that I came down after someone else
diverted the river and it was opened up.  Because my intentions
were bad.  But I didn't feel that I dodged a ticket because I
knew I was down there committing a crime.  If I thought I was
committing a crime and the river was already opened up I would
have put that shovel over my shoulder and been running back to
the car.

THE COURT:  Mr. Howard, I am not sure you are helping
yourself on appeal with your comments now, so I would just
suggest if there is other things you want to say maybe run them
past Mr. Valentine -

THE DEFENDANT:  Okay.

(ECF No. 32, PageID.567-72)

The trial court imposed restitution as set forth in the Judgment of Sentence.  Despite

Mr. Howard's argument on the issues of foreseeablity and causation, the trial court focused on

a footnote in Howard's sur-reply that said, "The Defendant agrees that restitution under that

statute would be in the Court's discretion."  (ECF No. 25, PageID.480)   The trial court's

comment ignored everything that Howard said about the issues of foreseeability and causation

in his sur-reply, including that the trial court's discretion could be exercised (of course it could)

but that restitution ordered under the probation statute would be inappropriate because those

"standards" had not been met.  (ECF No. 25, PageID.484)

This appeal followed.

16

### ARGUMENT

Title 18, United States Code, Section 3563(b) states that a district court may, as a condition of probation or supervised release, "make restitution to a victim of the offense." 18 U.S.C. § 3563(b)(2),   Further, restitution as a condition of probation is to be ordered "under section 3556." Id. Section 3556 refers to orders of restitution pursuant to the VWPA and the MVRA, which provide, "[t]he court, when sentencing a defendant convicted of an offense [under listed titles or statutes] may order . . . restitution to any victim of such offense," id. § 3663(a)(1)(A), and "when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense," id. § 3663A(a)(1)

The MVRA defines "victim" as any person:

> directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the  case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).  *United States v. Ellis*, 938 F.3d 757, 763 (6th Cir. 2019).

Courts are authorized to order restitution to persons other than a "victim" only "if agreed to by the parties in a plea agreement." Id. § 3663A(a)(3). *United States v. Betts*, 99 F.4th 1048, 1061 (7th Cir. 2024).

To determine whether a victim's actual losses are "directly and proximately" caused by the offense of conviction as set forth in 18 U.S.C. § 3663A(a)(2), courts look at both cause-in-fact (but-for causation) and proximate cause. *United States v. Clark*, 787 F.3d 451, 463 (7th Cir. 2015); see also *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). Under but-for causation, a defendant's conviction must have been a necessary factor in bringing about the victim's harm. *Goodrich*, 12 F.4th at 229. For proximate cause, the harm

17

alleged must have a "sufficiently close connection to the conduct," which is evaluated based

on whether the harm was "foreseeable" to a defendant. *Robers v. United States*, 572 U.S.

639, 645, 134 S. Ct. 1854, 188 L. Ed. 2d 885 (2014); see  *United States v. Donaby*, 349 F.3d

1046, 1054 (7th Cir. 2003).

The government bears the burden of showing causation by a preponderance of the

evidence. See 18 U.S.C. § 3664(e).

> Causation includes two distinct principles, cause in fact, or what is
> commonly known as "but for" causation, and legal causation. *Fedorczyk v.
> Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996). While the former is
> always a necessary condition of causation which often is easily satisfied, the
> ultimate question is whether the cause in fact is legally sufficient "to warrant
> imposing liability upon the actor." *Farwell v. Un*, 902 F.2d 282, 290 (4th Cir.
> 1990). See also [*United States v. Marlatt*, 24 F.3d [1005] at 1007 [(7th Cir. 1994)]
> (stating that "the presence of but-for causation is ordinarily a necessary condition
> but rarely a sufficient one").

*United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004).

### A. Ordering Restitution under a "but for" analysis was in appropriate.

Under a "but for" analysis of Mr. Howard's offenses of conviction - tampering and

vandalism, no causation existed justifying restitution of either the amounts claimed for

assessing the impact of the river's diversion or a helicopter flight to assess its impact.

A distasteful example:

> A man rapes a woman and she is hospitalized. Her injuries are not serious but the
> hospital burns down and she dies. The rapist would not be responsible for the death,
> because the rape did not make it more likely that the victim would die as a result of a
> fire. The rape therefore did not, in either a legal or an ordinary-language sense, "cause"
> her death, though she would not have died in the hospital fire but for the rape. *Brackett
> v. Peters*, 11 F.3d 78, 79-80 (7th Cir. 1993).

*Marlatt*, *supra*, 24 F.3d at 1007.

The question is whether "but for" Mr. Howard's conduct, would an evaluation of the site

or a helicopter's fly-over occurred?  The answer is no.  Therefore, "but for" causation does not

exist in this matter to justify awarding restitution for site investigation or a helicopter flight.

It is significant that is was the government that made the distinct choice, presumably after deliberation, to bring in Park Service employees and to fly a Coast Guard helicopter to take pictures (used at trial) of the site to study the change in the river's flow, again, a flow that preceded Mr. Howard's appearance at the beach on that afternoon.

### B.  Ordering Restitution under a Direct and Proximate Cause Analysis was Equally Inappropriate.

Under the MVRA, a "victim" is a person "directly and proximately harmed as a result of the *commission of an offense*." 18 U.S.C. § 3663A(a)(2). District courts are authorized to impose "full liability on any defendant" as long as his conduct was a material cause of the loss. *United States v. Church*, 731 F.3d 530, 537-38 (6th Cir. 2013).

*United States v. Buchanan*, No. 22-3301, 2023 U.S. App. LEXIS 22104, at *27 (6th Cir. Aug. 21, 2023). (italics added)

The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" (discussed above) and proximate cause analyses. *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010). The requirement contemplates that the "harm to the victim [must] be closely related to *the conduct inherent to the offense*, rather than merely tangentially linked. *Id*. at 352.  In this matter, the government has sought restitution for a National Park Service/hydrologist assessment, Natural Resources Personnel and United States Coast Guard helicopter operations.   Those amounts should not be awarded for the reasons that those were entities that if harmed, were tangentially linked and did not experience harm that was inherent to the offenses in this matter.

As a starting point - leaving aside any role that he arguably played in diverting the Platte River - the offenses of which Mr. Howard was convicted involve tampering and damaging property at the beach at Sleeping Bear National Lakeshore.  The conduct that Mr. Howard

19

engaged in was with a shovel and involved moving sand and rocks.  That is the conduct inherent to the offenses of which he was convicted.[8]  The restitution sought involves investigation.

The government cited two cases in support of its claims for restitution for investigation to the NPS and Coast Guard.  Each is distinguishable.  In citing a Sixth Circuit case, *United States v. Sawyer*, 825 F.3d 287 (6th Cir. 2016), the government states, that, "the Environmental Protection Agency ("EPA") expended employee time and funds *for cleanup of contaminated property using its statutory authority*"  It cites *United States v. Phillips* for the proposition that "[w]hen the government loses money as the direct result of an offense it is as entitled to restitution as any other victim" *Phillips*, 367 F.3d at 849 (9th Cir. 2004)".

The facts of *United States v. Sawyer* differ from the ones in this case in an important way.  In *Sawyer* the government expended funds for, as the government states, "cleanup of contaminated property using its statutory authority."  That is different from this case.  In this matter the government chose to take no such action.   Officer Dekkers testified at trial to the following:

BY MS. BIKSACKY:

Q Were you in any discussions about whether that channel
should be restored?

A Yes.

Q Okay.

A I apologize if I worded that incorrectly before.

Q Okay.

---

[8]The Defendant does not dispute that a government agency *can* be a victim to whom restitution is owed as the government states in its Memorandum, but it likewise *might not be.*

A But I was involved in those decisions.

Q Let me ask you some specific questions. Did the National
Park Service decide to restore that channel?

MR. VALENTINE: Objection, Your Honor.

THE COURT: Overruled. I'll allow it. You may
answer.

THE WITNESS: No. They decided not to -- we have
decided not to restore it.

(ECF No. 19, PageID.72-73)

That is an important distinction for the reason that it is when the government incurs

costs for remedying (in *Phillips* "cleaning up") the results of a defendant's conduct,

investigation and assessment costs are recoverable as restitution.  As the court in *Phillips*

stated:

> [T]he costs of gathering evidence solely for a criminal investigation are not directly
> related to the crime. However, [*United States v.*] *Salcedo-Lopez* [907 F.2d 97 (9th Cir.
> 1990] recognizes that "when the government loses money as the direct result of an
> offense, it is as entitled to restitution as any other victim."  A site investigation to
> determine what damage the defendant's conduct caused and to design an appropriate
> cleanup plan is likely not a routine matter in all such criminal cases.  Rather, the
> Government incurs such expenses as a direct result of the offense, not as a direct
> result of the criminal prosecution. In such situations, "investigation costs are a . . .
> subset of cleanup costs" and recoverable to the same extent.

*United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004).

> *Phillips* was also cited by the Sixth Circuit in its *Sawyer* opinion.

> Likewise, in *Phillips*, the court found that the EPA's investigation costs, *a subset of its
> cleanup and remediation costs*, were recoverable under the restitution statutes, even
> though the polluted waters were on private property. 367 F.3d at 862-63; see also
> *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 315, 37 V.I. 579 (3d Cir. 1997)
> (affirming district court's award of restitution to the Coast Guard based on the costs
> *required to clean the environmental damage* caused by defendants' conduct).

*United States v. Sawyer*, 825 F.3d 287, 294 (6th Cir. 2016) (italics added)

The government pursued no cleanup or in this matter - no restoration of the channel to

Lake Michigan.  Such helicopter and NPS/Natural Resources/hydrologist costs could therefore not be a subset of either the costs of cleanup or restoration of the beach.  Restitution for these things should not be ordered.

The government argued that it was *foreseeable* that Andy Howard's conduct would occasion the government's activities for which it now seeks compensation.  It was simply not foreseeable.  Taking the facts as can be gleaned from the record in this case, even the light most favorable to the government, it is impossible to conclude that when Andy Howard (or anyone else) moved sand with a shovel or moved rocks in a channel of water rushing into Lake Michigan that a National Park Service hydrologist or a United States Coast Guard helicopter would become even remotely become involved.

As mentioned above, at the trial of this matter the government used evidence of the meeting of Park Service employees to decide what to do about the river's diversion and offered to the trial court the government's decision to do nothing about the diversion. Additionally, it is clear that the government used photographs taken from the Coast Guard helicopter to prove its case.  (See, *e.g.*, Government's Exhibit 4, entered upon the stipulation of the parties.)   Both of those things involved the investigation of this matter and proofs offered by the government at trial.  What the government did *not* do was to engage in anything resembling cleaning, repairing, reconstructing or remediating anything in connection with Mr. Howard's conduct or the offenses In this case.

Ordering the restitution claimed by the government was in error.

**RELIEF**

The Defendant-Appellant respectfully asks this Court to vacate that portion of his Judgment of Sentence imposing restitution and for all other just and proper relief appropriate in the premises.

**CERTIFICATE OF COMPLIANCE**

Anthony J. Valentine, certifies and states the following"

1.  That he is the attorney who prepared the Brief including this Certificate of Compliance.

2.  The Brief complies with the type-volume limitation.

3.  The undersigned relies on the word count of their word processing system used to prepare the Brief, using Arial 12 font.

4.  The word processing system counts the number of words in this Brief as 7679.


Dated: August 26, 2024                    */s/ Anthony J. Valentine*
                                          Anthony J. Valentine
                                          Attorney for Defendant-Appellant
                                              Andrew Blair Howard
                                          Ste. 227, 29 Pearl Street, N.W.
                                          Grand Rapids, MI 49503
                                          (616) 288-5410
                                          *tonyvalentinelaw@gmail.com*

24

## CERTIFICATE OF SERVICE

Anthony J. Valentine, Attorney at Law and counsel for Defendant-Appellant Andrew Blair Howard, pursuant to 28 U.S.C. § 1746 states that on this 26th day of August, 2024, he caused a copy of this document to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the United States District Court for the Western District of Michigan, and via U.S. Mail to any counsel not registered to receive electronic copies from this Court, by enclosing same in a sealed envelope with first-class postage fully prepaid, addressed to the above, and depositing said envelope and its contents in a receptacle for the U.S. Mail.

/s/*Anthony J. Valentine*
Anthony J. Valentine
Attorney for Defendant-Appellant
    Andrew Blair Howard
Ste. 227, 29 Pearl Street, N.W.
Grand Rapids, MI 49503
(616) 288-5410
*tonyvalentinelaw@gmail.com*